Receipt Number
544323

# UNTIED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

OPERATION KING'S DREAM, KWAME M.
KILPATRICK, LOCALS 207 and 312 of the AMERICAN
FEDERATION OF STATE COUNTY, AND
MUNICIPAL EMPLOYEES (AFSCME),
SAMANTHA CANTY, BELITA H. COWAN,
MARTHA CUNEO, LINDA DEE McDONALD,
MICHELLE McFARLIN, PEARLINE McRAE,
and, SARAH SMITH,

Plaintiffs,

-vs-

WARD CONNERLY, JENNIFER
GRATZ, and the MICHIGAN CIVIL
RIGHTS INITIATIVE, and TERRI LYNN LAND,
in her official capacity as Secretary of State;
KATHRYN DEGROW, LYNN BANKES,
AND DOYLE O'CONNOR, in their official capacities as
members of the state Board of Canvassers; and
CHRISTOPHER THOMAS, in his official capacity as
State Director of Elections,

Defendants.

_____/

Case: 2:06-cv-12773
Assigned To: Tarnow, Arthur J
Referral Judge: Whalen, R. Steven
Filed: 06-22-2006 At 10:45 AM
CMP OPERATION KINGS DREAM, ET AL VS
CONNERLY, ET AL (LE)

Case No.

Hon.

GEORGE B. WASHINGTON (P-26201)
SHANTA DRIVER (P-65007)
SCHEFF & WASHINGTON, P.C.
Attorney for Plaintiffs
645 Griswold—Ste 1817
Detroit, MI  48226
(313) 963-1921

SHARON M. McPHAIL (P-26922)
Attorney for Kwame Kilpatrick
11th floor
Coleman A. Young Building
Detroit, MI 48226
313-628-4243

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Pursuant to the Federal Rules of Civil Procedure, the plaintiffs, by and through

their attorneys, Scheff & Washington, P.C., state as follows:

**INTRODUCTION**

1.      The purpose of the Voting Rights Act of 1965 was to give black people, Latinos, and other minorities a full and equal say in American democracy.

2.      Eliminating "white primaries" and all forms of racial discrimination in securing access to the ballot are crucial components of the protections of the Voting Rights Act.

3.      In direct violation of the letter and purpose of the Voting Rights Act, the defendants Connerly, Gratz and the Michigan Civil Rights Initiative attempted to gain access to the ballot by perpetrating systematic racially-targeted voter fraud against black voters throughout the state of Michigan.  These defendants and their agents obtained signatures from 125,000 black and Latino voters by falsely telling them that the petition supported affirmative action.

4.      The sweeping character of this voter fraud is now a matter of public record —and growing public concern.

5.      If the falsely-named Michigan Civil Rights Initiative is allowed to go on the Michigan ballot in November on this basis, every black and Latino voter will be served notice that they have few voting rights that the laws of this land need respect.

6.      The plaintiffs are Operation King's Dream (a certified ballot question committee), Kwame M. Kilpatrick (as a citizen of the City of Detroit), AFSCME Local 207 (the largest public workers' union in Detroit) and AFSCME Local 312 (Detroit's bus mechanics), and black and Latino citizens registered to vote in the State of Michigan who were themselves victims of the voter fraud perpetrated by defendants.

2

7.     The Michigan Civil Rights Commission, a Constitutionally-empowered, bipartisan governmental body, held a six-month investigation into the voter fraud committed by the defendants that culminated in a scathing 1000 page report (the summary of which is attached as Exhibit 1) detailing the voter fraud, its racially targeted character, its geographic reach, and the manner and duration of its execution. The Commission held a series of press conferences around the state to announce its findings: "This report presents evidence of shameful acts of deception and misrepresentation by paid agents of the Michigan Civil Rights Initiative (MCRI)."

8.     The report is unequivocal and it is now fully public. It reads in part: "MCRI's efforts to change the Constitution of the state of Michigan *rest on a foundation of fraud*...[D]eliberate and orchestrated fraud committed by circulators...*targeted African American citizens on a statewide basis*...[The evidence paints] a disturbing picture of deception and misrepresentation...". (Ex 1, our emphasis.)

9.     The report also cites incidents of deception targeted at minority voters of particular significance, such as the name of the President of the Macomb County Branch of the NAACP, Ruthie Stevenson, being used by MCRI circulators claiming she supported the ballot petition, doing so repeatedly, doing so to members of the NAACP and even doing so to her personally, not knowing to whom they were speaking.

10.    Defendants Ward Connerly, Jennifer Gratz and the Michigan Civil Rights Initiative (MCRI) engaged in a systematic campaign of racially-targeted fraud during their effort to secure signatures for their proposed Constitutional amendment, the deceptively named "Michigan Civil Rights Initiative." During the signature collection

3

process, paid agents of MCRI committed "shameful acts of deception" "targeted at African American citizens on a statewide basis" (Ex 1).

11.     The 1965 Voting Rights Act prohibits discrimination by private associations if their actions affect access to the ballot. The plaintiffs assert that Connerly, Gratz and the MCRI have violated Section 2 of the Voting Rights Act of 1965, 42 USC s 1973, by the systematic, racially-targeted fraud that they used to secure access to the ballot for their proposed initiative.

12.     Plaintiffs further assert that the defendant Secretary of State and individual members of the Board of Canvassers have abridged their right to vote on account of race and color in violation of Section 2 of the Voting Rights Act of 1965, 42 USC s 1973 by allowing the MCRI to gain access to the ballot by these means.

13.     The plaintiffs seek injunctive relief removing the Michigan Civil Rights Initiative from the November 2006 ballot and such damages, including attorneys' fees and costs, as are just and equitable.

**JURISDICTION AND VENUE**

14.     This Court has jurisdiction over this matter pursuant to 28 USC 1331 and 28 USC 1343(3).

15.     The United States District Court for the Eastern District of Michigan is a proper venue for this action as a substantial part of the events or omissions giving rise to this action occurred in the Eastern District of Michigan.

4

## PARTIES

16.    The plaintiff Operation King's Dream is a ballot question committee organized under Michigan law for the purpose of opposing the Michigan Civil Rights Initiative (MCRI) and any other attacks upon affirmative action.

17.    The plaintiff Kwame M. Kilpatrick is the Mayor of the City of Detroit and joins this action in his personal capacity as a citizen of the City of Detroit.

18.    The plaintiff AFSCME Local 207 is the largest union of Detroit city workers. An active, ardent and long-time base of support for affirmative action, approximately 140 members of Local 207 were deceived into signing the anti-affirmative action ballot petition.

19.    The plaintiff AFSMCE Local 312 represents the bus mechanics in the City of Detroit and has also been an active, ardent and long-time supporter of affirmative action.

20.    The plaintiffs Samantha Canty, Belita Cowan, Linda Dee McDonald, Michelle McFarlin and Pearline McRae are black voters who reside in the Eastern District of Michigan. The MCRI obtained their signatures on its petition to amend the Constitution by directly lying to them by saying that the petition supported affirmative action.

21.    The plaintiff Sarah Smith is a black voter who resides in the Western District of Michigan. The MCRI obtained her signature on its petition to amend the Constitution of the State of Michigan by directly lying to her by saying that the petition supported affirmative action.

22.     The plaintiff Martha Cuneo is a white voter who resides in the Eastern District of Michigan. The MCRI obtained her signature on its petition by directly lying to her and to her husband by claiming that its petition supported affirmative action.

23.     The defendant Ward Connerly is a citizen and resident of California, who is funding, supporting and leading the campaign to secure the adoption of the MCRI's proposed amendment to the Constitution of the State of Michigan.

24.     The defendant Jennifer Gratz is the Executive Director of the MCRI.

25.     The defendant MCRI is a ballot question committee organized under the laws of Michigan for the purpose of securing an amendment to the Constitution of the State of Michigan outlawing affirmative action based on race, gender, or national origin.

26.     The defendant Terri Lynn Land is the duly elected Secretary of State of the State of Michigan and is sued in her official capacity.

27.     The defendants Kathryn DeGrow, Lynn Bankes, and Doyle O'Connor are duly appointed members of the State Board of Canvassers, who are sued in their official capacities.

28.     The defendant Christopher Thomas is the duly appointed Director of Elections for the State of Michigan and is sued in his official capacity.

**29.**     The defendants Gratz, O'Connor, and Bankes are residents of the Eastern District of Michigan.

## STATEMENT OF FACTS

30.     The history of this ballot question is long and complicated. It began as a direct response to the US Supreme Court decision in *Grutter v Bollinger* in June 2003.

Since Connerly launched the MCRI's campaign, its aim has been to nullify the US Supreme Court's holding in *Grutter* and to eliminate affirmative action.

31.     Despite the fact that the purpose of the proposed amendment was to overrule *Grutter* and to ban race and gender-based affirmative action, neither the summary nor the text of the amendment stated that aim, claiming instead that they were civil rights initiatives designed to eliminate discrimination.

32.     From July through December 2004, the MCRI engaged in a systematic campaign of racially-targeted fraud and deception in order to obtain signatures on their ballot petition. MCRI circulators told black voters that the Constitutional amendment was *in support of affirmative action* when its actual aim is to *ban affirmative action* and nullify the US Supreme Court's *Grutter* ruling.

33.     Both the deceptive character of the proposal's title and its intentionally misleading language facilitated this racially-targeted deception.

34.     Virtually every one of the approximately 125,000 black Michigan voters who signed the ballot petition to ban affirmative action was deceived into signing it.

35.     On July 19, 2005, a bi-partisan majority of the state Board of Canvassers refused to certify the MCRI's proposed amendment for placement on the November 2006 ballot. From the beginning of the Board's review of MCRI's petitions, a bi-partisan majority of the Board has been for conducting an investigation into the allegation that the MCRI obtained its signatures by racially-targeted fraud — an allegation now roundly confirmed by the Michigan Civil Rights Commission report.

36.     The MCRI, however, sought and obtained a writ of mandamus from the Michigan Court of Appeals (Ex 3), declaring that the Board of Canvassers had no

authority to investigate the charges and directing the Board of Canvassers to place the proposed amendment on the ballot no matter how the MCRI obtained its signatures.

37.     The plaintiff Operation King's Dream filed an application for leave to appeal to the Michigan Supreme Court, which was denied without a ruling on the merits by an order dated March 29, 2006 (Ex 4).

38.     The plaintiff Operation King's Dream, supported by the Michigan Civil Rights Commission and others, timely filed a motion for reconsideration, asking the Supreme Court to reconsider its ruling on the basis of the findings of the Michigan Civil Rights Commission.

39.     As of this date, that motion for rehearing remains pending before the Michigan Supreme Court.

40.     By approximately September 1, 2006, federal law requires the State to finalize the ballot so that it can be sent overseas to those personnel in the United States military who have requested the right to vote in the November 2006 election.

**COUNT ONE**

**VIOLATION OF THE VOTING RIGHTS ACT
BY THE DEFENDANTS CONNERLY, GRATZ AND MCRI**

41.     The allegations of paragraphs one through 40 are repeated as if fully set forth herein.

42.     Section 2 of the Voting Rights Act of 1965, 29 USC 1973, prohibits any standards, procedures, or practices that have the purpose or the effect of abridging the right to vote on account of race or color.

8

43.     In repeated decisions, the United States Supreme Court has held that discrimination on account of race or color in the procedures by which access to the ballot is secured violates Section 2 of the Voting Rights Act.

44.     In repeated decisions invalidating white primaries, discriminatory rules for selecting delegates to party conventions, and similar actions, the United States Supreme Court has also repeatedly held that racial discrimination by private associations or organizations affecting ballot access violates the Voting Rights Act because that discrimination affects the choices that the state will offer on its ballot.

45.     In obtaining a place on the November 2006 general election ballot by means of systematic, widespread, and racially-targeted fraud, the defendants Connerly, Gratz and MCRI have violated Section 2 of the Voting Rights Act of 1965, 42 USC 1973.

