UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OPERATION KING'S DREAM, KWAME M.
KILPATRICK, LOCALS 207 AND 312 OF THE
AMERICAN FEDERATION OF STATE COUNTY,
AND MUNICIPAL EMPLOYEES (AFSCME),
SAMANTHA CANTY, BELITA H. COWAN,
MARTHA CUNEO, LINDA DEE MCDONALD,
MICHELLE MCFARLIN, PEARLINE MCRAE,
and SARAH SMITH,

Plaintiffs,

File No. 06-12773

v

HON. ARTHUR J. TARNOW

WARD CONNERLY, JENNIFER GRATZ,
and the MICHIGAN CIVIL RIGHTS INITIATIVE,
and TERRI LYNN LAND, in her official capacity
as Secretary of State; KATHRYN DEGROW, LYNN
BANKES, and DOYLE O'CONNOR, in their
official capacities as members of the state Board
of Canvassers; and CHRISTOPHER THOMAS,
in his official capacity as State Director of Elections,

Defendants.

| | |
|---|---|
| George B. Washington (P26201) | Sharon M. McPhail (P26922) |
| Shanta Driver (P65007) | Atty for Kwame Kilpatrick |
| SCHEFF & WASHINGTON, PC | General Counsel |
| Attorney for Plaintiffs | Coleman A. Young Building |
| 645 Griswold-Suite 1817 | 11th Floor |
| Detroit, MI 48226 | Detroit, MI 48226 |
| 313-963-1921 | 313-628-4243 |
| | |
| Patrick J. O'Brien (P27306) | James K. Fett (P39461) |
| Heather S. Meingast (P55439) | Lawrence A. Fields (P66084) |
| Assistant Attorneys General | Joshua R. Fields (P68559) |
| Attys for Defendants Land, Thomas, | Attys. for Defts Connerly, |
| DeGrow, Bankes & O'Connor | Gratz, and MCRI |
| PO Box 30736 | FETT & FIELDS, P.C. |
| 525 West Ottawa | 805 E. Main Street |
| Lansing, Michigan 48909 | Pinckney, MI 48169 |
| 517-373-6434 | 734-954-0100 |

**PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the plaintiffs move for a preliminary injunction restraining the defendants from placing the "Michigan Civil Rights Initiative" on the November 2006 general election ballot on the grounds that the proponents of that proposed amendment obtained the signatures in purported support of it by means of racially-targeted fraud, in violation of Section 2 of the Voting Rights Act of 1965, 42 USC 1973.

In support of this motion, the plaintiffs have attached a Brief and accompanying exhibits. The plaintiffs further request an expeditious hearing on this motion, as the State defendants will commence preparing and printing the ballots on or about September 1, 2006.

By Plaintiffs' Attorneys,
SCHEFF & WASHINGTON, P.C.

BY: _____
George B. Washington (P-26201)
Shanta Driver (P-65007)
645 Griswold—Ste 1817
Detroit, Michigan 48226
(313) 963-1921
(313) 407-4865

BY: _____
Sharon McPhail (P-26201)
Attorney for Kwame Kilpatrick
11th Floor
Coleman A. Young Building
Detroit, Michigan 48226
(313) 628-4243

Dated: July 17, 2006

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OPERATION KING'S DREAM, KWAME M.
KILPATRICK, LOCALS 207 AND 312 OF THE
AMERICAN FEDERATION OF STATE COUNTY,
AND MUNICIPAL EMPLOYEES (AFSCME),
SAMANTHA CANTY, BELITA H. COWAN,
MARTHA CUNEO, LINDA DEE MCDONALD,
MICHELLE MCFARLIN, PEARLINE MCRAE,
and SARAH SMITH,

      Plaintiffs,

             File No. 06-12773

   v

             HON. ARTHUR J. TARNOW

WARD CONNERLY, JENNIFER GRATZ,
and the MICHIGAN CIVIL RIGHTS INITIATIVE,
and TERRI LYNN LAND, in her official capacity
as Secretary of State; KATHRYN DEGROW, LYNN
BANKES, and DOYLE O'CONNOR, in their
official capacities as members of the state Board
of Canvassers; and CHRISTOPHER THOMAS,
in his official capacity as State Director of Elections,

      Defendants.
_____

| | |
|---|---|
| George B. Washington (P26201) | Sharon M. McPhail (P26922) |
| Shanta Driver (P65007) | Atty for Kwame Kilpatrick |
| SCHEFF & WASHINGTON, PC | General Counsel |
| Attorney for Plaintiffs | Coleman A. Young Building |
| 645 Griswold-Suite 1817 | 11th Floor |
| Detroit, MI  48226 | Detroit, MI  48226 |
| 313-963-1921 | 313-628-4243 |
| | |
| Patrick J. O'Brien (P27306) | James K. Fett (P39461) |
| Heather S. Meingast (P55439) | Lawrence A. Fields (P66084) |
| Assistant Attorneys General | Joshua R. Fields (P68559) |
| Attys for Defendants Land, Thomas, | Attys. for Defts Connerly, |
|    DeGrow, Bankes & O'Connor |    Gratz, and MCRI |
| PO Box 30736 | FETT & FIELDS, P.C. |
| 525 West Ottawa | 805 E. Main Street |
| Lansing, Michigan  48909 | Pinckney, MI 48169 |
| 517-373-6434 | 734-954-0100 |

_____

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR A
PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED                                           iv

CONTROLLING OR MOST APPROPRIATE AUTHORITIES                             v

INTRODUCTION                                                           1

STATEMENT OF FACTS                                                      4

    A.    The MCRI obtained its signatures by racially-targeted fraud.      4

    B.    The MCRI's circulators' description of the fraud they committed.   8

    C.    The impact of the MCRI's fraud.                                 12

    D.    The proceedings in state court.                                 14

ARGUMENT                                                               16

    I.    THE PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD
OF PREVAILING ON THEIR CLAIM THAT THE
DEFENDANTS VIOLATED SECTION 2 OF THE VOTING
RIGHTS ACT BY PLACING THE "MICHIGAN CIVIL
RIGHTS INITIATIVE" ON THE NOVEMBER 2006 BALLOT
ON THE BASIS OF SIGNATURES THAT WERE OBTAINED
BY RACIALLY-TARGETED FRAUD.                                            16

        A.    Section 2 of the Voting Rights Act broadly bans racial
discrimination in the standards that a State uses to
determine the choices that appear on the ballot.                       16

        B.    Section 2 of the Voting Rights Act bans discriminatory
actions by ostensibly private associations that affect the
choice of candidates on the ballot.                                    17

        C.    Section 2 of the Voting Rights Act applies to the
procedures by which propositions secure access to the
ballot.                                                                20

        D.    The plaintiffs have far more than a likelihood of success
on the merits in their claim against the MCRI and the
State defendants.                                                      24

    II.    THE COURT SHOULD GRANT A PRELIMINARY
INJUNCTION RESTRAINING THE DEFENDANTS FROM
PLACING THE MCRI'S PROPOSAL ON THE NOVEMBER
2006 GENERAL ELECTION BALLOT IN ORDER TO

PREVENT IRREPARABLE HARM TO THE PLAINTIFFS
AND TO THE PUBLIC.                                              26

CONCLUSION                                                     28

## STATEMENT OF ISSUES PRESENTED

### I

WHETHER THE  VOTING RIGHTS ACT OF 1965 PROHIBITS RACIALLY DISCRIMINATORY CONDUCT IN THE COLLECTION OF SIGNATURES THAT ARE REQUIRED BY STATE LAW FOR THE PLACEMENT OF A PROPOSITION TO AMEND THE CONSTITUTION OF THE STATE OF MICHIGAN ON THE 2006 GENERAL ELECTION BALLOT?