46.     Unless restrained after appropriate hearing by this Court, the defendants Connerly, Gratz and MCRI threaten to cause irreparable harm to all citizens of Michigan by tainting the November ballot with voter fraud.

## COUNT TWO

### VIOLATION OF THE VOTING RIGHTS ACT
### BY DEFENDANTS LAND, DeGROW, BANKES, O'CONNOR AND THOMAS

47.     The allegations of paragraphs one through 46 are repeated as if fully set forth herein.

48.     The defendants Land and Thomas are legally charged with administering the November 2006 general election of the State of Michigan, including the preparation of the ballot for that election.

49.     The defendants DeGrow, Bankes, and O'Connor are charged with the duty of determining the candidates and propositions that qualify for the November 2006 general election ballot.

50.     The defendants Land, Thomas, DeGrow, Bankes and O'Connor have a duty to ensure that the elections of the State of Michigan, including the ballot used in those elections, is prepared in compliance with Section 2 of the Voting Rights Act of 1965.

51.     The defendant DeGrow, however, has voted to place the MCRI's proposed amendment on the ballot without investigating whether it obtained its signatures by means that violated the Voting Rights Act of 1965.

52.     Acting under orders of the Michigan Court of Appeals, the defendants Bankes and O'Connor have been forced to place the MCRI's proposed amendment on the ballot even though they have declared that the State should investigate whether the MCRI obtained its signatures by means that include racially-targeted fraud.

53.     Acting under orders of the Michigan Court of Appeals, the defendants Land and Thomas are now forced to prepare ballots including the MCRI's proposed amendment without the option of investigating whether it obtained its signatures by means that include racially-targeted fraud.

54.     In placing the MCRI's proposed amendment on the November 2006 general election ballot without any investigation as to whether it obtained its signatures by means that violated Section 2 of the Voting Rights Act of 1965, the defendants Land, Thomas, DeGrow, Bankes and O'Connor, acting in their official capacities, have violated, or been forced to violate, Section 2 of the Voting Rights Act of 1965.

55.     Unless restrained after appropriate hearing by this Court, the defendants'

violations threaten to cause irreparable harm to all citizens of Michigan by tainting the

November ballot with racially-targeted voter fraud.

### PRAYER FOR RELIEF

Wherefore, the plaintiffs request that this Court, after an appropriate hearing,

grant a preliminary and final injunction restraining the defendants from placing the

MCRI's proposed amendment on the November 2006 general election ballot.  The

plaintiffs further request that this Court expedite the time for answering this Complaint

and for discovery and, grant the plaintiffs attorneys' fees and costs and such further relief

as is just and equitable.

> By Plaintiffs' Attorneys,
> SCHEFF & WASHINGTON, P.C.
>
> BY: _____
> George B. Washington (P-26201)
> Shanta Driver (P-65007)
> 645 Griswold    Ste 1817
> Detroit, Michigan 48226
> (313) 963-1921
> (313) 407-4865
>
> BY: _____
> Sharon McPhail (P-26201)
> Attorney for Kwame Kilpatrick
> 11th Floor
> Coleman A. Young Building
> Detroit, Michigan 48226
> (313) 628-4243

Dated: June 22, 2006



State of Michigan
### MICHIGAN CIVIL RIGHTS COMMISSION

JENNIFER M. GRANHOLM
GOVERNOR

MARK BERNSTEIN, J.D.
MOHAMMED ABDRABBOH, J.D.
ALBERT CALILLE, J.D.
DR. TARUN K. SHARMA
KELVIN W. SCOTT, J.D.
MATTHEW WESAW
KAREN HENRY STOKES

June 7, 2006

Michigan Hall of Justice
925 West Ottawa Street
Lansing, Michigan  48913

Dear Justices of the Michigan Supreme Court:

This report presents evidence of shameful acts of deception and misrepresentation by paid agents of the Michigan Civil Rights Initiative ("MCRI").

The Michigan Civil Rights Commission conducted public hearings in Detroit, Flint, Lansing and Grand Rapids where scores of citizens testified, under oath, about allegations of voter fraud perpetrated by petition circulators working on behalf of the MCRI. Over five hundred affidavits alleging voter fraud were also submitted during the hearing process.

We are grateful to these honest, concerned citizens for their courage to come forward on this matter of grave concern.

We consider these citizens and their testimony credible, and, therefore, the conduct of MCRI reprehensible.

The Commission was born during our national awakening to the necessity of protecting voting rights. Indeed, there is nothing more central or sacred to the mission of the Commission than an individual's voting rights.

Since 1964, Michigan has benefited from the wisdom of voters who overwhelmingly supported the first state constitution establishing a civil rights commission in the United States. The Elliot-Larsen Civil Rights Act, passed in 1976, is extraordinary in explicitly encouraging our Commission to adopt a broad jurisdictional vision.

In conducting these hearings about the alleged fraud of MCRI proponents, the Commission lived up to its responsibilities. By submitting this report, we are simply doing our job.

Two notable and distressing truths emerge from the hundreds of pages of testimony included in the report. First, the instances of misrepresentation regarding the content of the MCRI ballot language are not isolated or random. Acts of misrepresentation occurred across the state, in multiple locations



Ex 1

are not isolated or random. Acts of misrepresentation occurred across the state, in multiple locations in the same communities, and over long periods of time. Second, the impact of these acts of deception is substantial. It appears that the acts documented in the report represent a highly coordinated, systematic strategy involving many circulators and, most importantly, thousands of voters.

The events at issue in this report arise in the gap between the responsibilities attendant upon citizenship in a democracy. The responsibility of voters to read and understand the content of ballot language when signing a circulator's petition. And the responsibility of MCRI and its agents to be truthful. Does a voter's failure to live up to his or her responsibility give license to the fraudulent acts of a circulator? All fair-minded citizens know the answer to this question.

These serious grievances go to the core of our democracy and violate the very constitution that this honorable court is sworn to uphold. It is not enough for this court to say that it is against injustice. It must work to secure justice. Just as our commission has done its duty, so, too, must this court.

If the Secretary of State lacks jurisdiction and the Board of Canvassers has been restricted from exercising authority by the courts, then where do aggrieved citizens turn for relief? Surely it cannot be this court's intent to rule out any relief for victims of this fraud. To do so would put Michigan voters at the mercy of predatory special interest groups operating without consequence or accountability.

Forty years ago, the great theologian and civil rights activist, Rabbi Abraham Joshua Heschel spoke about responsibility: "In a free society, some are guilty, but all are responsible." Today, this truth applies to this profoundly important matter.

We live in a time of increasing cynicism about issues of public interest. This distrust flows less from the content of public policy than from the conduct of those who attempt to influence policy. In this case, the conduct of MCRI and its agents add fuel to this destructive fire.

We strongly urge this honorable Court to consider this report and the disturbing testimony contained herein during its deliberation.

Sincerely yours,

Mark Bernstein
Chairperson, Michigan Civil Rights
Commission

Mohammed Abdrabboh
Vice Chairperson, Michigan Civil Rights
Commission

Attachments

# Report of the Michigan Civil Rights Commission
# Regarding the Use of Fraud and Deception
# In the Collection of Signatures
# For the Michigan Civil Rights Initiative Ballot Petition

## Background of the Case

This report is written to document the results of the Michigan Civil Rights Commission (MCRC) efforts over a five month period from January to June 2006, to investigate allegations of voter fraud perpetrated by the Michigan Civil Rights Initiative (MCRI) and its agents.

The investigation focused on the conduct that took place in the gathering of signatures for the Michigan Civil Rights Initiative. Specifically, these allegations involve acts of deception and misrepresentation in the signature gathering process.

On June 27, 2003, the United States Supreme Court upheld the use of affirmative action[1] by the University of Michigan in *Grutter v Bollinger,* 539 U.S. 306, 288 F.3d 732 (2003). Shortly thereafter, the MCRI initiated a ballot petition drive in support of an initiative to nullify this landmark civil rights decision. The MCRI seeks to amend the Michigan Constitution to prohibit the use of affirmative action in public employment, public education, and public contracting on the basis of race, sex, color, ethnicity or national origin.

From the very beginning, the language on the ballot has been a matter of contention. In 2003, the Board of State Canvassers approved the ballot language and form. The circuit court, however, held that the form did not comply with State elections law. The Michigan Court of Appeals reversed the circuit court order in *Coalition to Defend Affirmative Action & Integration v Board of State Canvassers,* 262 Mich App 395; 686 NW2d 287 (2004). Instead of continuing to circulate petitions to place the issue on the ballot for the 2004 election MCRI began to circulate new petitions, with identical language, to place the issue on the 2006 ballot.

On January 6, 2005, MCRI submitted 508,159 petition signatures for the November 2006 ballot. The number of valid signatures required was 317,757[2]. The State Board of Canvassers has neither approved nor rejected the language for the 2006 ballot initiative because the Board failed to reach a decision as to whether or not there was substantial

---

[1] The phrase affirmative action is used throughout the report and should be given its traditional meaning. *Black's Law Dictionary* defines affirmative action programs as positive steps designed to eliminate existing and continuing discrimination, to remedy lingering effects of past discrimination, and to create systems and procedures to prevent future discrimination; commonly based on population percentages of minority groups in a particular area. Factors considered are race, color, sex, creed and age.

[2] Michigan Department of State , Bureau of Elections, Staff Review of Initiative Petition, July 13, 2005 attached as exhibit a.

fraud involved in the gathering of the signatures on the petitions. While the matter was still pending before the Board the MCRI filed a petition of mandamus with the Michigan Court of Appeals. The MCRI alleged that the Board lacked the authority to investigate fraudulent gathering of petition signatures. In *Michigan Civil Rights Initiative v Board of State Canvassers,* 268 Mich App 506: 708 NW2d 139 (2005) the Court agreed with MCRI and issued an order of mandamus directing the Board to approve the petition for placement on the November 2006 ballot.

In an October 31, 2005, opinion the Court stated:

> The challengers and intervenors assert that the legislature, through Sec. 476(2), conferred broad authority on the Board to "hold hearings on *any* complaints filed or for any purpose considered necessary by the board to conduct investigations of the petitions." Yet, it is clear to us that the Legislature has only conferred upon the board the authority to canvass the petition "to ascertain if the petitions have been signed by the requisite number of qualified and registered electors. MCL 168.476(1) clearly indicates that this authority encompasses examining the validity of the signatures and the registration status of the elector whose signature appears on the ballot, and investigating any doubtful signatures. Moreover, it is also clear that the Legislature, through MCL 168.476(2), only conferred upon the Board the right to hold hearings, should a complaint be filed or for any purpose considered necessary "to conduct investigations of the petitions." We cannot construe Sec. 476(2) as a delegation of additional authority or as an expansion beyond the authority prescribed under Sec. 476(1). Here, the challengers and intervenors seek an investigation that goes beyond the four corners of the petition itself (i.e., the validity of the signatures or registration status of the electors) into the circumstances by which the signatures were obtained. Such an investigation is clearly beyond the scope of the Board's authority set forth under MCL 168.476. Because the Legislature failed to provide the Board with authority to investigate and determine whether fraudulent representations were made by the circulators of an initiative petition, we hold that the Board has no statutory authority to conduct such an investigation. Moreover, an attempt by the Board to go beyond its authority clearly outlined in the constitution and statute clearly undermines the constitutional provision that reserves for the people of the State of Michigan the power to propose laws through ballot initiatives.

On March 29, 2006, the Michigan Supreme Court denied application for leave to appeal thereby upholding the decision of the Court of Appeals. There is currently pending before the court a motion for reconsideration filed on April 18, 2006, by Operation King's Dream. It is on behalf of this pending motion for reconsideration of the March 29, 2006 Order denying application for leave to appeal that this report is being filed.