### II

WHETHER THE VOTING RIGHTS ACT OF 1965 PROHIBITS RACIALLY DISCRIMINATORY CONDUCT IN THE COLLECTION OF SIGNATURES BY THE MICHIGAN CIVIL RIGHTS INITIATIVE, AN OSTENSIBLY PRIVATE ASSOCIATION, WHERE THAT CONDUCT AFFECTS THE CHOICES THAT WILL APPEAR ON THE 2006 GENERAL ELECTION BALLOT?

### III

WHETHER THE VOTING RIGHTS ACT OF 1965 PERMITS STATE ELECTION AUTHORITIES TO IGNORE COMPLAINTS OF RACIAL DISCRIMINATION IN THE COLLECTION OF SIGNATURES BY AN OSTENSIBLY PRIVATE ASSOCIATION ENTRUSTED BY STATE LAW WITH THE COLLECTION OF SIGNATURES FOR A PROPOSITION THAT IT SEEKS TO PLACE ON THE 2006 GENERAL ELECTION BALLOT?

### IV

WHETHER THE PLAINTIFFS HAVE SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS AND THE OTHER PREREQUISITES FOR A PRELIMINARY INJUNCTION DIRECTING THE DEFENDANTS NOT TO PLACE THE PROPOSITION SPONSORED BY THE MICHIGAN CIVIL RIGHTS INITIATIVE ON THE 2006 GENERAL ELECTION BALLOT?

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

### ISSUE ONE

42 USC 1973

42 USC  1973l(c)(1)

*Allen v State Bd of Elections*, 393 US 544 (1969)

*Armstrong v Allain*, 893 F Supp 1320 (SD Miss 1994)

*Lucas v Townsend*, 908 F 2d 85, 858 (CA 11, 1990), *rev'd on other grounds sub nom Board of Public Educ and Orphanage for Bibb County v Lucas*, 501 US 1226 (1991).


### ISSUE TWO

*Smith v Allwright*, 321 US 649, 664 (1944)

*Terry v Adams*, 345 US 461 (1953)

*Morse v Republican Party of Virginia*, 517 US 186 (1996)


### ISSUE THREE

*Smith v Allwright*, 321 US 649, 664 (1944)

*Terry v Adams*, 345 US 461 (1953)

*Morse v Republican Party of Virginia*, 517 US 186 (1996)


### ISSUE FOUR

*Harris v Graddick*, 593 F Supp 128 (MD Ala, 1984)

*United States v Berks County, Pennsylvania*, 277 F supp 2d 570 (ED Pa, 2003)

*Dillard v Crenshaw County*, 640 F Supp 1347 (MD Ala, 1986)

*Arbor Hill Concerned Citizens Neighborhood Association v County of Albany*, 281 F Supp 2d 436 (ND NY, 2003).

# INTRODUCTION

By undaunted courage and dedication, the integrated, mass Civil Rights Movement led by Dr. Martin Luther King, Jr., won passage of the Voting Rights Act of 1965.

In historic, sweeping and powerful provisions, that Act banned any attempt, blatant or subtle, to deny or abridge the right to vote on account of race or color.

But the Congress that passed the Voting Rights Act recognized that much more than registering and voting was needed to ensure equality in voting.  Drawing on a century of bitter experience and decades of Supreme Court precedents, Congress banned discrimination in the caucuses, conventions and primaries that determined the choices that appeared on the ballot.  As Congress and the Court declared, the right to cast a ballot meant little if the choices on that ballot were determined by racial discrimination.

In this case, the plaintiffs, who are among Michigan's most prominent political leaders and who speak for the black communities in this case, ask this Court to apply those well-established principles to the process by which Michigan chooses the propositions that will appear on the November 2006 ballot.  In particular, the plaintiffs ask this Court to enjoin the defendant state election officials from placing the Michigan Civil Rights Initiative's proposal to ban affirmative action on the November 2006 ballot because the MCRI obtained the signatures in support of its petition by widespread, racially-targeted fraud.

That fraud is a matter of public record.  After an intensive, six-month investigation, the bipartisan, Constitutionally-created Michigan Civil Rights Commission concluded that the MCRI used "deliberate and orchestrated fraud…targeted [at] African-

1

American citizens on a statewide basis" (Ex 1, at 5).  In particular, the Commission found

that the MCRI waged a systematic, statewide campaign to obtain signatures from black

and Latino voters by hiring black circulators to tell them that the MCRI's deliberately

vague petition actually *supported* affirmative action (Ex 1, at 5-6).

The deception of black voters made it possible to deceive white voters on a large

scale.  A ballot petition, or any other project, calling itself a civil rights initiative that had

zero or virtually zero black support would meet with pronounced skepticism, suspicion,

or outright hostility from the overwhelming majority of white citizens.  For this reason,

the fraud against black voters was essential to securing support from white voters.  This

disproportionate authority of black people on questions of civil rights and voting rights is

the product of the leading role black people have played in securing these rights for all

Americans throughout our national history.  It is no coincidence and it is no small thing.

Without fraud targeted against black voters creating a fictitious appearance of black

support, defendants' entire project would have failed.

The MCRI defendants, supported by the defendant state election officials, are

attempting to tear a gaping hole in the protections afforded by the Voting Rights Act.

That Act aimed at and in fact achieved a vast increase in the representation of blacks and

other minorities in Congress, legislatures, the major political parties, and every public

office in the Nation.  That representation gave blacks and later other minorities the right

to assure at least minimal protection of their most basic rights.

In recent years, however, the MCRI and similar organizations have attempted to

repeal or sharply limit many of those basic protections.  But precisely because minorities

now have significant representation in public bodies, those organizations can not achieve

their aim by the normal methods of representative democracy.   Instead, they have been forced to revive the long-dormant referendum process, complete with high-priced campaigns playing on misinformation and prejudice.