## Michigan Civil Rights Commission as an Interested Party

The Constitution of the State of Michigan reads:

2

Article I, Section 2 declarations of rights, equal protections, discrimination:

No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation.

Article V, Section 29 establishes a civil rights commission and addresses membership, duties, and appropriation. It reads:

It shall be the duty of the commission in a manner which may be prescribed by law to investigate alleged discrimination against any person because of religion, race, color or national origin in the enjoyment of the civil rights guaranteed by law and by this constitution, and to secure the equal protection of such civil rights without such discrimination. The legislature shall provide an annual appropriation for the effective operation of the commission.

Article 2 Sec. 209 and Sec. 210 of the Elliott-Larsen Civil Rights Act reads:

Sec 209. A contract to which the state, a political subdivision, or an agency thereof is a party shall contain a covenant by the contractor and his subcontractors not to discriminate against an employee or applicant for employment with respect to hire, tenure, terms, conditions, or privileges, of employment, or a matter directly or indirectly related to employment, because of race, color, religion, national origin, age, sex, height, weight, or marital status. Breach of this covenant may be regarded as a material breach of the contract.

Sec 210. A person subject to this article may adopt and carry out a plan to eliminate present effects of past discriminatory practices or assure equal opportunity with respect to religion, race, color, national origin, or sex if the plan is filed with the commission under rules of the commission and the commission approves the plan.

Article 7 of the Elliott Larsen Civil Rights Act at 37.2705 (1) reads:

This act shall not be construed as preventing the commission from securing civil rights guaranteed by law other than the civil rights set forth in this act.

The MCRC rules at 37.22 read:

The rules of the commission shall be available to the public, at offices of the department.

These rules shall be liberally construed to accomplish the purposes of the constitution and policies of the commission.

3

On November 13, 1978, the MCRC adopted a policy supporting the use of voluntary affirmative action programs. The policy was revised on October 18, 1999, and has not changed since that time.[3]

During the fall and winter of 2005 MCRC became aware of allegations that MCRI petition circulators targeted African American voters in their own communities. Citizens complained that circulators, who were African American, had misrepresented and misled signers into believing the amendment to be placed on the ballot was in favor of affirmative action. The testimony at the hearings confirmed that the areas in which signatures were gathered were not selected arbitrarily or haphazardly, but rather in deliberate and calculated manner. African American circulators, some of whom did not understand the ballot proposal, were sent into these areas and unsuspecting African American voters were lured into signing the petition. From the public hearing testimony, these citizens believe that the actual ballot proposal is inapposite and incongruous to their own personal and firmly held beliefs about civil rights and affirmative action.

When an issue such as the MCRI petition drive arises that may dramatically change the statutes that the MCRC and the Michigan Department of Civil Rights (MDCR) enforce, the MCRC and MDCR closely monitor the issue. This is especially true in the case of the MCRI because it impacts both the Elliott-Larsen Civil Rights Act and the way discrimination is defined under the Michigan Constitution.

Moreover, in following the media coverage of the MCRI ballot initiative it was clear that a substantial number of people were confused as to whether the initiative would protect the traditional use of affirmative action or eliminate the traditional use of affirmative action in public education, public employment and public contracting.

The Michigan Department of State Bureau of Elections recognized the confusion caused by the wording of this language.   On January 20, 2006, new language was proposed by the Board of Elections and approved by the State Board of Canvassers as the official ballot language. For the first time, the MCRI was identified as a proposal to ban affirmative action programs in public education, employment and contracting.

Christopher Thomas, Director of the Bureau of Elections indicated to the MDCR that the Bureau only has jurisdiction to investigate allegations of fraud in the actual voting process, and not in the gathering of petition signatures necessary to place an initiative on the ballot. Therefore, when the Michigan Court of Appeals ruled that the State Board of Canvassers did not have jurisdiction to investigate fraud in the gathering of petitions, the MCRC felt compelled to hear the testimony of concerned citizens.

---

[3] Copies of the Michigan Civil Rights Commission's policies are attached as exhibits b.

### The Public Hearings Process

The MCRC convened a public hearing in Detroit on January 11, 2006, to hear testimony of fraud.

Citizens traveled from across the state to provide testimony at the Detroit hearing. For example, Sammy Williams from Benton Harbor and several individuals from Flint traveled to Detroit to testify. After the second hearing, held in Flint, the public response to the hearings intensified, and the commission scheduled two additional hearings in Lansing and Grand Rapids.

The Commission sought inclusion of all views on this issue and invited MCRI to attend the hearings. The response from MCRI was to release a statement issued by Jennifer Gratz, Executive Director of MCRI. In the statement Ms. Gratz stated:

> Tonight MCRC will hold a hearing on baseless claims . . . and that MCRI highly
> doubts the MCRC is capable of conducting a fair and impartial hearing on this
> issue given its vocal and public opposition to our initiative.

Ms. Gratz also stated that the allegations of fraud in the circulation of petitions have been reviewed by the Bureau of Elections, the appropriate body to investigate election claims, and have been found to be without merit.[4]

These statements were incorrect at best, and intentionally misleading, at worst. Ms. Gratz and MCRI petitioned the court to restrict the Board of Canvassers from conducting a thorough review of the conduct of MCRI circulators. To date, the public hearings convened by MCRC and this report represent the only review of MCRI circulator conduct.

With the exception of public officials who attended to give welcoming remarks, all testimony was taken under oath and transcribed by Network Court Reporting Service. People of all ages provided testimony. This included students who testified about how their parents and relatives were deceived, union representatives who testified about the deception of their members, and senior citizens who spent their entire lives fighting against racism and supporting affirmative action who found that their names appeared on a ballot petition to eliminate affirmative action, without their knowledge.

The citizens who testified presented credible and compelling evidence about deliberate and orchestrated fraud committed by circulators. Although the testimony came from both African American and White citizens, it became clear to the MCRC that the conduct of the circulators was not limited to a small number of isolated incidents, but rather a strategy that targeted African American citizens on a statewide basis. The petition circulators frequently chose locations where it would be expected that a large number of supporters of affirmative action would congregate, such as churches and community

---

[4] MCRI Release, Jan. 6, 2006 Exhibit 5 of the Detroit Hearing transcript and exhibit c.

gatherings in African American neighborhoods. It was at these venues that African American circulators would ask voters to sign a petition to support affirmative action.

In order to have as much information as possible to assist the Court, and to have a fully informed Commission, the MCRC issued a Commission Order for MCRI to produce evidence. The requested evidence would assist MCRC in identifying circulators and their managers, and to determine what they were told about how to gather petitions and what they actually were telling voters who signed the petition.[5] MCRI refused to comply with the narrowly tailored order that was issued under the authority of the MCRC as codified in the Michigan Constitution, the Elliott-Larsen Civil Rights Act and the Rules of the MCRC.[6] Without the information requested in the MCRC Order and without the voluntary cooperation of MCRI to answer questions and concerns about the petition gathering process the MCRC cannot make an educated analysis of who is actually at the root of the fraud that has occurred.

### Testimony at Public Hearings

Three groups or themes emerged from the public hearing testimony.

The first and primary group consists of citizens who claim to have personally been victims of fraud and deceit. These citizens signed the ballot petition under the belief that they were signing a petition in support of continuing affirmative action. This group also includes circulators who voluntarily testified about their role in these specific deceptive events. Some of these witnesses testified that they were prevented or not given the opportunity to read the petition before signing. Others stated that they did not take the time to read the petition because they believed the comments made by the circulator. These comments included representations that they were signing a document to support the minimum wage, a document to support affirmative action and/or a document to protect civil rights. A complete record of witness testimony is set forth in the attached transcripts.

The second group included citizens who offered anecdotal or observational testimony about friends and/or relatives who signed the MCRI petition under the belief that they were signing a petition to support affirmative action. This group also consisted of citizens who were approached by circulators, but who did not personally sign the petition because they were previously aware of its true purpose or because they read the petition and understood it to be an anti- affirmative action petition.

The third group included citizens who were neither directly or indirectly involved in the petition signing process, but who voiced outrage that in their view, such reprehensible conduct occurred and that no action was taken to void the petitions or to punish the organizers of the petition drive.

---

[5] MCRC Order attached as exhibit d.
[6] MCRI May 30, 2006, response to MCRC Order attached as exhibit e.

The purpose of the hearings was to focus on conduct in the gathering of petition signatures. When a person in this third group began their testimony, the Commission felt obligated to allow that person a short period of time to voice their concern. These comments were not invited by the Commission. Although these citizens presented no direct evidence, they expressed the anger, frustration, shame, embarrassment, and outrage experienced as a result of the conduct of the MCRI petition gatherers.

## Testimony in Detroit

The first public hearing was held at Cadillac Place in Detroit on January 11, 2006. Approximately 450 concerned citizens attended this hearing; a number well over the venue seating capacity.

Ruthie Stevenson, President of the Macomb County Chapter of the NAACP, testified that she was approached outside the Mt. Clemens Post Office by an MCRI circulator. She was asked to sign a petition about affirmative action and was told by the circulator that Ruthie Stevenson supported the petition. Ms. Stevenson stated that she told the circulator, "I'm Ruthie Stevenson, and I'm not in support of this divisive initiative," and the circulator walked away. Ruthie Stevenson also read an affidavit of Noah Felix who was also told by a circulator that Ruthie Stevenson supported the petition.

Six representatives from AFSCME Local 207 testified that they and other members of the Local were tricked, duped and misled into signing the MCRI petition. Local 207 represent the Detroit water and sewer treatment workers.

In addition to voters being given fraudulent information about the MCRI petition, Sammy Williams, an African-American circulator, testified that he was told the petition was for affirmative action. Williams further testified that if he had known it was to ban affirmative action he never would have signed or circulated it.

In addition to hearing testimony from 28 citizens in Detroit, the MCRC received 218 affidavits and documents signed by citizens who state they were misled or fraudulently induced to sign the ballot petition.

Of particular note are a letter written by Wayne County Circuit Court Judge Robert L. Ziolkowski and an affidavit signed by Genesee County Circuit Court Judge Archie L. Hayman.

Judge Ziolkowski stated that he was approached by a circulator to sign a pro-affirmative action petition while shopping at a pharmacy in Detroit. After signing the petition, he heard customers talking about the representations made by the circulator. Judge Ziolkowski confronted the circulator and verified that the circulator's representations were false. The circulator told Judge Ziolkowski that she was instructed to present the MCRI as a pro-affirmative action ballot proposal.

Judge Hayman's affidavit states that he was misled by a petition circulator to believe that the petition was a civil rights petition for affirmative action and other equal opportunity programs. Judge Hayman stated if he had been informed that the petition aims to eliminate or limit affirmative action and other equal opportunity programs, he never would have signed this petition.

The hearing in Detroit ended at 8:47 pm, with over 20 citizens still waiting to testify. During the hearing, MCRC Commissioner Kelvin Scott asked that a second hearing be scheduled in Flint to accommodate people who were unable to give testimony due to time constraints.

## Testimony in Flint

A second hearing before the MCRC was held on February 8, 2006, at the Mott Center on the University of Michigan Flint Campus. Approximately 200 citizens were present.

The Commission received sworn testimony from 31 citizens and received 106 affidavits from citizens concerned about their experience with MCRI petition circulators.

The MCRC heard repeated testimony that petition circulators represented the proposed constitutional amendment for which they were soliciting signatures as being "in support of affirmative action" and civil rights. As former Flint Mayor Woodrow Stanley stated, "I don't remember the exact words, but I know the pitch was not, 'Do you want to sign a petition to get rid of affirmative action?' That is not what was said on any of the three occasions when I had an opportunity to encounter circulators."