In this case, the MCRI asks this Court to allow it to end run the protections of minority representation guaranteed by the Voting Rights Act.  They ask that this Court declare that the protections of the Act do not apply at all to referendums, or at least to the crucial phase when the MCRI and others seek to obtain the signatures needed to get their proposal on the ballot.  The MCRI asks this Court to declare that it is entitled to a place on the Michigan ballot *even if it obtained its signatures by racially-targeted fraud*.

Echoing the MCRI, the state defendants ask that they be allowed to rubber stamp the signatures so obtained, even if there is voluminous evidence of the racially-targeted fraud that was used to obtain them.

The defendants' assertions ignore the letter and the fundamental principles of the Act.  The defendants ask the Court to hold that the Act does not apply to referendums even though the Act *defines* "voting" to include the procedures by which ballots are cast on "…*propositions* for which votes are received in an election."  42 USC 1973l(c)(1) (emphasis added).  The defendants also ask the Court to hold that the Act does not apply to the procedures used to select a proposition for the ballot, even though the Supreme Court has long held that the Act prohibits discrimination in the caucuses, conventions and primaries that select the candidates who will appear on the ballot.

If adopted, the defendants' assertions lead to absurd results.  According to the defendants, the Voting Rights Act governs the procedures by which Governors, Attorneys General and Supreme Court Justices are nominated and elected--but it does not

3

govern the procedures by which changes are made in the Constitution that those officials are sworn to uphold.

The Voting Rights Act must be vigilantly protected if this Nation's continuing promise of a multi-racial and multi-national democracy is to be fulfilled. For that reason, and on the basis of the facts and law set forth below, the plaintiffs ask this Court to grant their request for a preliminary injunction restraining the defendants from placing the "Michigan Civil Rights Initiative" on the November ballot because the MCRI obtained the signatures needed for that placement by systematic, racially-targeted fraud.

## STATEMENT OF FACTS

A.    <u>The MCRI obtained its signatures by racially targeted fraud.</u>

The Michigan Civil Rights Commission concluded as follows:

> The citizens who testified presented credible and compelling evidence about deliberate and orchestrated fraud committed by [the MCRI's] circulators. Although the testimony came from both African American and white citizens, it became clear to the Michigan Civil Rights Commission that the conduct of the circulators was not limited to a small number of isolated incidents, but rather [was] a strategy that targeted African American citizens on a statewide basis. The petition circulators frequently chose locations where it would be expected that a large number of supporters of affirmative action would congregate, such as churches and community gatherings in African American neighborhoods. It was at these venues that African American circulators would ask voters to sign a petition to support affirmative action.
>
> (Ex 1, at 5-6).

The Commission's report continues:

> There is substantial credible testimony that MCRI's efforts to change the Constitution of the State of Michigan rest on a foundation of fraud and misrepresentation…..
>
> - The instances of misrepresentation regarding the content of the MCRI ballot language are not random or isolated. These acts occurred across the state, in multiple locations in the same communities and over long periods of time.

4

- The impact of the acts of misrepresentation is substantial. It appears that the acts documented in this report represent a highly coordinated, systematic strategy…

(Ex 1, at 12).

There is overwhelming evidence to support the Commission's findings.

In a letter sent to the plaintiffs' attorneys, the Honorable Robert Ziolkowski of the Wayne County Circuit Court provided a dramatic example of the fraud that the Commission found. As Judge Ziolkowski entered a CVS store on Jefferson Avenue in Detroit, an MCRI circulator asked him to sign a petition that she said *supported* affirmative action. Judge Ziolkowski did so. Inside the store, however, other patrons told the Judge that the petition actually opposed affirmative action. Judge Ziolkowski returned to the circulator and demanded that she remove his signature. Perhaps because he spoke with the authority of a judge, she did so. She then told the Judge that when she was hired, the MCRI told her to say that the petition supported affirmative action (Ex 4).

Judge Ziolkowski's story is the tip of the iceberg. At Eastland Mall, an MCRI circulator told Michael Mulholland, the Secretary-Treasurer of AFSCME Local 207, that he should sign the MCRI petition because it supported affirmative action (Ex 5). Heidi Osgood, a local reporter, heard another black MCRI circulator telling the same lie to numerous citizens at the Apollo Market in Detroit (Ex 6). Harry Campbell, a black member of the school board in the City of Grand Rapids, was induced to sign the petition by the MCRI circulator's claim that it would "keep affirmative action going" (Ex 7, Tr Grand Rapids, 12-15). [1]

---

[1] "Tr. Grand Rapids" refers to the hearing conducted before the Michigan Civil Rights Commission in Grand Rapids, Michigan on May 22, 2006. "Tr Detroit," "Tr Flint," and

The testimony of Ruthie Stevenson, a black citizen of Mt. Clemens, revealed the calculated nature of the MCRI's fraud.  She testified that she was approached by an MCRI circulator outside the post office in that city.  He asked her to sign the petition because it was for "civil rights" and "affirmative action," and he asserted that the President of the Macomb County NAACP had endorsed it.  Stevenson told the MCRI's circulator that she *was* the President of the Macomb County NAACP, that she had not endorsed the petition, and that it was not for civil rights or affirmative action.  But two weeks later, another member of the NAACP reported to her that the same circulator had told the same lie to him as he had approached the Mt. Clemens post office (Ex 8, Tr Detroit, at 9-13).

A legion of citizens provided similar testimony.  Samantha Canty, a resident of Southfield, was approached by a black man at the Taste Fest in Detroit and asked to sign the MCRI petition in order to "keep affirmative action going" (Ex 11, Dec of Canty).  Similarly, Ken Gray, a black worker for the City of Detroit who had grown up under segregation, testified that he signed the petition because the MCRI circulator told him it was "to keep affirmative action going" (Ex 8, Tr Detroit, at 38-39).  Mark Bryant, another employee of the City of Detroit, signed because the MCRI circulator told him that the petition supported affirmative action, while Lawrence Fears, still another worker for Detroit, signed on the basis of a specific representation by the circulator that this

---

"Tr Lansing," refer to the hearings conducted by the Commission in those cities on January 11,  February 8, and May 8,  respectively.

petition opposed Mr. Connerly's attempt to end affirmative action (Ex 8, Tr Detroit, 41-46).[2]

Outside various markets in Flint, MCRI circulators told Reverend Willie Hill, Fred Anthony, and James Edwards and William Allen that the petition supported affirmative action (Ex 9, Tr Flint, 53-58, 70-72).

In Grand Rapids, Lupe Ramos-Montigny was approached at a Martin Luther King Day celebration and asked to sign the MCRI's petition on the representation that it "protected" affirmative action in Michigan.  She not only signed it, but persuaded her friends to sign it based on this misrepresentation (Ex 7, Tr Grand Rapids, 40-42). Similarly, the MCRI approached Allison Kranz at a Latino festival in downtown Grand Rapids on September 12, 2004, assuring her and many others that it would preserve affirmative action (Ex 8, Tr Detroit, 23-31).