Ms. Kathleen Butler stated that when she asked the circulator if this petition was for affirmative action, the circulator answered "Yes." She stated, "I'm very upset that I was duped into signing this petition. I feel like I was lied to, deliberately lied to. I never, ever would sign a petition like this."[7]

Ms. Kim Peterson stated that a petition circulator told them that the petition was against discrimination and "for affirmative action." She read the proposed amendment and determined this was not at all "for" affirmation action and she did not sign the petition.

James Edwards, Fred Anthony, and William Allen each stated that a petition circulator had told them that the petition was against discrimination and "for affirmative action."

Another woman, Ms. Heather Miller, brought affidavits from five circulators who affirmed that they did not realize that they were circulating a petition that was against affirmative action.

Reverend Willie Hill stated that he was told by a circulator that the petition was to keep affirmative action. It was reported that petitioners also told signers that the amendment

---

[7] MCRC February 8, 2006, Flint Hearing Transcript pg. 16

would help their children get into college, or that it would help the petitioner go to college.

Ms. Deidre Belton stated that she believes circulators who were incompetent and unable to question or comprehend the nature of the proposal on the petition, were intentionally recruited by MCRI so that they would disingenuously mislead potential signers.

Others commented about the fact that so many signatures were obtained in urban communities with largely African American residents. About one-quarter of the total number of signatures gathered by MCRI are likely from African American individuals. It was felt that these communities were targeted by MCRI who hired African American circulators, suggesting to them that the petition drive would ensure civil rights. In turn the African American circulators, motivated by money, unwittingly persuaded fellow African Americans to sign a petition for an amendment that they would not have knowingly supported.

Kathryn Blake testified about how a black female circulator at the Flint African American festival tricked a substantial number of African Americans (including Katherine Williams the CEO and curator of the Museum of African Ancestry and Research Center) to sign the petition, saying it is for affirmative action.

The hearing ended at 9:00 pm by prior agreement with the venue. When the hearing ended, there were still over a dozen citizens who had requested to speak to the Commission, but due to time constraints could not be heard.


### Testimony in Lansing

The third hearing was conducted at Gier Park Community Center in Lansing, Michigan on May 8, 2006. Approximately 125 individuals attended.

In Lansing, testimony again revealed that citizens had been subjected to misleading statements and intentionally presented with misinformation by MCRI petition circulators.

At this hearing, a petition circulator, Reverend Nathaniel Smith, described the petitioner orientation that he attended. He stated that petitioners (about 35 to 40 African American persons) were told that this ballot proposal was about keeping and maintaining civil rights. He had no idea that he was circulating a petition against affirmative action until a citizen told him. He stated that he then read the proposal and was humiliated and embarrassed when he realized that he had gathered at least 500 signatures that would place this type of amendment on the ballot. He stopped gathering signatures. He stated that he believed hundreds of people had signed the petition under false pretenses.

A state representative from the Lansing area, Mr. Michael Murphy, declared that he and other state representatives had repeatedly heard from constituents that they had been tricked into signing the MCRI petition. These constituents had been told that successful

passage of the MCRI would strengthen fairness and equity and opportunity in the state. These citizens were unaware that they were signing a petition to place an amendment on the ballot that would end affirmative action programs within the state.

A 17 year old high school student from Detroit, Jevon Cochran, relayed how his grandfather, aunts and uncles were tricked into signing the MCRI petition. One of his aunts was approached at Wayne State University and given misinformation; she also signed the petition.

Shirley Schwartz, a citizen who strongly supports affirmative action, stated that she was at a University of Michigan function when an African American woman who was circulating the petition approached her. When she asked the circulator about the petition, she was told that it was for affirmative action. She believed that she and many others, who were waiting in line to sign the petition, were misled by the circulator.

Joyce Schon presented 31 affidavits from voters to the commission. She stated that these individuals saw their names on a website that identified MCRI petition signers. These people were visibly upset to discover that they had signed something that could lead to the end of affirmative action. All explained how the ballot language was misrepresented to them by the circulator.

Michigan State University Professor William Allen, the only MCRI supporter to testify at any of the four hearings, testified that he found the petition to be clearly understandable and not misleading.

Some citizens voiced concern regarding illegal procedures employed by MCRI circulators. For example, Ms. Debra Gomez stated that she signed a petition that was left on a table in her housing complex with no circulator present. This is contrary to the affidavit signed by the circulator that affirms he or she has observed the citizen signing the petition.

### Testimony in Grand Rapids

The fourth and final hearing was held in Grand Rapids at the Grand Rapids Public Schools Administrative Offices on May 22, 2006. The auditorium held 250 people and the seating was at capacity, including "standing room only." Others not able to get into the "packed" auditorium were watching on a monitor in the hallway outside of the auditorium.

Robert Womak, who hosts a radio talk show on WJNZ, 1140 AM, targeted to the African-American community, testified about allegations of fraud that he heard from callers when he read the names of Grand Rapids petition signers on his radio program.

One granddaughter called in and said her grandmother's name was on the petition but that she can't read or write, and seldom leaves the house. Others called in and said their

names were on petitions with old, invalid addresses. It is believed that these individuals would never have signed using these obsolete addresses.

Several voters in Grand Rapids including Deron Jackson and Tina Belbot testified that they signed the petition after being told it was a petition to raise the minimum wage.

Robert Davidson testified that he and his wife were registering voters in front of a store in Kalamazoo when he saw a ballot circulator who was mainly approaching only Black citizens and asking them if they wanted to sign a petition for affirmative action. Davidson testified that he knew the MCRI petition was going around and after telling a few people to read the petition before they signed it, the circulator subsequently got into his truck and drove off.

Lupe Ramos Montigny is a teacher, political and community activist and a self described product of affirmative action. Ms. Montigny stated she signed the petition without reading it because she was asked by an MCRI circulator if she wanted to protect affirmative action.

Rosie Smith testified that her name appeared on the signature list in support of MCRI. However, Ms. Smith said her name appeared as Rosie Lee Smith and she never uses Lee and only signs as Rosie L. Smith. She stated that she doesn't remember signing any petition in support of MCRI.

Edwina Cervantes stated that she was asked to sign a petition to increase the minimum wage and later found her name as an MCRI ballot proposal signature.

Dannee Mayhue stated that she never signs her middle name Dannee Sue Mayhue as it appeared on the ballot petition.

Quincy Watson testified that his friend was circulating the MCRI petition and insisted that it was to preserve affirmative action. Mr. Watson stated that he went with his friend to meet the individuals who were employing his friend as a circulator. It was a husband and wife team. Mr. Watson further stated that he asked these agents of MCRI to confirm that the petition was for affirmative action. They declined to do so. The friend was being paid $1.50 per signature.

### Summary

The MCRC approached the public hearing process in an objective, inclusive manner.

Every effort was made to obtain testimony from MCRI including the issuance of a valid, lawful, narrowly tailored Order to produce relevant information. The failure of MCRI to comply with the MCRC Order effectively precluded a complete assessment of these allegations.

The weight of the evidence received in the form of sworn testimony and affidavits offered by aggrieved citizens from across the state, paints a disturbing picture of deception and misrepresentation.

Hundreds of concerned citizens attended the four MCRC hearings. They did so in many cases after working all day and often driving long distances. The hearings were crowded and in some cases uncomfortable. Still, the people came and stayed to give and hear testimony, and to support their family, friends, and neighbors who also attended the hearings.

The results of MCRC hearings were not based on the actions of a few disgruntled opponents of MCRI who are putting forth baseless claims of fraud. At least two circuit court judges believed they were deceived into signing the petition, as does Hannah McKinney, the Mayor of Kalamazoo. Attorneys, educators and other professionals have also testified or signed affidavits as to how they were purposely tricked and deceived into signing the petition. The MCRC believes that the number of people who have come forward is just the tip of the iceberg. There is substantial credible testimony that MCRI's efforts to change the Constitution of the State of Michigan rest on a foundation of fraud and misrepresentation.

## Findings and Recommendations

The Commission, in light of the testimony obtained during the public hearing process, makes the following findings and recommendations:

➢ The instances of misrepresentation regarding the content of the MCRI ballot language are not random or isolated. These acts occurred across the state, in multiple locations in the same communities, and over long periods of time.

➢ The impact of the acts of misrepresentation is substantial. It appears that the acts documented in this report represent a highly coordinated, systematic strategy involving many circulators and, most importantly, thousands of voters.

➢ The events at issue in this report highlight the gap between two responsibilities: first, the responsibility of voters to read and understand the content of ballot language when signing a circulator's petition; second, the responsibility of MCRI and its agents to be truthful. A failure of the first responsibility should not permit abrogation of the second. The conduct of MCRI to avoid false and misleading statements is of paramount importance irrespective of all other events.

➢ In the absence of intervention by the Michigan Attorney General or an Order of the Michigan Supreme Court, victims of voter fraud perpetrated by MCRI and/or agents of MCRI in the gathering of ballot signatures lack relief or remedy. The Secretary of State Bureau of Elections lacks jurisdiction and the Michigan Board of Canvassers has been restricted, as a result of MCRI litigation, from investigating the conduct of circulators.

> The Michigan Attorney General enjoys the authority to conduct an investigation into voter fraud involving MCRI and/or agents of MCRI and should conduct such an investigation to preserve the integrity of Michigan's electoral process.
> The Michigan Supreme Court should reconsider and grant Leave to Appeal to Operation King's Dream in the matter of *Michigan Civil Rights Initiative v. Board of State Canvassers* 206 Mich App 506 (2005).
> The Michigan Supreme Court should exercise its jurisdiction in equity to address this matter as provided by the Constitution or by law. MCR 7.301(A) (7)
> The Michigan legislature should support strong preventative laws to prevent similar acts of misconduct in the future.

*G:\Commission\FINALREPORTvp-gg6-7-06.doc*

AUTO RECORDS CENTER



STATE OF MICHIGAN
TERRI LYNN LAND, SECRETARY OF STATE
DEPARTMENT OF STATE
LANSING

July 13, 2005

## STAFF REVIEW OF INITIATIVE PETITION

**SPONSOR:** Michigan Civil Rights Initiative Committee, P.O. Box 1398, Southgate, Michigan 48195

**DATE OF FILING:** January 6, 2005.

**NUMBER OF VALID SIGNATURES REQUIRED:** 317,757 signatures.

**TOTAL FILING:** 70,569 sheets containing 508,159 signatures.

### SIGNATURE SAMPLE

**NOT INCLUDED IN SAMPLE:** 364 sheets; 2,189 signatures.

|  | Sheets | Signatures |
|---|---|---|
| Circulator certificate defective: | 133 | 852 |
| County of circulation entry defective: | 108 | 158 |
| All signatures on sheet defective: | 10 | 9 |
| Signatures dated more than 180 days prior to filing: | 113 | 1,170 |
|  | 364 | 2,189 |

**INCLUDED IN SAMPLE:** 70,205 sheets containing 505,970 signatures.

**SAMPLE SIZE:** 500 signatures.

**SAMPLE RESULT:** 450 valid signatures; 50 invalid signatures.

Valid signatures
    Registered signers:

    450

Invalid signatures
    Facially defective signatures:
    Signatures determined invalid due to signer's registration status:

    12
    38

Total

    500

Exhibit a.

## ANALYSIS OF SAMPLE RESULT

- The signature validity standards employed by staff when sampling the petition were consistent with established law and current Board practices and polices; no new signature validity standards were employed.

- Forty-two (42) signatures identified in the challenge filed against the petition are among the 50 signatures determined invalid in the sample.

- The estimated number of valid signatures which appear on the petition as determined under the sampling process is 455,373. (See attached "Results from MCRI Petition.") Based on the standard procedures traditionally employed to sample petitions, the sample data demonstrates that the petition is sufficient.