Theo Bates provided dramatic confirmation of the scope of the MCRI's fraud.  As he left his treatment at the University of Michigan Hospital in Ann Arbor, an MCRI circulator asked him to sign a petition to "keep affirmative action going."  Then, at his home in Grand Rapids, another MCRI circulator asked him to sign the petition because it would "keep affirmative action going!" (Ex 7, Tr Grand Rapids, 12, 16-19).

The list could go on indefinitely.  Suffice it to say that volunteer investigators from the plaintiff Operation King's Dream first attempted to contact every voter in the 500-person statistical sample compiled by the Michigan Bureau of Elections from

---

[2] John Riehl, the President of AFSCME Local 207 at the City's wastewater plant, testified that 125 of his 1100 members were recorded as signing the petition, even though the Local was overwhelmingly black and overwhelmingly in support of affirmative action (Ex 8, Tr Detroit, 32-35).

Detroit, Highland Park, Inkster, Flint, and Benton Harbor.  After the investigators

obtained a list that contained 60 percent of those who had signed the MCRI's petition,

they then attempted to call or visit hundreds, if not thousands, of persons who lived in

black or Latino neighborhoods in numerous cities who had purportedly signed the

MCRI's petition.  Almost all had signed it--but *only one* signed it knowing that it was

against affirmative action (Ex 2, Dec of Stern).

Retired teachers, UAW officials, and students have testified that black and Latino

voters were shocked when they were told that they had signed a petition to ban

affirmative action (Ex 10, Tr Lansing 61-71; Ex 9, Tr Flint, 84-86).   Sarah Smith, who is

a plaintiff in this action and a member of the South East Community Association in

Grand Rapids, spoke for many when she told the media that she and her neighbors who

had been deceived into signing the petition felt "Bamboozled, hoodwinked, raped, that's

what people are telling me they feel over this." (*The Grand Rapids Press*, June 13, 2006).

B.    The MCRI circulators' description of the fraud that they committed.

The MCRI deliberately wrote its petition in order to facilitate this fraud.  Neither

the proposed amendment nor the summary that is on the petition even uses the words

"affirmative action."  Unless a prospective signer happened to notice a five-word phrase

prohibiting "preferential treatment" buried inside the small print of the 337-word

amendment--*and* happened to know that "preferential treatment" was a conservative

codeword for affirmative action--the voter would have no clue that the petition had

anything to do with affirmative action.  In fact, unless the prospective signer happened to

know that Michigan's Constitution already banned racial discrimination,[3] he or she had

---

[3] Const 1963, art 1, sec 2.

no reason to suspect that this petition was anything other than what its title proclaimed it to be--a "civil rights" initiative broadly banning racial and other forms of discrimination (Ex 3).

The MCRI put this deliberately deceptive petition in the hands of black circulators and paid them $1 to $2 per signature for stating that it was for affirmative action and civil rights.

Reverend Nathaniel Smith, a black citizen of Detroit, described the process.  He had occasionally circulated other petitions to supplement his income and was apparently contacted to circulate this one for that reason.  At first he did not know what it was. When he went to an MCRI training session in Southfield, he found numerous other black people.  The MCRI officials told the audience that this was a petition to "keep civil rights going" and that they should solicit signatures for it on that basis.   Reverend Smith obtained about 500 signatures from black citizens on that basis, until one finally convinced him that the petition opposed affirmative action (Ex 10, Lansing Tr, 43-45, 51, 54).

Exie Chester, a black MCRI circulator who eventually obtained about 2,300 signatures, declared that the MCRI officials did not tell her the purpose of the petition at all.  She read it, however, and understood that the ban on preferences meant "the kind of preferences that white families have," including money, good schools, and so on (Ex 12, Dec of Chester, para 6).  Soon after she began collecting signatures, Chester saw other MCRI circulators obtaining numerous signatures outside the 36th District Court by telling "everyone that it was a petition to help blacks get into college" (Ex 12, Dec of Chester, para 9).   From that point forward, Chester used the same appeal in front of liquor stores

9

and at other public places in the City of Detroit.  As she declared, she "…got an

enthusiastic response and obtained many signatures based on the statement that 'This is a

petition to help blacks get into college'" (Ex 12, Dec of Chester, paras 11-12).

Dana Clowney, another black person hired by the MCRI to circulate petitions in

Detroit, told similar falsehoods outside the main post office on Fort Street in downtown

Detroit.  As set forth in his sworn statement,

> I told persons that this petition was to help minority students in getting into
> college.  I also told them that there were people who were trying to keep blacks
> out of college and that this initiative would stop that.

(Ex 13, Dec of Clowney, para 9).

John Henry Reed, another black citizen hired by the MCRI to circulate its petition

in Detroit, made similarly false statements in order to obtain the signatures on the

MCRI's petition.  An MCRI official named "Glenda" told Reed that the petition was for

affirmative action and "would help black students get into college." Glenda also told him

that there was another petition that was attempting to end affirmative action but that this

one was to "preserve it" (Ex 14, Dec of Reed, para 3).

Reed circulated the MCRI's petition at Northland Mall, in Troy, in downtown

Detroit, and in the Cass Corridor.  After a few potential signers objected that the petition

was against affirmative action, he raised it with MCRI supervisors "Glenda" and "Heidi,"

who just laughed it off and said "some people will just be like that."  Reed continued

circulating the petitions from August through November, although he reported receiving

more objections as time went on (Ex 14, Dec of Reed, paras 8-10. 13).

LaVon Marshall, another black citizen hired by the MCRI, received similar

instructions from Jennifer Gratz, a top official in the MCRI campaign, along with a

young white man and a black woman named Nicki, who were also officials in the MCRI campaign.  Marshall circulated the petition outside Food Basics in Detroit and at downtown festivals, telling potential signers that it was for affirmative action (Ex 15, Dec of Marshall, para 8-12).

In Flint, the story was the same.  At a Halo Burger in downtown Flint, two white MCRI officials hired Elitha Marie Shumpert to circulate the MCRI petition.   She petitioned in front of a Family Dollar Store.  When some black citizens began telling her that the petition was against affirmative action, she asked her supervisors, who assured her that it was "…not against affirmative action at all." She continued telling voters that it was for affirmative action until she quit for unrelated personal reasons (Ex 16, Dec of Shumpert, paras 9-12).

Three other black residents of Flint – Christi Lynn Sanders, June Scroggins, and Lerwonia Summers – have signed sworn declarations setting forth similar misrepresentation and fraud perpetrated on them – and, unwittingly, by them on voters whom they induced to sign the MCRI's petition (Ex's 17, 18, 19, Decs of Sanders, Scroggins, and Summers).