## SUMMARY OF CHALLENGE DATA

The challenge is unique as it heavily relies on the alleged "misrepresentation of the petition" by petition circulators while collecting signatures from Michigan voters. Misrepresentation of a petition has not been presented to the Board as the critical issue associated with the sufficiency of an initiative petition. The staff report reaches no conclusions on the legal authority of the Board to consider misrepresentation as a basis for finding petition signatures invalid. The following summary is the result of an analysis of the challenge documents and is intended to advise the Board on the categories of challenges that would have to be accepted in order to determine the petition invalid. A more detailed analysis follows the summary

- A total of 325 signatures are identified in the challenge. After processing the challenge, staff identified 42 invalid signatures as referenced above and 88 challenges that are unacceptable. The reasons for determining the 88 challenges unacceptable are detailed in the accompanying documentation.

- The remaining 195 challenges involve issues related to the alleged "misrepresentation" of the petition and remain unresolved at this date.

- Had the sample revealed that the number of valid signatures was 297 or less, the petition would be insufficient. At least 153 of the 195 misrepresentation challenges would have to be accepted to render the petition insufficient.

- To reach the insufficiency threshold (i.e., an additional 153 invalid signatures) it would be necessary for the Board to determine invalid:

  - 3 signatures challenged on the basis of "misrepresentation" which are supported by a personalized statement;

2

- 32 signatures challenged on the basis of "misrepresentation" which are supported by a form statement executed by the signer;

- 10 signatures challenged on the basis of "misrepresentation" which are supported by a statement executed by the circulator;

- 36 signatures challenged on the basis of "misrepresentation" which are supported by a statement executed by a person who claims that he or she interviewed the signer by phone; and

- at least 72 signatures challenged by implication. The signatures challenged by implication are not supported by a statement executed by either the signer or the circulator. To reach 72 invalid signatures in this category, the Board must determine invalid:

  1) 38 signatures collected by circulators who *other signers* allege misrepresented the petition; and

  2) at least 34 signatures collected by circulators who are alleged to have misrepresented the petition according to persons who claim to have conducted phone interviews with *other signers* who interacted with the circulator.

- It merits observation that any determination that signatures challenged by "implication" are invalid would necessarily be premised on three assumptions 1) that the circulator misrepresented the petition to every signer he or she encountered 2) that every signer who interacted with the circulator did not understand the purpose of the petition and 3) that every individual who signed the petition at the request of the circulator would wish to have their signature determined invalid.

3

**KEY TO ACCOMPANYING CHALLENGE DOCUMENTATION AND "MISREPRESENTATION" CLAIMS**

|  | --- Challenge Status --- | | | |
| --- | --- | --- | --- | --- |
| **Categories** | **Unresolved** | **Rejected** | **Overlap** | **Total** |
| A – Alleged misrepresentation of petition | 68 | 7 | 1 | 76 |
| C – Alleged deception: circulator statements | 4 | 0 | 0 | 4 |
| D – Invalid date | 0 | 0 | 2 | 2 |
| F – Alleged forgery or fraud | 0 | 6 | 0 | 6 |
| H – Alleged invalid or nonexistent address | 0 | 1 | 1 | 2 |
| I – Alleged illegible or incomplete information | 0 | 3 | 1 | 4 |
| R – Registration status challenges | 0 | 30 | 13 | 43 |
| Z – Alleged circulator deception | 90 | 29 | 6 | 125 |
| Signatures subjected to multiple challenges | 33 | 12 | 18 | 63 |
|  | 195 | 88 | 42 | 325 |

**"MISREPRESENTATION" CLAIMS:** The signatures challenged on the basis of "misrepresentation" are reflected in the above chart as described below:

– In 3 instances, the voter drafted and executed a personalized statement which alleges misrepresentation (all 3 are included under category "A").

– In 32 instances, the voter executed a form statement supplied by the petition opponents which alleges misrepresentation (29 are included under category "A"; 3 are included under "Multiple" – the last category on the chart).

– In 10 instances, the circulator who collected the signature executed a statement which alleges misrepresentation (4 are included under category "C"; 6 are included under "Multiple" – the

4

last category on the chart. In 3 cases, the signers also executed form statements; in 1 case, a person who claims to have interviewed the signer by phone executed a statement).

– in 36 instances, someone who claims to have interviewed the signer by phone executed a statement which alleges that the petition was misrepresented to the signer (all 36 are included under category "A").

– In 114 instances, no statement was executed by the signer or the circulator. Instead, the signature was challenged because it was collected by a circulator alleged to have deceived other signers included in the sample (90 are included under category "Z"; 24 are included under "Multiple" – the last category on the chart). Of the 114 signatures challenged on this basis, 38 of the challenges are based on form statements executed by other signers; 73 of the challenges are based on statements executed by persons who claim to have interviewed other signers by phone; and 3 of the challenges are based on personalized statements executed by other signers.

# MICHIGAN CIVIL RIGHTS COMMISSION

## Proposed Policy Statement Regarding Affirmative Action Plans

Section 210 of the Elliott-Larsen Civil Rights Act, P.A. 453 of 1976 as amended states

*A person subject to this article may adopt and carry out a plan to eliminate present effects of past discriminatory practices or assure equal opportunity with respect to religion, race, color, national origin, or sex if the plan is filed with the commission under rules of the commission and commission approves the plan.*

Affirmative action plans which are carefully designed to overcome the pervasive current and past effects of discrimination are permissible by law

An affirmative action plan shall include

1. Reason for the underutilization of the racial or ethnic groups that identifies specific problematic employment practices, that caused the problem. The reason cannot be benign, nor solely to promote diversity

2. Identification of the current effect of past discrimination and a narrowly tailored remedy to overcome that effect.

3. Relatively short parameters for the duration of the plan.

4. Flexible measurements which do not unnecessarily trammel the rights of others

**The Commission will not consider for approval any affirmative action plan which lacks a factual predicate (demonstration of the present effects of past discrimination) or for which the time period for coverage has expired.**

**Adopted: October 18, 1999**

C:\MyFiles\WPwin\PositionStatements\PosStat.AffActPl.wpd

EM-8

Exhibit b

# VOLUNTARY AFFIRMATIVE ACTION PROGRAMS

Affirmative action is often necessary to eliminate segregated patterns in the work place.  The past systemic exclusion of minorities, women and handicappers from the work force has operated to deprive them of equal opportunities in gaining employment and obtaining advancement.

The effects of these employment practices cannot be eliminated merely by removing prejudicial attitudes from future personnel decisions.  Positive steps are required to enable minorities, women and handicappers to share in the benefits and rewards derived from meaningful employment.

Voluntary compliance is and always has been the preferred method of achieving equal employment opportunities for protected groups.  Affirmative action programs have generally been regarded as sound business practices.  Through the institution of such programs, the employer's exposure to costly civil rights litigation is reduced.  Through the implemention of such programs, employment decisions are based solely on job related criteria and produce better results.

Section 210 of the Elliott-Larsen Civil Rights Act and Section 208 of the Michigan Handicappers' Civil Rights Act provide employers with the opportunity to submit to the Commission affirmative action plans designed to "eliminate (the) present effects of past discriminatory practices or ensure equal opportunity with respect to religion, race, color, national origin, sex,... or handicap."  The Michigan Civil Rights Commission encourages employers, pursuant to these statutory provisions, to develop affirmative action plans, in accordance with Department guidelines, and submit these plans to our agency for approval.

ADOPTED: November 13, 1978

EM-3



Paid for with regulated funds by the

# Michigan Civil Rights Initiative Committee

PO Box 1398, Southgate, MI 48195   www.michigancivilrights.org   734-730-4842

Statement of Jennifer Gratz
Executive Director, Michigan Civil Rights Initiative

To the Michigan Civil Rights Commission:

The Michigan Civil Rights Initiative is dedicated to giving the people of Michigan the opportunity to end preferential treatment based on race, gender, ethnicity, or national origin by State or local governments, to that end, we believe that civil rights belong to everyone and are not the sole propriety of a single group or individual.

Last January, MCRI submitted more than half-a-million petition signatures asking voters to end racial and gender preferences in university admissions, state employment and government contracting. The Michigan Secretary of State has certified these petition signatures, and the Michigan Court of Appeals has ordered this initiative on the November ballot.

Tonight, the Michigan Civil Rights Commission will hold a hearing on the baseless claims put forward by a group whose very name indicates it will use any means necessary to accomplish its radical political agenda, including breaking the law and intimidating voters and state officials.

MCRI highly doubts that the Michigan Civil Rights Commission or the Department of Civil Rights is capable of conducting a fair and impartial public hearing on this issue given its vocal and public opposition to our initiative.

Nearly all of the allegations of "fraud" have been made by the group By Any Means Necessary, a group whose name – and pattern of behavior – makes clear its willingness to deceive, intimidate and break the law to advance it's agenda.

These allegations have been reviewed by the Bureau of Elections, the appropriate body to investigate elections claims, and have been found to be without merit.

MCRI cooperated completely with the Bureau of Elections when it reviewed BAMN's claims. For each and every allegation, we provided evidence showing how MCRI set the gold standard for following Michigan elections law in circulating its petitions. The Bureau of Elections has already determined these allegations did not merit further review or Investigation. And even today, state Elections Director Chris Thomas said of BAMN's allegations, "They just never made their case."

EXHIBIT

| STATE OF MICHIGAN<br>CIVIL RIGHTS COMMISSION | ORDER | |
|---|---|---|

Commission Address

110 W. Michigan Avenue, Suite 800

Lansing, MI 48913

Telephone

517-335-3165

**In the Name of the People of the State of Michigan.**

TO: Michigan Civil Rights Initiative, P O Box 1818, Southgate MI 48195

## YOU ARE ORDERED TO:

1. Produce the following items, in person or by mail, on or before the date, time. and place listed at Number 2. below:

   (1) Name, Address and Telephone Number of all Petition coordinators and copies of signature tally sheets

   (2) All material used to train, educate, suggest statements or responses by circulators to questions regarding MCRI and the petitions

   (3) List of all MCRI offices and paid employees

   (4) Name and address of all organizations that MCRI contracted with in connection with the efforts to gather signatures on the ballot petition.

   (5) All documents and materials provided to MCRI by any organization that MCRI contracted with in the effort to gather signatures on the ballot petition

   (6) All documents and materials provided by MCRI to any organization that MCRI contracted with in the effort to gather signatures on the ballot petition

2.

| Place | | |
|---|---|---|
| Michigan Civil Rights Commission<br>130 W. Michigan Avenue<br>Lansing, MI 48913 | | |
| | | Attention: George Wirth |
| Day | Date | Time |
| Tuesday | May 30, 2006 | 12:00 Noon |

**Failure to comply with this order may subject you to enforcement proceedings in the Circuit Court of the State of Michigan.**

Issued By _____

Mark Bernstein , Commission Chair

Date _____

Issued pursuant to Article V Sec. 29 of the Michigan Constitution, P.A. 453 of 1976, and rules of the Michigan Civil Rights Commission and Michigan Department of Civil Rights.

Exhibit 4



**MCRI**  Michigan Civil Rights Initiative Committee

www.michigancivilrights.org

*Affirmative Action was Never Meant to Include Racial Preferences*

5/30/06

MAY 30 2006

Michigan Civil Rights Commission
Attn: George Wirth
110 W. Michigan Ave.
Lansing, MI 48913

Mr. Wirth:

In accordance with Article 5 section 29 of the MI Constitution of 1963, the Commission is required to have court authorization when requesting records. If we receive a court order, we will comply with that court order.

Furthermore, we request you specify which law or statute you believe we are in violation of that would prompt you to request this information.