The story was also the same in the western part of the State.   Sammy Williams, a black resident of Benton Harbor, had previously circulated other petitions.  An MCRI official, whose name he could not recall, approached him and asked him to circulate what he said was a petition that supported affirmative action.  Williams did so for several weeks, when he was told by others that the petition actually opposed affirmative action (Ex 8, Tr Detroit, 81-90).

Chester, Clowney, Reed, Marshall, Shumpert, Scroggins, Summers, and Williams had the courage to come forward.  The most open and systematic fraud was, however, perpetrated by those who wish to remain silent.  The affidavit of Heather Miller, a Detroit teacher, sets forth what could be revealed if those persons were subpoenaed to a hearing (Ex 21, Aff of Miller).

On July 13, 2005, Miller visited the home of Albert Anderson, an MCRI circulator.  When she asked Anderson whether he told potential signers that the petition was for affirmative action, Anderson said that "Yeah, I got a dollar a signature, so I told them it was for affirmative action" (Ex 21, Aff of Miller, paras 2-3).  As Miller left his home, another person appeared, identifying himself as Sherman Irvin.  Irvin told Miller that he also circulated the MCRI's petitions in Detroit and Flint, obtaining signatures by telling persons that it was for affirmative action.  Some potential signatories reportedly objected to what Irvin was doing but he said he threatened to get a gun if they did not leave him alone.  He said that he "needed the money" (Ex 21, Aff of Miller, paras 4-6).

C.     The impact of the MCRI's fraud.

The statistical sample drawn by the Bureau of Elections provides a ready estimate of the number of voters who were deceived by the MCRI's fraud.  According to that sample, the MCRI obtained 15 percent, or 75,000, of its signatures from Detroit--which is now over 81 percent black--and another 10 percent or 50,000 of its signatures from other communities that are from 60 to 99 percent black.  The breakdown of those signatures by ZIP code shows that the overwhelming majority came from neighborhoods where white citizens have not lived for years (Ex 2, Dec of Stern).

There are very few black citizens who oppose affirmative action.[4]  It is obvious that the MCRI obtained approximately 125,000 signatures from black citizens who were defrauded by the MCRI.  When Stevenson and other black citizens in white majority communities are added, the number swells.

But the impact of the MCRI's fraud does not stop there.  The MCRI's ability to deceive and utilize black circulators enabled it to obtain signatures from many white voters.  A black MCRI circulator approached Allison Kranz at a Latino festival in downtown Grand Rapids on September 12, 2004, assuring her and many others that it would preserve affirmative action (Ex 8, Tr Detroit, 23-31).  Martha Cuneo and her husband signed the petition outside the Royal Oak Post Office because a black circulator assured them that the petition supported affirmative action (Ex 8, Tr Detroit, 58-63). At an outdoor event in Ann Arbor, black MCRI circulators asked Shirley Schwartz and numerous others to sign the petition because it purportedly supported affirmative action (Ex 10, Tr Lansing 58-59).

More generally, the fraud allowed the MCRI to obtain signatures from tens of thousands of blacks and Latinos without stirring up a hornet's nest of opposition.  That made it possible for the MCRI to obtain its signatures in many white areas.

The MCRI was not able to obtain a place on the 2004 ballot by circulating its petition in all-white areas.  After the deadline for securing a place on that ballot passed, the MCRI decided to get its signatures by deceitfully enlisting those persons whom it knew would be harmed the most if its proposal ever passed.

---

[4] "Michigan Split Over Affirmative Action," Detroit Free Press, Jan. 19, 2004, at 1A.

D.      The proceedings in the state courts.

Operation King's Dream presented much of the evidence described above to the

State Board of Canvassers in support of its request that the Board exercise its authority

under MCL 168.476(2) by investigating whether the MCRI had in fact submitted a

sufficient number of valid and genuine signatures.  Just prior to the July 19, 2005 meeting

that was to consider that request, however, the Deputy Attorney General issued an

informal (non-binding) opinion that stated that the Board of Canvassers had no authority

to conduct an investigation into whether the MCRI obtained its signatures by unlawful

means.

On a motion to conduct an investigation, the Board split two-two, with

Republican member Lyn Bankes stating that she felt bound by the Attorney General's

Opinion but that she believed that an investigation by the Legislature was warranted by

the evidence of fraud that she had seen (Ex 22, Tr Bd of Canvassers, 180-181, 206-207).

On the subsequent motion to certify the question for the ballot, Member Bankes

abstained, the two Democratic members voted No, and only one Canvasser voted to place

the proposed amendment on the ballot (Ex 22, Tr Bd of Canvassers, 200-201).

That was the only open consideration of the evidence of fraud by the state election

officials or by the state courts.  The MCRI filed a Petition for Mandamus with the Court

of Appeals, in which Operation King's Dream intervened.  In its October 31, 2005

Opinion, the Court of Appeals stated that the Board could not consider the evidence of

racially-targeted fraud nor anything else that went beyond the four corners of the petition

itself.  It ordered the Canvassers to place the proposal on the ballot no matter how the

MCRI had obtained its signatures. *Michigan Civil Rights Initiative, supra*, 268 Mich App at 517-520.[5]

On December 7, the Court of Appeals denied a motion for reconsideration and gave immediate effect to its decision.  After the Canvassers were threatened with contempt, they voted under protest to certify the proposal to the ballot.  Meanwhile, Operation King's Dream filed an application for leave to appeal with the Michigan Supreme Court.

The Michigan Civil Rights Commission then began its own investigation of the fraud, holding hearings in Detroit, Flint, Lansing and Grand Rapids.  Before the Commission issued its report, the Michigan Supreme Court denied the application for leave to appeal.  *Michigan Civil Rights Initiative, supra*, 474 Mich at 1099.  After the Commission entered its report, it then filed a brief amicus curiae asking the Supreme Court to grant the motion for reconsideration.  On July 13, the Supreme Court denied that motion with two Justices dissenting (Ex 23).

---

[5] No party in the state proceedings raised any issue under the Voting Rights Act,

## ARGUMENT

## I

**THE PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF PREVAILING ON THEIR CLAIM THAT THE DEFENDANTS VIOLATED SECTION 2 OF THE VOTING RIGHTS ACT BY PLACING THE "MICHIGAN CIVIL RIGHTS INITIATIVE" ON THE NOVEMBER 2006 BALLOT ON THE BASIS OF SIGNATURES THAT WERE OBTAINED ON THE BASIS OF RACIALLY-TARGETED FRAUD**.

A.    Section 2 of the Voting Rights Act broadly bans racial discrimination in the standards that a State uses to determine the choices that appear on the ballot.

Section 2 of the Voting Rights Act of 1965 provides in relevant part as follows:

(a) No voting qualification or prerequisite to voting or *standard, practice, or procedure* shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees [of language rights] set forth in section 1973b(f)(2), as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that *the political processes leading to nomination or election in the State or political subdivision* are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice….