Sincerely,

Jennifer Gratz
Executive Director

Cc: Michigan Attorney General Mike Cox

Paid for with regulated funds by the Michigan Civil Rights Initiative Committee

# INITIATIVE PETITION
## AMENDMENT TO THE CONSTITUTION

A Proposal to amend the Michigan Constitution by adding a Section 25 to Article I that would: (1) prohibit the University of Michigan, Michigan State University, Wayne State University, and any other public college or university, community colleges, or school district from discriminating against, or granting preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting; (2) prohibit the State from discriminating against, or granting preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting; (3) define for purposes of this section "State" as including, but not necessarily limited to, the State itself, any city, county, public college or university, community college, school district, or other political subdivision or governmental instrumentality of or within the State of Michigan; (4) not apply to actions that must be taken to establish or maintain eligibility for any federal program, if ineligibility would result in a loss of federal funds; (5) not affect bona fide qualifications based on sex that are reasonably necessary to the normal operation of public employment, public education, or public contracting; (6) allow remedies as are now allowed by law; (7) be self-executing and its provisions severable; (8) act as effective date, (9) not invalidate any court order or consent decree that is in force as of the effective date. See reverse side of this petition for the full text of the proposal. This proposal is to be voted on at the November 2, 2004 General Election.

We, the undersigned qualified and registered electors, residents in the county of _____ State of Michigan, respectively petition for said amendment to the constitution.

**WARNING** – A person who knowingly signs this petition more than once, signs a name other than his or her own, signs when not a qualified and registered elector, or sets opposite his or her signature on a petition, a date other than the actual date the signature was affixed, is violating the provisions of the Michigan election law.

| INDICATE CITY OR TOWNSHIP IN WHICH REGISTERED TO VOTE | SIGNATURE | PRINTED NAME | STREET ADDRESS OR RURAL ROUTE | ZIP CODE | DATE OF SIGNING MONTH | DAY | YEAR |
|---|---|---|---|---|---|---|---|
| City of ☐ Township of ☐ | 1. | | | | | | |
| City of ☐ Township of ☐ | 2. | | | | | | |
| City of ☐ Township of ☐ | 3. | | | | | | |
| City of ☐ Township of ☐ | 4. | | | | | | |
| City of ☐ Township of ☐ | 5. | | | | | | |
| City of ☐ Township of ☐ | 6. | | | | | | |
| City of ☐ Township of ☐ | 7. | | | | | | |
| City of ☐ Township of ☐ | 8. | | | | | | |
| City of ☐ Township of ☐ | 9. | | | | | | |
| City of ☐ Township of ☐ | 10. | | | | | | |

## CERTIFICATE OF CIRCULATOR

I, the circulator of this petition, assert that I am qualified to circulate this petition, that each signature on this petition was signed in my presence, and that, to my best knowledge and belief, each signature is the genuine signature of the person purporting to sign the petition, the person signing the petition was at the time of signing a qualified registered elector of the city or township indicated preceding the signature, and the elector was qualified to sign the petition.

**WARNING** – A CIRCULATOR KNOWINGLY MAKING A FALSE STATEMENT IN THE ABOVE CERTIFICATE, A PERSON NOT A CIRCULATOR WHO SIGNS AS A CIRCULATOR, OR A PERSON WHO SIGNS A NAME OTHER THAN HIS OR HER OWN AS CIRCULATOR IS GUILTY OF A MISDEMEANOR.

## CIRCULATOR – Do not sign or date certificate until after circulating petition.

Complete Residence Address (Street and Number or Rural Route) _____

(City or Township Where Qualified to be Registered) _____

(Signature of Circulator) _____

(Printed Name of Circulator) _____

(Zip Code) _____   (Date) ___/___/___

Paid for with registered funds by
**The Michigan Civil Rights Initiative**
PO Box 1818, Southgate, MI 48195

www.MCRI2004.org   ◆   313-550-9000

Ex 2

# INITIATIVE PETITION

## AMENDMENT TO THE CONSTITUTION

A PROPOSAL TO AMEND THE CONSTITUTION TO PROHIBIT THE UNIVERSITY OF MICHIGAN AND OTHER STATE UNIVERSITIES, THE STATE, AND ALL OTHER STATE ENTITIES FROM DISCRIMINATING OR GRANTING PREFERENTIAL TREATMENT BASED ON RACE, SEX, COLOR, ETHNICITY, OR NATIONAL ORIGIN.

THE PROPOSAL WOULD AMEND THE STATE CONSTITUTION BY ADDING A SECTION 25 TO ARTICLE I.

### ARTICLE I, SECTION 25:

**Civil Rights.**

(1) The University of Michigan, Michigan State University, Wayne State University, and any other public college or university, community college, or school district shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.

(2) The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.

(3) For the purposes of this section "state" includes, but is not necessarily limited to, the state itself, any city, county, any public college, university, or community college, school district, or other political subdivision or governmental instrumentality of or within the State of Michigan not included in sub-section 1.

(4) This section does not prohibit action that must be taken to establish or maintain eligibility for any federal program, if ineligibility would result in a loss of federal funds to the state.

(5) Nothing in this section shall be interpreted as prohibiting bona fide qualifications based on sex that are reasonably necessary to the normal operation of public employment, public education, or public contracting.

(6) The remedies available for violations of this section shall be the same, regardless of the injured party's race, sex, color, ethnicity, or national origin, as are otherwise available for violations of Michigan anti-discrimination law.

(7) This section shall be self-executing. If any part or parts of this section are found to be in conflict with the United States Constitution or federal law, the section shall be implemented to the maximum extent that the United States Constitution and federal law permit. Any provision held invalid shall be severable from the remaining portions of this section.

(8) This section applies only to action taken after the effective date of this section.

(9) This section does not invalidate any court order or consent decree that is in force as of the effective date of this section.

Westlaw Attached Printing Summary Report for WASHINGTON,GEORG 5310597

| | |
|---|---|
| Your Search: | "MICHIGAN CIVIL RIGHTS INITIATIVE" |
| Date/Time of Request: | Wednesday, June 21, 2006 22:09:00 Central |
| Client Identifier: | OKD |
| Database: | MI-CS |
| Citation Text: | 708 N.W.2d 139 |
| Lines: | 475 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.


Westlaw.

708 N.W.2d 139
268 Mich.App. 506, 708 N.W.2d 139
**(Cite as: 268 Mich.App. 506, 708 N.W.2d 139)**

**H**

Court of Appeals of Michigan.
**MICHIGAN CIVIL RIGHTS INITIATIVE**, Plaintiff,
v.
BOARD OF STATE CANVASSERS, Defendant,
and
Carl Williams, Hassan Aleem, and Percy Harris, Jr., Intervenors,
and
Operation King's Dream, Exie Chester-Griffin, Roosevelt T. Briston, Lillian A.
Cummings, Nicole McCoy, Alicia Rose Spencer, Cheryl Thompson, Leslie Atzmon,
Monica Smith, Maricruz Lopez, Kate Stenvig, Liana Mulholland, Alishia Steward,
Joseph Johnson, Johnathan Crutcher, Turquoise Wise-King, Deneshea Richey, Ivan
Adams, Rhiannon Chester, and Curtis Ray, Intervenors.
**Docket No. 264204.**


Submitted Oct. 28, 2004, at Troy.
Decided Oct. 31, 2005, at 9:00 a.m.
Released for Publication Jan. 6, 2006.

**Background:** Challengers sought mandamus relief regarding Board of State Canvassers' approval of form of initiative petition, for placement on 2004 election ballot, to amend the Michigan Constitution to add a provision prohibiting race or sex discrimination or preferences in public employment, public education, and public contracting. The Circuit Court, Ingham County, Paula J. Manderfield, J., granted mandamus relief in part. Cross-appeals were taken. The Court of Appeals, 262 Mich.App. 395, 686 N.W.2d 287, affirmed in part, reversed in part, and remanded. Initiative proponents did not attempt to place the initiative petition on ballot for 2004 election, and instead circulated new initiative petitions, with identical language, for placement on ballot at 2006 general election. The Board of State Canvassers failed to reach consensus regarding allegations that signatures for initiative petitions were procured fraudulently. Initiative proponents sought mandamus relief.


**Holding:** The Court of Appeals held that the Board of State Canvassers lacked statutory authority to investigate whether fraudulent representations were made by circulators in order to obtain signatures for initiative petition.
Relief granted.


West Headnotes

**Ex 3**

**[1] Mandamus ⬤‒‒‒187.9(1)**
250k187.9(1) Most Cited Cases
Whether the defendant had a clear legal duty to perform and whether the plaintiff had a clear legal right to the performance of that duty are questions of law that the Court of Appeals reviews de novo, on a petition for writ of mandamus.

**[2] Mandamus ⬤‒‒‒1**
250k1 Most Cited Cases
To obtain a writ of mandamus, the plaintiff must show that: (1) the plaintiff has a clear legal right to the performance of the duty sought to be compelled; (2) the defendant has a clear legal duty to perform; (3) the act is ministerial in nature; and (4) the plaintiff has no other adequate legal or equitable remedy.

**[3] Mandamus ⬤‒‒‒74(1)**
250k74(1) Most Cited Cases
Proponents of initiative to amend State Constitution to add a provision prohibiting race or sex discrimination or preferences in public employment, public education, and public contracting had clear legal right to performance of the duty sought to be compelled, as element for mandamus relief, relating to Board of State Canvassers' failure to issue an official declaration regarding the sufficiency of the initiative petition. M.C.L.A. §§ 168.476, 168.477.

**[4] Mandamus ⬤‒‒‒3(4)**
250k3(4) Most Cited Cases

**[4] Mandamus ⬤‒‒‒3(9)**
250k3(9) Most Cited Cases
Proponents of initiative to amend State Constitution to add a provision prohibiting race or sex discrimination or preferences in public employment, public education, and public contracting lacked another adequate legal or equitable remedy, as element for mandamus relief, relating to Board of State Canvassers' failure to issue an official declaration regarding the sufficiency of the initiative petition. M.C.L.A. §§ 168.476, 168.477.

**[5] Elections ⬤‒‒‒258**
144k258 Most Cited Cases
Any authority the Board of State Canvassers has is vested by the Legislature, in statutes, or by the Constitution. M.C.L.A. Const. Art. 2, § 7; M.C.L.A. § 168.476(1).

**[6] Constitutional Law ⬤‒‒‒9(.5)**
92k9(.5) Most Cited Cases
Board of State Canvassers lacked statutory authority to investigate whether fraudulent representations were made by circulators in order to obtain signatures for initiative petition to amend State Constitution to add a provision prohibiting race or sex discrimination or preferences in public employment, public education, and public contracting. M.C.L.A. Const. Art.
2, § 7; M.C.L.A. § 168.476(1, 2).
**140 Stephen J. Safranek, Ann Arbor, for **Michigan Civil Rights Initiative.**

Michael A. Cox, Attorney General, Thomas L. Casey, Solicitor General, and Heather S. Meingast and Patrick O'Brien, Assistant Attorneys General, for the Board of State Canvassers.

Carl Williams, Detroit, in propria persona.

Hassan Aleem, Detroit, in propria persona.

Percy Harris, Jr., Royal Oak, in propria persona.

Scheff & Washington, P.C. (by Miranda K.S. Massie, Shanta Driver, and George B. Washington), Detroit, for Operation King's Dream and others.

Before: SAAD, P.J., and CAVANAGH and JANSEN, JJ.

PER CURIAM.

### *508 I. Nature of the Case

The **Michigan Civil Rights Initiative** (MCRI) complaint for mandamus asks this Court to direct the Board of State Canvassers to certify initiative petitions for placement on the November 2006 ballot. MCRI needed 317,757 signatures to qualify for the ballot and obtained and submitted 508,202 signatures. In 2003, the identical petitions in issue were approved by the board for form and language. But, thereafter, the circuit court held that the form did not comply with MCL 168.482(3). On appeal, a panel of our Court expedited the appeal, held that the circuit court erred, reversed the circuit court's order, found that the form of the petition complied with the statute, and directed the board to reinstate its earlier approval. Rather than attempt to place the petition on the ballot for the 2004 election, MCRI instead circulated new petitions, with identical language, for placement on the November 2006 ballot. The board has neither approved nor rejected the current petitions because the board failed to reach consensus regarding the recent allegations that the signatures were procured fraudulently. The board failed to reach agreement on whether the board has the authority to investigate these challenges. MCRI says the board lacks the authority to investigate these allegations, and, because we **141 agree, we hereby grant the petition for *509 mandamus and contemporaneous with this opinion issue an order for mandamus.