42 USC 1973 (emphasis added).

As set forth in the seminal decision of the United States Supreme Court, the

Congress added the emphasized words to the initial text of the Voting Rights Act to

assure that the Act was an "all-inclusive" ban of any discriminatory practice, however

"subtle," that "might effectively be employed to deny citizens their right to vote."  *Allen*,

393 US at 656.

The Court specifically held that the Act banned discrimination in the procedures that determined the choices that were on the ballot, including signature requirements, filing deadlines, and any other standard, practice or procedure that affected those choices. *Id*, at 570.  It concluded that the Act gives "a broad interpretation to the right to vote, recognizing that voting includes 'all action necessary to make a vote effective.'" *Allen v State Bd of Elections*, 393 US 544, 565-566 (1969).  *Accord. Chisom v Roemer*, 501 US 380, 403 (1991).

In decisions that followed *Allen*, the Court has reaffirmed that the Act governs all procedures that affect the choices that appear on the ballot and reaffirmed that the Act should be given a broad construction consistent with its overriding purpose.  *NAACP v Hampton County Election Comm'n*, 470 US 166, 176-177 (1985)(filing deadlines); *Dougherty County Bd of Ed v White*, 439 US 32 (1978)(leave requirements for candidates); *Thornburgh v Gingles*, 478 US 30 (1986)(use of multi-member districts); *League of Latin American Citizens v Perry*, ___ US ___, 2006 WL 1749637 (June 28, 2006)(district lines).

    B.    <u>Section 2 of the Voting Rights Act bans discriminatory actions by ostensibly private associations that affect the choice of candidates that are on the ballot.</u>

The MCRI has claimed that it is exempt from the Act because it is a private association.  But in a long line of cases that were incorporated by the Congress in the Voting Rights Act, the Supreme Court held that the Fifteenth Amendment banned racial discrimination by ostensibly private associations that affected the choices that appeared on a State's ballot.

The most important cases arose out of Texas.  In that state, unlike in most Southern states, a substantial number of black and Latino voters continued to vote in general elections.  But those votes meant little because the real choices were made in the Democratic Party primaries, where only whites could vote.

At first, a Texas statute mandated white primaries.  The Supreme Court held that statute violated the Fourteenth Amendment.  *Nixon v Herndon*, 273 US 536 (1927)(Holmes, J.).

Texas then passed a statute that allowed the executive committees of the parties to determine who was eligible to vote in the party primary.  Predictably, the state Democratic committee voted to limit its primaries to whites.  Again, the Supreme Court struck down the statute, holding that an ostensibly private association--the executive committee of the Democratic Party--was acting as an agent of the state when it made that decision.  *Nixon v Condon*, 286 US 73 (1932)(Cardozo, J.).

Undeterred, Texas passed yet another statute, leaving it to state party conventions to determine a party's membership and thus who would be eligible to vote in its primaries.  After initially upholding that statute on the grounds that the party was a private association, *Grovey v Townsend*, 295 US 45 (1935), the Supreme Court reversed course and held that the Fifteenth Amendment's ban on discrimination by a State applied to private associations.  In words that are applicable here, the Court held that the Fifteenth Amendment banned discrimination by a private association that had the power to affect the choices that black voters had on the general election ballot:

> If the state requires a certain electoral procedure, prescribes a general election ballot made up of party nominees so chosen and limits the choice of the electorate in general elections for state offices, practically speaking, to those whose names appear on the ballot, it endorses, adopts and enforces the discrimination against

Negroes, practiced by a party entrusted by Texas law with the determination of the qualifications of participants in the primary.

*Smith v Allwright*, 321 US 649, 664 (1944).

After *Smith*, the Court struck down whites-only private "Jaybird" primaries conducted by the Texas Democratic Party in which the participating candidates agreed to support the candidate who won the Jaybird primary in the official state primary and subsequent general election.   Again, the Court held that the Fifteenth Amendment banned discriminatory action by private associations which affected the choice of candidates on the State's official ballots.  *Terry v Adams*, 345 US 461 (1953)(Black, J).

One year before Congress passed the Voting Rights Act, Mississippi showed again why a ban on discrimination had to apply to private associations that affected the choice of candidates on a ballot.  By excluding blacks from its caucuses, Mississippi brazenly continued its tradition of sending an all-white delegation to the Democratic National Convention in 1964.

When Congress passed the Voting Rights Act, it made certain that Texas's white primaries and Mississippi's lily-white delegation would not occur again. [6]  Almost immediately after Congress passed the Act, the Attorney General issued regulations banning discrimination by parties and private associations that affected the choices that appeared on the ballot.  28 CFR 51.7.

---

[6] Congress also had the delay in the white primary litigation firmly in mind when it passed the Voting Rights Act.  To "shift the advantage of time and inertia from the perpetrators of evil to its victims," *Katzenbach*, 383 US at 328, Section 5 of the Voting Rights Act required the southern states to submit any changes in election laws to the Attorney General of the United States for approval before they are placed in effect.  42 USC 1973c.

In 1994, black delegates to the 1994 Republican state convention in Virginia challenged the $35 fee imposed on all delegates as a "poll tax" prohibited by the Voting Rights Act.  In sustaining that challenge, the Supreme Court held that the fact that the Virginia Republican Party was a private association was irrelevant.  If its decisions affected the choices on the ballot, which they clearly did, the Voting Rights Act prohibited racial discrimination in the elections to or conduct of that convention.  *Morse v Republican Party of Virginia*, 517 US 186, 198 (1996)(Stevens, J).  As Justice Breyer declared, "It is beyond question that the [Voting Rights] Act encompassed the discriminatory practices struck down in *Terry* and *Smith,*" and prohibited the practices that led to the Mississippi delegation to the 1964 Convention.  *Morse v Republican Party of Virginia*, 517 US 186, 208-209, 217 (1996)(Breyer, J, concurring).

Because of the special history of racial discrimination in this country, the Court has recognized the need for regulation of racial discrimination by private associations when the actions of those associations affect the choices that appear on a State ballot. *Smith*, *Terry* and *Morse*.   Under those defining precedents, the MCRI cannot use its status as a private association as an excuse for racial discrimination that affects the choice on Michigan's election ballot.

C.   Section 2 of the Voting Rights Act applies to the procedures by which propositions secure access to the ballot.

Section 13 of the Voting Rights Act defines "voting" as follows:

(1)  The terms "vote" or "voting" shall include all action necessary to make a vote effective in any primary, special or general election, including, but not limited to…having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office *and propositions for which votes are received in an election.*

42 USC 1973l(c)(1)(emphasis added).

Because the referendum process had fallen into general disuse by 1965, because it had never been used extensively in the South, and because those few referendums that did occur usually occurred in conjunction with other elections, there was little Congressional consideration of referendums under the Act and few appellate decisions that even mentioned votes on referendums.