### II. Facts and Proceedings

The initiative petition in issue seeks to amend the Michigan Constitution by adding a new § 25 to Article 1, and, as stated above, was the subject of a prior appeal in this Court, *Coalition to Defend Affirmative Action & Integration v. Bd. of State Canvassers*, 262 Mich.App. 395, 686 N.W.2d 287 (2004). The proposed amendment provides:

ARTICLE 1, SECTION 25:

Civil Rights.

(1) The University of Michigan, Michigan State University, Wayne State University, and any other public college or university, community college, or school district shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education or public contracting.

(2) The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.

(3) For the purposes of this section "state" includes, but is not necessarily limited to, the state itself, any city, county, any public college, university, or community college, school district, or other political subdivision or governmental instrumentality of or within the State of Michigan not included in sub-section 1.

(4) This section does not prohibit action that must be taken to establish or maintain eligibility for any federal program, if ineligibility would result in a loss of federal funds to the state.

*510 (5) Nothing in this section shall be interpreted as prohibiting bona fide qualifications based on sex that are reasonably necessary to the normal operation of public employment, public education, or public contracting.

(6) The remedies available for violations of this section shall be the same, regardless of the injured party's race, sex, color, ethnicity, or national origin, as are otherwise available for violations of Michigan's anti-discrimination law.

(7) This section shall be self-executing. If any part or parts of this section are found to be in conflict with the United States Constitution or federal law, the section shall be implemented to the maximum extent that the United States Constitution and federal law permit. Any provision held invalid shall be severable from the remaining portions of this section.

(8) This section applies only to action taken after the effective date of this section.

(9) This section does not invalidate any court order or consent decree that is in force as of the effective date of this section. [*Coalition to Defend Affirmative Action, supra* at 398-399, 686 N.W.2d 287.]

After MCRI filed the petition in 2003, the board conducted a public hearing on December 11, 2003, to determine whether the form of the petition met the requirements of the Michigan Election Law, MCL 168.1 *et seq.* Two organizations, the Coalition to Defend Affirmative Action & Integration and Fight for Equality by Any Means Necessary (BAMN) and the Citizens for a United Michigan (CFUM), opposed the petition and claimed that the proposed language of the petition violated MCL 168.482(3), which requires that a petition state whether it **142 would alter or abrogate an existing provision of the Constitution and include the text of the constitutional provision that would be changed or eliminated by the proposal. These organizations also objected to the inclusion, content, and placement of summaries *511 of the proposal on the petition. After the hearing, the board voted to approve the

petition. *Coalition to Defend Affirmative Action, supra* at 399-400, 686 N.W.2d 287. BAMN and CFUM filed separate actions for mandamus against the board in the Ingham Circuit Court, again challenging the form of the petition. After ruling that the petition form failed to conform to MCL 168.482(3), the circuit court granted an order of mandamus, directing the board to rescind its approval. *Coalition to Defend Affirmative Action, supra* at 400, 686 N.W.2d 287. The board then filed claims of appeal from both cases, and in turn, this Court expedited the appeal, and issued a published opinion that reversed the circuit court's ruling that the petition did not comply with MCL 168.482(3). *Coalition to Defend Affirmative Action, supra* at 401-404, 686 N.W.2d 287. Specifically, this Court held that the proposed amendment did not "add to, delete from or change the existing wording of" Article 1, § 2, because the current language of that provision was unaffected by the amendment and the amendment did not render the provision "wholly inoperative." *Coalition to Defend Affirmative Action, supra* at 402, 686 N.W.2d 287. Accordingly, this Court ruled that the circuit court erred in granting mandamus relief and directed the board to reinstate its approval of the form of the petition. *Id.* at 407, 686 N.W.2d 287.

Apparently because of timing issues, MCRI chose not to pursue reinstatement of the petition for placement on the ballot in 2004, but, instead, circulated new petitions for placement of the proposal on the November 2006 general election ballot. On January 6, 2005, MCRI filed approximately 508,202 signatures in support of its initiative petition. The Secretary of State staff reviewed the petition, which included a random sampling of 500 signatures.

**\*512** On April 18, 2005, two groups, Operation King's Dream (OKD) and BAMN filed a challenge to the MCRI petition. The challengers accepted the 500 signatures as representative and conducted their own review. They claimed that a significant number of the sampled signatures were procured by MCRI circulators through fraud. Among other claims, the challengers maintained that the petition language was deceptive and that the petition drive was funded by out-of-state interests, which were not properly reported under the Campaign Finance Act, MCL 169.201 *et seq.* MCRI filed a response to the challenge and pointed out that it submitted 508,202 signatures, whereas in order to qualify for the ballot only 317,757 valid signatures were needed, and that the petition itself fairly revealed its nature and purpose and was available to be read by any signer of the petition.

On July 13, 2005, the staff review report was issued, which examined the 500 sampled signatures, and found 450 valid signatures and 50 invalid signatures. The report noted that the 50 signatures were discounted because they were facially defective or were rejected on the basis of the signer's registration status, and that although 42 of the 50 invalid signatures were also identified in the challenge, these signatures were not rejected on the basis of the challenge. The report further concluded that the petition was sufficient under the standard procedures traditionally employed to sample petitions.

The board conducted a lengthy hearing on July 19, 2005, at which time the challengers **\*\*143** and their witnesses and MCRI and its witnesses made their presentations. Upon conclusion of these presentations, one board member moved that the board, with the assistance of the Bureau of Elections, conduct an investigation **\*513** into the allegations of fraud and "doubtful signatures" on the basis of the board's authority to conduct any hearing upon any complaint pursuant to MCL 168.476(2). The board split on a vote of two to two, and the motion did not pass. Another board member moved to certify the petition, which also did not pass on a vote of one to two, with one abstention. Various other motions also did not reach a majority consensus.

As a result, MCRI filed its complaint for mandamus and sought a directive from this Court to the board to certify the petition for placement on the November 2006 ballot. MCRI says that the board has a clear legal duty under Michigan law to certify petitions meeting the statutory requirements, and that a writ of mandamus should issue. MCRI further contends that the Constitution and law do not allow the board to vote against certification on the basis of allegations of misrepresentation and that the board has ignored its legal duties and acted outside the scope of its authority.

In its answer to the complaint, the board acknowledges that it has a duty to issue an official declaration regarding the sufficiency of MCRI's petition pursuant to MCL 168.476 and 168.477, and contends that it attempted to fulfill its legal duty by listening to testimony, considering the arguments presented to it, and voting on various motions regarding the petition. Because there is a disagreement among the board members with respect to whether their duties include investigating the claims of fraudulent misrepresentations presented by the challengers, the board requests this Court's guidance in order to fulfill its statutory duty.

Furthermore, two motions to intervene were filed in this matter, which were granted in the accompanying order. In their answer to the complaint, the OKD **\*514** intervenors argue that in order for the board to discharge its duty to

canvass the validity of the signatures, the Legislature conferred upon the board broad authority to hold hearings upon any complaints filed or for any purpose considered necessary by the board to conduct investigations of the petitions, under MCL 168.476(2). The OKD intervenors further contend that this Court should deny the complaint for mandamus and remand this matter to the board with instructions that the board may investigate whether MCRI in fact obtained signatures by means of fraud.

### III. Legal Analysis

[1] This Court clearly has jurisdiction to review the complaint for mandamus filed by MCRI. See *Citizens for Protection of Marriage v. Bd. of State Canvassers*, 263 Mich.App. 487, 688 N.W.2d 538 (2004), and *Deleeuw v. Bd. of State Canvassers*, 263 Mich.App. 497, 688 N.W.2d 847 (2004). Whether the defendant had a clear legal duty to perform and whether the plaintiff had a clear legal right to the performance of that duty are questions of law that this Court reviews de novo. *Citizens for Protection of Marriage, supra* at 491-492, 688 N.W.2d 538.

[2][3][4] " 'To obtain a writ of mandamus, the plaintiff must show that: (1) the plaintiff has a clear legal right to the performance of the duty sought to be compelled, (2) the defendant has a clear legal duty to perform, (3) the act is ministerial in nature, and (4) the plaintiff has no other adequate legal or equitable remedy.' " *Deleeuw, supra* at 500, 688 N.W.2d 847, quoting **144*White-Bey v. Dep't Of Corrections*, 239 Mich.App. 221, 223-224, 608 N.W.2d 833 (1999), citing *In re MCI Telecom. Complaint*, 460 Mich. 396, 443, 596 N.W.2d 164 (1999). Here, there is no dispute that MCRI has a clear legal right to the performance of the duty sought to be compelled and that MCRI has no *515 other adequate remedy at law, because the board has failed to certify or reject the petitions. In deciding whether mandamus relief is appropriate, this Court must resolve whether the board has a duty to conduct an investigation into the allegations of fraud asserted by the challengers.

[5] The Board of State Canvassers is a constitutional board created by Const. 1963, art. 2, § 7. Any authority the board has is vested by the Legislature, in statutes, or by the Constitution. *Citizens for Protection of Marriage, supra* at 492, 688 N.W.2d 538. The Michigan Constitution, Const. 1963, art. 12, § 2, provides in part:

Amendments may be proposed to this constitution by petition of the registered electors of this state. Every petition shall include the full text of the proposed amendment, and be signed by registered electors of the state equal in number to at least 10 percent of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected. Such petitions shall be filed with the person authorized by law to receive the same at least 120 days before the election at which the proposed amendment is to be voted upon. Any such petition shall be in the form, and shall be signed and circulated in such manner, as prescribed by law. The person authorized by law to receive such petition shall upon its receipt determine, as provided by law, the validity and sufficiency of the signatures on the petition, and make an official announcement thereof at least 60 days prior to the election at which the proposed amendment is to be voted upon.

The board's authority and duties with regard to canvassing petitions is set forth under MCL 168.476(1), which provides, in relevant part:

Upon receiving notification of the filing of the petitions, the board of state canvassers shall canvass the petitions to ascertain if the petitions have been signed by the requisite number of qualified and registered electors. The qualified voter file may be used to determine the validity of petition *516 signatures by verifying the validity of signers. If the qualified voter file indicates that, on the date the elector signed the petition, the elector was not registered to vote, there is a rebuttable presumption that the signature is invalid. If the qualified voter file indicates that, on the date the elector signed the petition, the elector was not registered to vote in the city or township designated on the petition, there is a rebuttable presumption that the signature is invalid. The board may cause any doubtful signatures to be checked against the registration records by the clerk of any political subdivision in which the petitions were circulated, to determine the authenticity of the signatures or to verify the registrations. Upon request, the clerk of any political subdivision shall cooperate fully with the board in determining the validity of doubtful signatures by rechecking the signature against registration records in an expeditious and proper manner.[ [FN1]]

FN1. Although none of the parties has quoted the current version of MCL 168.476(1), which was recently amended by 2005 PA 71, which was approved and filed on July 14, 2005, to take immediate effect, the slight modifications made by that act would not affect the arguments raised by the parties. We quote the current, effective version.

**145 This Court has stated that the board's duty is limited to determining whether the form of the petition substantially complies with the statutory requirements and whether there are sufficient signatures to warrant

certification of the proposal. *Citizens for Protection of Marriage, supra* at 492, 688 N.W.2d 538, citing *Ferency v. Secretary of State,* 409 Mich. 569, 297 N.W.2d 544 (1980); *Council About Parochiaid v. Secretary of State,* 403 Mich. 396, 270 N.W.2d 1 (1978); *Leininger v. Secretary of State,* 316 Mich. 644, 26 N.W.2d 348 (1947).