Nevertheless, it was clear from the beginning that the Act governed the referendums that did occur.  In enforcing Section 5 of the Voting Rights Act (see note 6, supra), the Attorney General made clear that referendums *are* subject to the Act:

> (a)  The conduct of a special election (e.g. an election to fill a vacancy, an initiative, referendum, or recall election, or a bond issue election) is subject to the preclearance requirement to the extent that the jurisdiction makes changes in the practices or the procedures to be followed.

> 28 CFR 51.17(a).[7]

After the Act was amended to provide protection for language minorities, the Attorney General categorically asserted that Section 2 covers "…elections regarding such matters as bond issues, constitutional amendments and referendums."  28 CFR 55.10(a).

In an extensive and insightful decision, a United States District Court directly held that Section 2 applied to elections on propositions, citing the "language of the Act," the intent of the Congress, and the Supreme Court's "insistence" that the Act be broadly interpreted in order to provide maximum protection against any form of racial discrimination that affected voting rights.  *Armstrong v Allain*, 893 F Supp 1320 (SD

---

[7] While Congress provided Section 5 as a special remedial provision due to the recalcitrance of the Southern States, the statutory language defining the discriminatory practices banned by Section 2 (which has nationwide scope) and Section 5 (which applied to the South) is identical and the two sections are, in substance, "closely connected."  Compare 42 USC 1973 and 1973c.  See also *Chisom v Roemer*, *supra*. 501 at 403 (1991).

Miss 1994).  Similarly, in a Section 2 decision subsequently reversed on other grounds, the Eleventh Circuit held that "Minority communities have the right to vote for or against the propositions of their choice just as they have the right to vote to elect candidates of their choice."  *Lucas v Townsend*, 908 F 2d 85, 858 (CA 11, 1990), *rev'd on other grounds sub nom Board of Public Educ and Orphanage for Bibb County v Lucas*, 501 US 1226 (1991).

The plaintiffs have found no case in which a court has held that Section 2 does not apply to discrimination on account of race in an election on any form of ballot proposition.  Nor is there any reason for deciding that the Voting Rights Act applies to elections for city councils--but not to elections to amend the fundamental governing law of the State.

In fact, in view of the increasing use of initiatives and referendums to repeal laws protecting minorities, it would violate the entire purpose of the Voting Rights Act to exempt the conduct of those elections from its provisions.

The State defendants nevertheless assert that the Act does not apply to elections on propositions, or, alternatively, at least to the process of gathering signatures for those elections.  See State Defs' Br in Supp of Mot to Dismiss, citing See *Montero v Meyer*, 861 F 2d 603 (CA 10, 1988), *cert den* 492 US 921 (1989); *Delgado v Smith*, 861 F 2d 1489 (CA 11 1988), *cert den* 492 US 918 (1989)(same); *Lever v Padilla*, 429 F 3d 910 (CA 9 2005), *opinion withdrawn and reh en banc granted and pending* 446 F 3d 922 (CA 9 2006).

*Montero*, *Delgado* and *Lever* interpreted a later amendment to the Voting Rights Act that required the State or subdivision to publish materials related to an election in any

language that is the primary language of five percent or more of the voters in that jurisdiction. See 42 USC 1973b(f)(2). By divided votes, *Montero* and *Delgado* held that it did not apply to petitions for a referendum election circulated by private parties. The dissent in *Delgado* and the original panel opinion in *Lever* hold that it does apply.

The decisions are distinguishable in that the affirmative obligation to translate material contained in 42 USC 1973b(f)(2) differs from the requirement to avoid racial discrimination contained in 42 USC 1973(a).

More fundamentally, however, the majority opinions in *Montero* and *Delgado* badly misconstrue the petition circulating process that leads to the placement of referendums on the ballot. That process is *not* like the private circulation of "petitions" demanding action by public officials, where the First Amendment requires a wide toleration of the languages chosen and words used by a private actor. A "petition" demanding an election on a proposed change to the State's Constitution is *an official public document with enormous legal significance.* The State clearly has a compelling interest in assuring that the circulators do not use racially targeted fraud--or racially-targeted bribery or intimidation--*in signatures on that type of petition*.

Indeed, in striking down a Colorado statute that prohibited paying circulators, the Supreme Court noted with approval a criminal provision in Colorado that banned circulators from making false statements to obtain signatures on a petition. *Meyer v Grant*, 486 US 414, 427 (1988). If the State can ban garden-variety fraud, the Voting Rights Act can clearly regulate racially-targeted fraud.

Like registering to vote and voting, signing or refusing to sign a petition to amend the Constitution is a discrete civic choice by a citizen. Precisely because signing such

petitions does not occur at public locations where other voters, challengers and poll
workers are present, the possibility of fraud, intimidation, bribery and racial
discrimination is greater in circulating petitions than it is in voting or registering to vote.
Especially in view of the increasing importance of referendums on issues affecting
minority communities, it is vital that the Act regulate the gathering of signatures.  It is
vital that petitions, like this one, that used a systematic campaign of racially-targeted
fraud, not be allowed to secure access to the ballot by such means.

> D.    The plaintiffs have far more than a likelihood of success on the merits in
>        their claim against the MCRI and the State defendants.

Like most states, Michigan requires proponents of a proposed amendment to the
Constitution to collect signatures to show a modicum of support before a proposal is
placed on the ballot.  Const 1963, art 12, sec 2.  By screening out proposals that have
little support, the signature-gathering process serves the same function as conventions,
caucuses and primaries do for candidates for public office.  Just as the Voting Rights Act
bans systematic racial discrimination in the procedures for selecting the candidates who
appear on the general election ballot violates the Voting Rights Act, *Morse, supra*, it bans
systematic racial discrimination in the collection of signatures that determines the
propositions that will appear on the ballot.  *Allain, supra.*

The evidence set forth above makes clear that the procedures that the MCRI used
to gather signatures were not simply tainted, but rather were *permeated* by racial
discrimination.  The MCRI's petition deliberately obscured its real purpose; its
circulators targeted black and Latino voters, gaining their signatures by stating that the
petition supported affirmative action; and it hired black circulators to obtain signatures at
events where it knew that white voters could also be deceived into signing onto its

agenda.   As even the MCRI knows, no more than a handful of the 126,000 signatures that it obtained in black communities actually support the petition's real aim of banning affirmative action.

To their credit, three members of the State Board of Canvassers sensed the fraud that the MCRI had perpetrated and wanted to conduct an investigation before placing the MCRI's proposed amendment for placement on the November 2006 ballot.  The Michigan Court of Appeals and Supreme Court, however, prevented the Canvassers from conducting that investigation.  According to the Court of Appeals, if a sufficient number of registered voters had signed the petition, the Board had to place the proposed amendment on the ballot no matter how much racial discrimination the MCRI used to obtain those signatures.  *MCRI v Board of Canvassers*, *supra*, 268 Mich App at 516-520.