In *Citizens for Protection of Marriage* this Court examined the scope of the board's duties in the context of an initiative petition to recognize that the union of one man and one woman in marriage shall be the only agreement recognized as a marriage for any purpose. *517 The Secretary of State estimated that there were 462,243 valid signatures on the petition and the number of valid signatures required was 317,757. However, two members of the board declined to certify the petition on the basis that the proposal was unlawful and unconstitutional. As a result, the ballot proponents filed a complaint for mandamus relief in this Court and sought immediate relief because the proponents wanted the proposal placed on the November 2004 ballot. *Id.* at 489-491, 688 N.W.2d 538. This Court issued an order and opinion that granted an order of mandamus because the board breached its clear legal duty to certify the petition where the petition was in the proper form and had sufficient signatures. *Id.* at 492-493, 688 N.W.2d 538. In doing so, this Court further held that the board erred in considering the merits of the proposal because it did not have authority to consider the lawfulness of the proposal. [FN2] *Id.* at 493, 688 N.W.2d 538.

FN2. This Court also ruled that the constitutionality of the proposal was not ripe for review. *Citizens for Protection of Marriage, supra* at 493, 688 N.W.2d 538.

In *Deleeuw* this Court also examined the board's duties regarding qualifying petitions under MCL 168.552(8), which is similar to MCL 168.476(1). The board could not reach a majority decision on several motions, including certification, regarding a petition to nominate Ralph Nader as an independent candidate for the office of the President of the United States for the November 2004 election. The signatures for the petition were collected by members and officials of the Republican Party, and the Michigan Democratic Party Chairman filed a challenge to the petition, asserting, among other things, that Nader's qualifying petition could not include the signatures filed by Nick Deleeuw because under MCL 168.590, the candidate must file the petition, and that a substantial number of the signatures *518 had been obtained in violation of Michigan election law. *Deleeuw, supra* at 499-500, 688 N.W.2d 847. After the plaintiffs filed a complaint for mandamus, this Court issued an order and opinion and granted the complaint for mandamus. Noting there was nothing in MCL 168.552(8) that would permit the board to look behind the signatures to determine the motives of the individual signatories or the motives or desires of the candidate, this Court stated:

Under MCL 168.552(8), challenges to the sufficiency of the petition are limited to "questioning the registration or the genuineness of the signature of the circulator or of a person signing a ... petition filed with the secretary of state...." The board had no authority to consider any issues other than those identified in MCL 168.552(8). The challenge to the petition failed to establish that there were not at least thirty thousand **146 valid signatures filed in support of Nader's candidacy, and, in fact, the board never disputed the genuineness of the signatures or the registration status of the people who signed the petitions. Rather, the challenge alleged various violations of election law, a subject that is not within the scope of the board's review. See MCL 168.31 (requiring the Secretary of State to report election fraud to the Attorney General or prosecutor) and MCL 168.943 (conferring on circuit courts jurisdiction over offenses committed under the act). [*Deleeuw, supra* at 501, 688 N.W.2d 847.]

As a result, this Court held that the board breached its clear legal duty to certify the petition because the challenge to the petition failed to establish that there were not at least 30,000 valid signatures filed in support. *Id.* at 501-502, 688 N.W.2d 847.

[6] Here, OKD and two board members contend that the board's authority to conduct an investigation into the allegations of fraud is drawn from subsection 2 of MCL 168.476, which provides:

*519 The board of state canvassers may hold hearings upon any complaints filed or for any purpose considered necessary by the board to conduct investigations of the petitions. To conduct a hearing, the board may issue subpoenas and administer oaths. The board may also adjourn from time to time awaiting receipt of returns from investigations that are being made or for other necessary purposes, but shall complete the canvass at least 2 months before the election at which the proposal is to be submitted.

The challengers and intervenors assert that the Legislature, through § 476(2), conferred broad authority on the board to "hold hearings upon *any* complaints filed or *for any purpose considered necessary by the board to conduct investigations of the petitions.*" (Emphasis added.) Yet, it is clear to us that the Legislature has only conferred upon the Board the authority to canvass the petition "to ascertain if the petitions have been signed by the requisite number of qualified and registered electors." MCL 168.476(1). MCL 168.476(1) clearly indicates that this authority encompasses examining the validity of the signatures and the registration status of each elector whose signature appears on the petition and investigating any doubtful signatures. Moreover, it is also clear that the Legislature, through MCL

http://web2.westlaw.com/print/printstream.aspx?util=%2F40234...

168.476(2), only conferred upon the board the right to hold hearings, should a complaint be filed or for any purpose considered necessary "to conduct investigations of the petitions." We cannot construe § 476(2) as a delegation of additional authority or as an expansion beyond the authority prescribed under § 476(1). Here, the challengers and intervenors seek an investigation that goes beyond the four corners of the petition itself (i.e., the validity of the signatures or registration status of the electors) into the circumstances by which the signatures were obtained. Such an investigation is clearly beyond the scope of the board's authority set **520 forth under MCL 168.476(1). Because the Legislature failed to provide the board with authority to investigate and determine whether fraudulent representations were made by the circulators of an initiative petition, we hold that the board has no statutory authority to conduct such an investigation. Moreover, an attempt by the board to go beyond its authority as clearly outlined in the Constitution and statutes undermines the constitutional provision that reserves for the people of the state of Michigan the power to propose laws through ballot initiatives. [FN3]

> FN3. Const. 1963, art. 2, § 9 provides, "The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted by the legislature, called the referendum...."

**147 Because there is no dispute that the form of the petition is proper or that there are sufficient signatures, we conclude that the board is obligated to certify the petition, and thus, breached its clear legal duty to certify the petition. [FN4] Accordingly, we remand to the Board of State Canvassers with directions to approve the petition for placement on the November 2006 ballot. Along with the release of this opinion, we issue an order of mandamus. We retain jurisdiction.

> FN4. The OKD intervenors also contend that the petition failed to comply with MCL 168.482(3). Yet, they acknowledge that this Court previously rejected this argument in *Coalition to Defend Affirmative Action, supra* at 395, 686 N.W.2d 287. Therefore, we will not address this argument any further.

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw Attached Printing Summary Report for WASHINGTON,GEORG 5310597

| | |
|---|---|
| Your Search: | "MICHIGAN CIVIL RIGHTS INITIATIVE" |
| Date/Time of Request: | Wednesday, June 21, 2006 22:08:00 Central |
| Client Identifier: | OKD |
| Database: | MI-CS |
| Citation Text: | 711 N.W.2d 81 |
| Lines: | 28 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

711 N.W.2d 81
474 Mich. 1099, 711 N.W.2d 81
**(Cite as: 474 Mich. 1099, 711 N.W.2d 81)**

**H**

Supreme Court of Michigan.
**MICHIGAN CIVIL RIGHTS INITIATIVE, Plaintiff-Appellee,**
v.
BOARD OF STATE CANVASSERS, Defendant-Appellee,
and
Carl Williams, Hassan Aleem, and Percy Harris, Jr., Intervenors-Appellants,
and
Operation King's Dream, Exie Chestergriffin, Roosevelt T. Briston, Lillian A.
Cummings, Nicole McCoy, Alicia Rose Spencer, Cheryl Thompson, Leslie Atzmon,
Monica Smith, Maricruz Lopez, Kate Stenvig, Liana Mulholland, Alishia Steward,
Joseph Johnson, Johnathan Crutcher, Turquoise Wise-King, Deneshea Richey, Ivan
Adams, Rhiannon Chester, and Curtis Ray, Intervenors-Appellees.
**Docket Nos. 130344 & (119)(133)(134).**
**COA No. 264204.**

March 29, 2006.

On order of the Court, the application for leave to appeal the October 31, 2005 judgment of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court. The motion for stay and the miscellaneous motions are DENIED.

KELLY, J., would grant leave to appeal.

474 Mich. 1099, 711 N.W.2d 81

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Ex 4

IN WHICH ACTION AROSE ___Wayne___

(2/84)

## CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS
OPERATION KING'S DREAM, KWAME M. KILPATRICK,
MACOMB COUNTY CHAPTER, NAACP, LOCAL 207,
AFSCME, SAMANTHA CANTY, BELITA H. COWAN,
MARTHA CUNEO, LINDA DEE McDONALD, MICHELLE
McFARLIN, PEARLINE McRAE, and SARAH SMITH

### DEFENDANTS
WARD CONNERLY, JENNIFER GRATZ, MICHIGAN
CIVIL RIGHTS INITIATIVE, And TERRI LYNN
LAND, KATHRYN DeGROW, LYNN BANKS, and
DOYLE O'CONNOR

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Wayne
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

(C) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
George B. Washington        Sharon McPhail
Scheff & Washington, P.C.    Atty for Kilpatrick
645 Griswold – Suite 1817,   11th Floor
Detroit, Michigan 48226      Coleman Young Bldg
313-963-1921                 Detroit, MI 48226

ATTORNEYS (IF KNOWN)

Case: 2:06-cv-12773
Assigned To: Tarnow, Arthur J
Referral Judge: Whalen, R. Steven
Filed: 06-22-2006 At 10:45 AM
CMP OPERATION KINGS DREAM, ET AL VS
CONNERLY, ET AL (LE)

### II. BASIS OF JURISDICTION (PLACE AN X IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

This is an action under 42 USC 1973 for violation of the Voting Rights Act of 1965..

### V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury- Med Malpractice | ☐ 620 Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | ☐ 650 Airline Regs | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 660 Occupational Safety/Health | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 690 Other ( ) 625 Drug Related Seizure/Prop | ☐ 830 Patent ☐ 840 Trademark | ☐ 810 Selective Service ☐ 850 Securities/Commodities Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt Relations | ☐ 862 Black Lung (923) ☐ 863 DIWC (405(g)) | ☐ 892 Economic Stabilization Act ☐ 893 Environmental Matters |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 863 DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☒ 441 Voting | ☐ 510 Motions to Vacate Sentence 28 USC 2255 | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | ☐ 442 Employment | | | | |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Accommodations | ☐ 530 Habeas Corpus | ☐ 791 Empl Ret Inc Security Act | ☐ 870 Taxes | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | | ☐ 871 IRS Third Party 28 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | |
| ☐ 290 All Other Real Property | | ( ) 535 Habeas/Death | | | |

### VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

### VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND $
Injunctive relief

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☒ NO

### VIII. RELATED CASE(S) IF ANY    None

JUDGE                    DOCKET NUMBER

DATE
June 22, 2006

SIGNATURE OF ATTORNEY OF RECORD
George B. Washington

UNITED STATES DISTRICT COURT

## PURSUANT TO LOCAL COURT RULE 8 (b) (3) (i)

IS THIS A CASE THAT HAS BEEN PREVIOUSLY DISCONTINUED OR
DISMISSED WITHOUT PREJUDICE OR REMANDED TO A STATE COURT?          _____ YES  X No

(b) IF YES GIVE THE FOLLOWING INFORMATION:                          CASE NO: _____

    COURT _____                                      ASSIGNED JUDGE _____


## PURSUANT TO LOCAL COURT RULE 8 (b) (3) (ii)

(a) OTHER THAN STATED ABOVE, ARE THERE ANY PENDING OR PREVIOUSLY DIS-
CONTINUED OR DISMISSED COMPANION CASES (cases in which it appears sub-
stantially similar evidence will be offered at trial or the same or related parties are
present and the cases arise out of the same transaction or occurrence) IN THIS OR ANY
OTHER COURT, INCLUDING STATE COURT?          _____ YES  _____ NO

(b) IF YES GIVE THE FOLLOWING INFORMATION:                          CASE NO: _____

    COURT: _____                                     ASSIGNED JUDGE: _____