But *Smith* and *Terry* make clear that the Voting Rights Act does not allow a State to play Pontius Pilate when it recognizes that a private association is using systematic racial discrimination to shape the choices that will appear on the ballot.  If the State of Michigan authorizes a private association to collect signatures, places proposals on the ballot based on signatures that the association has collected, and then declares that its election officials have no power even to investigate evidence of racially-targeted fraud by that association, then the State has "endors[ed], adopt[ed], and enforc[ed] the discrimination against Negroes, practiced by [that association]" in direct violation of the Fifteenth Amendment and the Voting Rights Act.  *Smith, supra,* 321 US at 664; *Terry*, *supra; Morse, supra,* 577 US at 198.

As with the MCRI defendants, the plaintiffs have shown far more than a reasonable likelihood of success on their claim against the State defendants.

**II**

THE COURT SHOULD GRANT A PRELIMINARY INJUNCTION
RESTRAINING THE DEFENDANTS FROM PLACING THE MCRI'S
PROPOSAL ON THE NOVEMBER 2006 GENERAL ELECTION BALLOT IN
ORDER TO PREVENT IRREPARABLE HARM TO THE PLAINTIFFS AND
TO THE PUBLIC.

In addressing a motion for preliminary injunction, the district court must make

specific findings on four familiar factors:

> (1) the likelihood that the movant will succeed on the merits, (2) whether the
> movant will suffer irreparable harm without the injunction, (3) the probability that
> granting the injunction will cause substantial harm to others and (4) whether the
> public interest will be advanced by issuing the injunction.

*Six Clinics Holding Corp v Cafcomp Sys Inc*., 119 F 3d 393, 399 (CA 6, 1997).

While there have been few cases deciding on the propriety of preliminary relief

under Section 2 of the Voting Rights Act, they have uniformly held that the traditional

four factors govern requests for injunctive relief under that Section.  See, e.g., *Bridgeport*

*Coalition for Fair Representation v City of Bridgeport*, 26 F 3d 271 (CA 2, 1994), *rev'd*

*on other grounds* 512 US 1283 (1994); *Harris v Graddick*, 593 F Supp 128, 135-136

(MD Ala, 1984); *United States v Berks County, Pennsylvania*, 277 F supp 2d 570, 578

(ED Pa, 2003); *Dillard v Crenshaw County*, 640 F Supp 1347, 1363 (MD Ala, 1986); and

*Arbor Hill Concerned Citizens Neighborhood Association v County of Albany*, 281 F

Supp 2d 436 (ND NY, 2003).

In applying the traditional criteria, the courts have been unanimous in holding that

because discrimination in the right to vote "strikes at the heart of representative

government," an abridgement of the right to vote would "…by its nature be an irreparable

injury."  *Harris, supra*, 593 F Supp at 135; *Dillard, supra*, 640 F Supp at 1363 ("Given

the fundamental nature of the right to vote, monetary remedies would obviously be

inadequate…"); *Berks County*, 277 F Supp 570 ("denial of the right to participate in an election is by its nature an irreparable injury").

Similarly, the courts have held that there is a strong public interest in assuring that elections are conducted within the mandates of the Voting Rights Act.  The Middle District of Alabama, for example, has twice held as follows:

> ….Section 2 and its history reflect a strong national mandate for the immediate removal of all impediments, intended or not, to equal participation in the electoral process.  When Section 2 is violated, the public as a whole suffers irreparable injury.

> *Harris, supra*, 593 F Supp at 135.  *Accord Dillard, supra*, 640 F Supp at 1363.

Likewise, in considering the factors for issuing an injunction to enforce the language requirements of Section 2, the Eastern District of Pennsylvania held as follows:

> Ordering defendants to conduct elections in compliance with the Voting Rights Act so that all citizens may participate equally in the electoral process serves the public interest by reinforcing the core principles of our democracy.

> *Berks County, supra*, 277 F Supp 2d at 582.

Those considerations apply with overwhelming force in this case.  The Civil Rights Act of 1964, the Voting Rights Act of 1965, and the advent of affirmative action were the crowning achievements of the Civil Rights Movement.  Of those achievements, affirmative action--which was endorsed by President Johnson in 1964--was *the* means by which the major American universities and corporations were actually desegregated.

Under Michigan law, as interpreted by the Court of Appeals, however, the Board of Canvassers was forced to place on the ballot a proposal to ban affirmative action on the basis of signatures that were gathered in violation of the Voting Rights Act.   More concretely, the Board of Canvassers was forced to place this proposal on the ballot on the

basis of signatures that the MCRI obtained by deceiving tens of thousands of the parents whose children will be excluded from the state's universities if this proposal is adopted.

The State of Michigan and the City of Detroit recall with pride its daughters and sons who risked their lives to win the right for black people to vote in Mississippi.  To certify this question onto the Michigan ballot on the basis of the racially targeted fraud that has been so amply documented by the Civil Rights Commission is not only shameful, but a betrayal of the letter, spirit and purpose of one of the most important statutes passed in the Twentieth Century.

## CONCLUSION

For the reasons stated, the plaintiffs ask the Court to grant their motion for a preliminary injunction restraining the defendants from placing the so-called Michigan Civil Rights Initiative on the November 2006 general election ballot, pending trial on the merits of this cause.

By Plaintiffs' Attorneys,
SCHEFF & WASHINGTON, P.C.


BY:  _____
George B. Washington (P-26201)
Shanta Driver (P-65007)
645 Griswold—Ste 1817
Detroit, Michigan 48226
(313) 963-1921


BY:  _____
Sharon McPhail (P-26201)
Attorney for Kwame Kilpatrick
11th Floor
Coleman A. Young Building
Detroit, Michigan 48226

Dated: July 17, 2006                    (313) 628-4243

28

### CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2006, I electronically filed the Plaintiff's Motion for a Preliminary Injunction, Plaintiffs' Brief in Support of their Motion for a Preliminary Injunction and this Certificate of Service with the Clerk of the Court using the ECF system which will automatically send notification of filing to:

        Patrick J. O'Brien
        Heather S. Meingast
        Assistant Attorneys General
        Attys for the Defts Land, Thomas, DeGrow, Bankes & O'Connor

        James K. Fett
        Michael E. Rosman
        Attys for the Defts Connerly, Gratz and MCRI

        George B. Washington (P-26201)
        SCHEFF & WASHINGTON, P.C.
        645 Griswold—Ste 1817
        Detroit, Michigan 48226
        (313) 963-1921
        scheff@ameritech.net

Dated: July 17, 2006