UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---------------------------------------------------------------x

OPERATION KING'S DREAM, *et al.*,                     :

           Plaintiffs,                     :     Civ. No. 06-12773

          v.                     :     HON. ARTHUR J. TARNOW

WARD CONNERLY, *et al.*,                     :     HON. R. STEPHEN WHALEN

          Defendants.                     :     MOTION FOR JUDGMENT
                                                       ON THE PLEADINGS

---------------------------------------------------------------x

JAMES K. FETT (P39461)                     MICHAEL E. ROSMAN
FETT & FIELDS, P.C.                     CENTER FOR INDIVIDUAL RIGHTS
805 E. Main St.                     1233 20th St. NW Suite 300
Pinckney, MI 48169                     Washington, DC 20036
Phone: (734) 954-0100                     Phone: (202) 833-8400

      Defendants Ward Connerly, Jennifer Gratz, and Michigan Civil Rights Initiative hereby

move for a judgment on the pleadings pursuant to Rule 12(c) and 12(b)(6) of the Federal Rules of

Civil Procedure on the ground that the complaint fails to state a claim for relief.  In support of

this motion, the moving defendants submit the accompanying brief.

      Pursuant to Local Rule 7.1, the moving defendants conferred with counsel for plaintiffs

and counsel for defendants Terry Lynn Land, *et al.* to determine if they would consent to the

relief sought by this motion.  Defendants Land, *et al.* have no objection to the relief sought here,

but plaintiffs do.


/s/ James K. Fett
JAMES K. FETT (P39461)
FETT & FIELDS, P.C.
805 E. MAIN ST.
PINCKNEY, MI 48169
Phone: (734) 954-0100

/s/ Michael E. Rosman
MICHAEL E. ROSMAN
CENTER FOR INDIVIDUAL RIGHTS
1233 20th St. NW Suite 300
Washington, DC 20036
Phone: (202) 833-8400

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

-----------------------------------------------------------------x

OPERATION KING'S DREAM, *et al.*,                    :

         Plaintiffs,                    :        Civ. No. 06-12773

        v.                    :        HON. ARTHUR J. TARNOW

WARD CONNERLY, *et al.*,                    :        HON. R. STEPHEN WHALEN

        Defendants.                    :

-----------------------------------------------------------------x

THE CITIZEN DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR JUDGMENT ON THE PLEADINGS

JAMES K. FETT (P39461)                    MICHAEL E. ROSMAN
FETT & FIELDS, P.C.                    CENTER FOR INDIVIDUAL RIGHTS
805 E. Main St.                    1233 20th St. NW Suite 300
Pinckney, MI 48169                    Washington, DC 20036
Phone: (734) 954-0100                    Phone: (202) 833-8400

<u>Issues Presented</u>

1.      Does the Complaint adequately allege a violation of Section 2 of the Voting Rights Act against the moving defendants, Gratz, Connerly, and the Michigan Civil Rights Initiative, two private citizens and a ballot question committee?

      a.      Is the alleged racially-targeted fraud of the moving defendants a "practice" or "procedure" imposed by a State or political subdivision sufficient to constitute a violation of Section 2 of the Voting Rights Act?

      b.      Does the Complaint adequately allege that the racially-targeted fraud denied plaintiffs the right to vote on account of race?

      c.      Do principles of statutory interpretation that require courts to (i) favor federalism and (ii) avoid constitutional problems further militate in favor of the conclusion that the allegations in the Complaint do not state a claim under Section 2?

      d.      Does the Complaint state the elements of fraud?

      e.      Does the Complaint allege fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure?

2.      Do the moving defendants have legislative immunity?

3.      Would a finding that the Voting Rights Act reaches purely private conduct render the statute violative of Congress's powers under Section 2 of the Fifteenth Amendment?

i

4.      Do the moving defendants have a First Amendment right to express their opinion concerning the effect of a proposed constitutional amendment on "affirmative action"?

5.      Would a finding that the Voting Rights Act reaches speech made during political campaigns render that Act violative of the First Amendment?

<u>Leading Authorities</u>

U.S. Const., amend. I

28 CFR 51.7

*Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999)

*Montero v. Meyer*, 861 F.2d 603 (10th Cir. 1988)

*Delgado v. Smith*, 861 F.2d 1489 (11th Cir. 1988)

*Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996)

*James v. Bowman*, 190 U.S. 127 (1903)

*Lungren v. Superior Court*, 48 Cal. App. 4th 435, 55 Cal. Rptr. 2d 690

     (Ct. App. 1996)

*State ex rel. Public Disclosure Comm'n v. 119 Vote No! Comm.*, 135

     Wash. 2d 618, 957 P.2d 691 (1998)

Table Of Contents

Issues Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Leading Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

Table Of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

The Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

      I.      THE COMPLAINT DOES NOT ALLEGE A VIOLATION OF SECTION
             2 OF THE VOTING RIGHTS ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

             A.     None Of The Citizen Defendants Is A State . . . . . . . . . . . . . . . . . . . . . .  5

             B.     The Complaint Does Not Allege A Standard, Practice, Or
                     Procedure That Has Denied Plaintiffs The Right To Vote . . . . . . . . . .  10

             C.     The Voting Rights Act Should Be Interpreted To Avoid
                     Constitutional Problems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

             D.     The Voting Rights Act Should Be Interpreted To Permit States To
                     Determine The Correct Regulation Of Free Speech In Political
                     Campaigns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

             E.     The Complaint Does Not Allege The Elements of Fraud . . . . . . . . . . .  15

      II.    THE CITIZEN DEFENDANTS HAVE LEGISLATIVE IMMUNITY . . . . . .  16

      III.   THE COMPLAINT FAILS TO ALLEGE FRAUD WITH
             PARTICULARITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

      IV.   INTERPRETATION OF THE VOTING RIGHTS ACT TO REGULATE
             THE CITIZEN DEFENDANTS' ALLEGED CONDUCT WOULD
             RENDER IT UNCONSTITUTIONAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

A.    Congress Cannot Regulate Purely Private Conduct Pursuant To The Voting Rights Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

B.    Application Of The Act Here Would Violate The Citizen Defendants' First Amendment Rights . . . . . . . . . . . . . . . . . . . . . . . . .  20

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

Defendants Ward Connerly, Jennifer Gratz, and the Michigan Civil Rights Initiative (together, the "Citizen Defendants") submit this memorandum of law in support of their motion for a judgment on the pleadings.

<u>Introduction</u>

To characterize the theory of this lawsuit as unusual would be a gross understatement.  In the topsy-turvy world of plaintiffs' theory, the Citizen Defendants are "states" that have denied plaintiffs the right to vote by placing a referendum on a ballot -- despite the fact that each plaintiff will have an opportunity to vote on the referendum, and their vote will count just as much as any other voting citizen of the State of Michigan.  That is, plaintiffs claim that defendants have violated the Voting Rights Act (the "Act") by *facilitating* an *opportunity* to vote that they would prefer not to have (or, more accurately, that they would prefer other citizens not to have).

Their theory then further depends upon turning the federal judiciary into the national campaign police, assessing the truth or falsity of statements made during a political campaign. Nor could that role be limited to the specific facts of this case.  For if inducing people into signing a petition that states on its face *precisely* what it would do denies those people their right to vote, surely a last-minute "racially-focused" television advertisement that "falsely" induces people to vote for or against a ballot proposition -- or for that matter, for or against a particular candidate -- right before the actual vote would also deny people their right to vote.  After all, the petition signers can rectify the harm to them by voting against the proposition; the voters who

selected the "wrong" candidate have no such option.  Federal courts will forever be in the

business of assessing whether the "Swift Boat Captains for Truth" were really telling the truth

about John Kerry's record in Vietnam or whether George Bush really completed his service in the

National Guard.

This is not some imaginary parade of horribles.  In this very case, plaintiffs ask this Court

to provide a definitive meaning for the term "affirmative action," a locution that has defied

precision since it was first used.  With due respect to plaintiffs' very creative counsel,

determining the truth or falsity of campaign speech is not a desirable role for the judiciary.

<u>Procedural Background</u>

The brief in support of the motion to dismiss ("State Defs' Memo.") by defendants Terri

Lynn Land, *et al.* (the "State Defendants") provides a thorough description of the proposed

constitutional amendment that is the subject of this litigation, and the previous attacks on it.

State Defs' Memo. 5-9.  We note only that the attacks have been led by the Coalition To

Defendant Affirmative Action & Integration, and Fight for Equality by Any Means Necessary

("BAMN").  BAMN was the lead plaintiff in *Coalition To Defendant Affirmative Action &

Integration, and Fight for Equality by Any Means Necessary (BAMN) v. Bd. of State Canvassers*,

262 Mich. App. 395, 686 N.W.2d 287 (Ct. App. 2004) (hereinafter "*BAMN v. Bd. of

Canvassers*"), which unsuccessfully attacked the language of the petition, and which included as

plaintiffs the two unions that are also plaintiffs here.  In the state litigation attacking the validity

of the signatures because of the purported fraud in obtaining those signatures, Operation King's

Dream ("OKD") was the lead intervenor.  *See* Complaint Ex. 3.  OKD is "a civil rights campaign launched by Michigan BAMN."  http://www.bamn.com/operation-kings-dream.asp.  And plaintiffs' lead counsel is a member of BAMN.  *Maldonado v. Ford Motor Co.*, 2006 WL 2129809 at *2 n.10 (Mich. Sup. Ct. July 31, 2006).

<u>The Complaint</u>

The complaint, whose non-conclusory allegations are assumed true for purposes of this motion, claims that the Citizen Defendants "engaged in a systematic campaign of racially-targeted fraud during their effort to secure signatures for their proposed Constitutional amendment."  Complaint ¶ 10.  To the extent that the specifics of this purported systematic campaign are spelled out, it is alleged that defendant Michigan Civil Rights Initiative ("MCRI") obtained the signatures of various plaintiffs "by saying that the petition supported affirmative action."  Complaint ¶¶ 20-22, 32.  Although there are vague claims that other statements were fraudulent, these assertions do not appear relevant to any claim that one of the plaintiffs was falsely induced to sign his or her name to the petition.[1]  According to the Complaint, this pattern

---

[1]     For example, the complaint also refers to a report of the Michigan Civil Rights Commission ("MCRC") claiming that an MCRI circulator claimed that Ruthie Stevenson supported the proposed constitutional amendment when, in fact, she opposed it (Complaint ¶ 9).  It also alleges that the name of defendant MCRI, the actual text of the proposed constitutional amendment, and the summary of the text contained on the petitions were all "false" and/or "misleading."  Complaint ¶¶ 5, 31, 33.  Further, the complaint alleges that the "deceptive character of the proposal's title and its intentionally misleading language facilitated th[e] racially-targeted deception," but it does not allege that it was a factor with any of the plaintiffs herein, each of whom alleges that they were induced to sign through false assertions that the proposal was for affirmative action.  Of course, the allegations concerning the text of the proposal and the summaries were rejected in state court, and collateral estoppel principles would preclude at least some of the plaintiffs from raising them here.  *BAMN v. Bd. of Canvassers*, 686 N.W.2d at 292-
                                                                                            (continued...)

3

of fraud constituted a violation of Section 2 of the Act.  Although the complaint alleges that "[u]nless restrained," the Citizen Defendants "threaten to cause irreparable harm to all citizens of Michigan by tainting the November ballot with voter fraud," Complaint ¶ 46, the prayer for relief asks only that the Court grant an injunction "restraining the defendants from placing MCRI's proposed amendment on the November 2006 general election ballot."  It is not entirely clear from the Complaint what restraining the Citizen Defendants will do since they cannot unilaterally place anything on the ballot.

<u>Argument</u>

The complaint does not state a claim under Section 2 of the Act against the Citizen Defendants because (1) the Citizen Defendants are not a State or political subdivision and have not promulgated a standard, practice, or procedure that denies any plaintiff the right to vote on the basis of color, (2) the Citizen Defendants have legislative immunity, (3) the complaint fails to allege fraud against the Citizen Defendants with the particularity required by Rule 9(b), Fed. R. Civ. P., and (4) if interpreted in accordance with plaintiffs' theory, Section 2 would violate the United States Constitution in that it would be outside the scope of Congress's enumerated authority and violate the Citizen Defendants' well-established First Amendment rights.

A motion for failure to state a claim pursuant to Rule 12(b)(6) can be made as part of a Rule 12(c) motion for a judgment on the pleadings.  *See* Rule 12(h)(2), Fed. R. Civ. P.  On such a

---

[1](...continued)
93 ("There is simply no merit to plaintiffs' contention that the language is `propaganda' or misleading.  The summaries that plaintiffs find objectionable do not introduce any information that is not found in the language of the proposed amendment.").

motion, the allegations of the complaint are deemed true.  The court need not, however, accept

any conclusory allegations made without factual basis.

I.      THE COMPLAINT DOES NOT ALLEGE A VIOLATION OF
        SECTION 2 OF THE VOTING RIGHTS ACT

        In relevant part, section 2 of the Act (42 U.S.C. § 1973) states:

                No voting qualification or prerequisite to voting or standard,
                practice or procedure shall be imposed or applied by any State or
                political subdivision in a manner which results in a denial or
                abridgement of the right of any citizen of the United States to vote
                on account of race or color . . .

        The Complaint fails to allege that the Citizen Defendants violated this section.  The

Citizen Defendants are not a State or political subdivision.  Nor did they impose a voting

qualification, a prerequisite to voting, or a standard, practice or procedure that resulted in any

plaintiff's right to vote being denied or abridged on the basis of race or color.

        A.      None Of The Citizen Defendants Is A State

        Section 2 prohibits certain actions "imposed or applied by any State or political

subdivision."  The Citizen Defendants are not "States" or "political subdivisions."  *Cf. Buckley v.*

*American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 192 n.11 (1999) ("Nothing in this

opinion should be read to suggest that initiative-petition circulators are agents of the State.

Although circulators are subject to state regulation and are accountable to the State for

compliance with legitimate controls . . . circulators act on behalf of themselves or the proponents

of ballot initiatives"); *Fred Meyer, Inc. v. Casey*, 781 F. Supp. 1511, 1515 (D. Ore. 1992)

(although state law gave promoters of petition authority to seek signatures for proposed initiative,

they were "not state officials or employees" and "did not act with the aid of or together with state

officials or employees in soliciting signatures" and, accordingly, did not act under color of state

authority).

Section 2 does not specifically define "State," but courts interpreting that phrase have

held that it does not include the acts of private political campaigns.  *E.g.*, *Welch v. McKenzie*, 765

F.2d 1311, 1316 (5th Cir. 1985) (fraud committed against black voters did not violate the Act

because "the fraudulent acts causing the deprivation were committed by [white candidate] and his

supporters, not by the county registrar . . .  Because Section 2 only affords redress for voting

practices `imposed or applied by any State or political subdivision,' [white candidate's] chicanery

is not a Voting Rights Act infringement"); *Coleman v. Bd. of Educ. of the City of Mount Vernon*,

990 F. Supp. 221, 232 (S.D.N.Y. 1997) (letter that "warned voters to protect their property values

by supporting white . . . candidates to the School Board" and phone calls "warn[ing] that if

minority candidates were elected, they would undermine the quality of public education . . . and

would cause a decline in property values" did not state a claim under Section 2 because "[t]hey

were not implemented by any official actor with responsibility for conducting the elections").

Interpretations of other sections of the Act support the same conclusions.  For example,

Section 5 of the Act states that certain covered "states" and "political subdivisions" may seek

preclearance for certain changes that affect voting.[2]  Several members of the Supreme Court have noted that "[o]rdinary `persons' do not create and implement voting practices."  *Morse v. Republican Party of Virginia*, 517 U.S. 186, 221 n.34 (1996) (opinion of Stevens, J.).  Defendants Gratz and Connerly are ordinary persons, and the MCRI is a ballot committee question composed of ordinary persons.[3]

Indeed, under Section 5, *Morse* may be the most far-reaching interpretation of "State," and it demonstrates limits that cannot be circumvented here.  *Morse* concluded that the Republican Party of Virginia was subject to Section 5 of the Act.  In doing so, the Court relied heavily on (1) regulations of the Attorney General that specifically subjected political parties to the preclearance requirement of Section 5 (*id.* at 194-95), and (2) the special status given both the

---

[2]     Specifically, it states that "[w]henever a [covered] State or political subdivision . . . shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in effect [on various dates] . . . such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, . . . and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice or procedure."

[3]     Among the many *sui generis* issues raised by plaintiffs' unusual theory is the degree and extent to which principles of *respondeat superior* apply to the Act, a question that is meaningless in the normal case under the Act where the action challenged is a rule or procedure adopted by the entity itself.  As a general rule, Congress is deemed to legislate with the rules of common-law liability (and its limitations) in mind.  *Meyer v. Holley*, 537 U.S. 280, 284 (2003) (Fair Housing Act).  This would appear to have a number of consequences here.  First, the MCRI can only be liable for the acts of its agents, not its independent contractors, and certainly not everyone who may share its political goals.  Second, Connerly and Gratz cannot be vicariously liable.  *Id.* at 286 (vicarious liability does not extend to individuals corporate officers who operate the corporation).  Third, limitations on *respondeat superior* for torts that might chill free speech rights may be applicable.  *Desmond v. Troncalli Mitsubishi*, 243 Ga. App. 71, 75, 532 S.E.2d 463, 467 (2000) (principal not liable for slander of agent unless principal directly authorized slander).

Democratic and Republican Parties by Virginia law.  *Id.* at 195-96 (contrasting the "two separate

tracks for access to the ballot," one for independent candidates and the other for representatives

of the two major parties; "By contrast, the election code [of Virginia] provides that the nominees

of the two major political parties shall automatically appear on the general election ballot,

without the need to declare their candidacy or to demonstrate their support with a nominating

petition"); *id.* at 197 ("In this dual regime, the parties `ac[t] under the authority' of Virginia when

they decide who will appear on the general election ballot" quoting 28 CFR § 51.7) (brackets in

original); *id.* at 197-98 ("Those [two] parties are effectively granted the power to enact their own

qualifications for placement of candidates on the ballot, which [Virginia] ratifies by adopting

their nominees.  By holding conventions, for example, the Party does not need to assemble

thousands of signatures on a petition for its nominee"); *id.* at 198 n.16 (crediting the party's

candidate with the past showing of strength by the party "does not answer the question why the

Party nominee should receive automatic ballot access.  The fact that the Party has polled well in

previous elections does not logically entail any conclusion about the success of its present

candidate").

There are no DOJ regulations that would purport to find the Citizen Defendants to be

subject to Section 2, and plaintiffs have not cited to any.  Moreover, no state favoritism is alleged

here, nor does it appear in Michigan state law.  MCRI is a ballot question committee, just like

plaintiff OKD.  It had to follow the normal procedures that *any* citizens must follow to bring an

initiative to the ballot (just like independent candidates in Virginia).  It cannot, like a major

political party, reduce voter choice by eliminating candidates (with the imprimatur of the state);

8

to the contrary, it promotes choice by giving voters an opportunity to change the organic law of Michigan.

Courts interpret Section 203(c) of the Act similarly.  That provision states that whenever any of certain States or political subdivisions [*viz.*, those with significant minority populations] "provide[] any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, it shall provide them in the language of the applicable minority group as well as in the English language."  42 U.S.C. § 1973aa-1a.  The courts have concluded that private individuals who circulate initiative petitions only in English do not violate that section because, *inter alia*, they are not "States."  *Montero v. Meyer*, 861 F.2d 603, 609-10 (10th Cir. 1988) (although state actors performed some ministerial functions in preparing petitions for circulation, the right to circulate a petition was reserved by Colorado law for the people and those who did so were not acting pursuant to state authority); *Delgado v. Smith*, 861 F.2d 1489, 1495-96 (11th Cir. 1988) (where Florida constitution expressly reserves to the people the right to amend the constitution by initiative, the limited ministerial duties of state officials did not bring the distribution of English-only petitions within the aegis of Section 203(c)).  (In *Delgado*, plaintiffs had sued only state officials; private supporters of the petition drive intervened.)

Notably, *Montero* and *Delgado* presented much *stronger* cases for concluding that private individuals were acting pursuant to State direction.  As the dissent in *Delgado* (and the district court in *Montero*) correctly pointed out, the cases there involved the actual contents of the petitions themselves, which had received significant state vetting and approval, at least as to their

9

form.  *Delgado*, 861 F.2d at 1499-1500 (Anderson, J., dissenting).  Even with that, the dissent in

*Delgado* viewed the "state action" question as a close one.  *Id.* at 1499.  *Cf. Montero v. Meyer*,

696 F. Supp. 540, 542-43, 548-49 (D. Colo.) (describing role of state in approving form of

petition and concluding that private actors had acted jointly with state officials in approving the

form of the petition documents), *rev'd*, 861 F.2d 603 (10th Cir. 1988); *id.* at 546 (distinguishing

case of *Gerena-Valentin v. Koch*, 523 F. Supp. 176 (S.D.N.Y. 1981) because "it does not appear

that New York City played any part in establishing the form or contents of the petitions involved

in that case"); *id.* at 549 n.3 (distinguishing *Zaldivar v. City of Los Angeles*, 590 F. Supp. 852

(C.D. Cal. 1984), *modified*, 780 F.2d 823 (9th Cir. 1986) on the same grounds).  Here, plaintiffs'

primary complaint is not about the content of the petition (*see* n.1, *supra*), an issue which already

has been well-litigated in state court.  The complaint does not allege that state actors made,

directed, or approved any of the oral communications that allegedly violated the Act.  Moreover,

as in *Montero* and *Delgado*, the Michigan Constitution specifically reserves the right of petition

to the people.  Mich. Const. 1963, art. 12, § 2; art. 2 § 9.


      B.     The Complaint Does Not Allege A Standard, Practice, Or Procedure
               That Has Denied Plaintiffs The Right To Vote


      Section 2 of the Act prohibits only voting prerequisites, voting qualifications, and

standards, practices or procedures that deny individuals the right to vote.  Plaintiffs' allegations

do not demonstrate that they have been denied the right to vote.


      As set forth in the State Defendants' brief (St. Defs' Memo. 11-14), cases like *Montero*

and *Delgado* have concluded that Section 203(c) does not cover the petitioning process at all

because that process is not sufficiently tied to the *voting* process.  Again, it deserves emphasis that these are *a fortiori* cases because the scope of Section 203(c) in one sense is much broader than Section 2.  Specifically, while Section 203(c) applies to any "materials or information *relating to the electoral process*," Section 2 reaches only things that "result[] in a denial or abridgement of the right . . . to vote."  Obviously, there are materials and information related to the electoral process that do not result in a denial or abridgement of the right to vote.  Yet the courts in *Montero* and *Delgado* concluded that the circulation of petitions did not even fall under the broader rubric of Section 203(c).  And they did so even though the Attorney General had promulgated regulations that arguably had supported including "petitions" as materials "related to the electoral process."  *E.g.*, *Montero*, 861 F.2d at 606 (referring to 28 C.F.R. § 55.19(a), identifying petitions as among the materials that should be provided in the language of an applicable language minority group).

Similarly, Section 5 of the Act uses the same "standard, practice, or procedure" phrase as Section 2 in describing the things "with respect to voting" for which States may seek preclearance when they seek to change them.  *See* n.2, *supra*.  Practices "with respect to voting" is certainly a broader category than practices that "result[] in a denial or abridgement of the right . . . to vote," but the Attorney General nonetheless has promulgated regulations that make clear that the conduct of political campaigns, even by political parties that have special status under state law, is not a practice with respect to *voting*, and thus they need not seek preclearance for any changes in them.  28 CFR § 51.7.  *Morse*, 517 U.S. at 227 (opinion of Stevens, J.) (noting that a "change must be one `affecting voting'" to be covered by Section 5 and noting the Attorney

11

General's regulation limiting what that phrase can legitimately reach with respect to political parties); *id.* at 238 (opinion of Breyer, J.) (noting same regulation and same limitation).  The regulations are entitled to deference as to the interpretation of Section 5, and demonstrate that even general practices of a political party in the conduct of a political campaign are not the practices contemplated by Section 2 since, if they do not even *affect* voting, they certainly cannot deny anyone the right to vote.  *A fortiori*, the political and strategic practices of private citizens and a ballot question committee are outside the scope of Section 2.

The initiative petition process cannot deprive anyone of their right to vote.  Indeed, unlike rules for using petitions to nominate a candidate, initiative petitions cannot even make it harder for someone to vote.  Arguably, a state rule making it more difficult for someone to place a valid signature on a candidate's nominating petition might make it more difficult for voters to select that candidate for the general election in the same sense that a rule making it more difficult to vote in a primary election does so.  But there is no analogue between a primary election and an initiative petition because initiatives do not appear on primary ballots, and, unlike primaries, initiative petitions cannot *limit* the choices of voters, they can only expand them.  That is what the Citizen Defendants have done here; they have given the voters of Michigan a choice over state policy in the upcoming general election.  All persons will have a right to vote on that policy choice.

      C.     The Voting Rights Act Should Be Interpreted To
              Avoid Constitutional Problems

As shown in Part IV, *infra*, application of the Act here would create serious constitutional

problems, relating both to Congress's authority under Section 2 of the Fifteenth Amendment and

the Citizen Defendants' rights under the First Amendment.  Courts should avoid statutory

interpretations that would raise serious Constitutional issues.  *Edward J. DeBartolo Corp. v.*

*Florida Gulf Coast Trades Council*, 485 U.S. 568, 575 (1988); *Larouche v. Fowler*, 77 F. Supp.

2d 80, 87-90 (D.D.C. 1999) (three-judge court) (refusing to extend Act to state Democratic

Parties because of First Amendment associational rights).

> D.   The Voting Rights Act Should Be Interpreted To Permit
>       States To Determine The Correct Regulation Of
>       Free Speech In Political Campaigns

Principles of federalism here also support an interpretation of the Act that protects

Michigan's prerogative to conduct its ballot initiative process, and limit "fraud" in its campaigns,

as it thinks best.  Both areas are preeminently matters for State, rather than national, regulation.

*E.g.*, *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. at 192 ("States

allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the

initiative process, as they have with respect to election processes generally").

"`[I]f Congress intends to alter the usual constitutional balance between the States and the

Federal Government, it must make its intention to do so unmistakably clear in the language of the

statute.'"  *Gregory v. Ashcroft*, 501 U.S. 452, 460-61 (1991) (quoting *Atascadero State Hospital*

*v. Scanlon*, 473 U.S. 234, 242 (1985)) (internal quotation marks omitted).  Here, it is hardly

"unmistakably clear" that the Act reaches the conduct plaintiffs allege here; to the contrary, it is

clear that it does not.  Because Congress made no unambiguous statement that it intended to

reach this conduct, as a matter of statutory construction, it should not be deemed to have interfered with the states' primary role in protecting the integrity and reliability of their ballot initiative process.

Specifically, as an initial matter, Michigan may decide to give more protection to speech in an initiative petition drive than the First Amendment may give. *Cf. Michigan Civil Rights Initiative v. Bd. of State Canvassers*, 268 Mich. App. 506, 708 N.W.2d 139 (Ct. App. 2005) (investigation of fraud by Board of Canvassers would "undermine[] the constitutional provision that reserves for the people of the state of Michigan the power to propose laws through ballot initiatives").[4]  Or perhaps Michigan and other states might decide that those who do not read carefully the petitions that they sign do not deserve a day in court even if improper false statements were made.  *See, e.g.*, *In re Initiative Petition No. 142, State Question No. 205*, 55 P.2d 455, 457 (Ok. 1936) ("The presumption is to be indulged that the signers read the instrument presented to them.  Frequently there is divergency of opinion as to the result of a proposed political measure.")  Under any circumstances, the regulation of speech during political campaigns, like electoral districting, "is a most difficult subject for legislatures, and so the States

---

[4]      States may "protect" speech by simply choosing not to regulate it even if they have the power to do so.  In fact, only a minority of states regulate campaign speech at all.  Many of them, to avoid constitutional problems, limit their regulation to knowingly false speech about another candidate (tantamount to defamation).  *E.g.*, Alaska Stat. § 15.56.014 (2006); Miss. Code § 23-15-875 (2006).  Others have various limitations as to the *kind* of speech that is subject to regulation.  *E.g.*, Tenn. Code § 2-19-42 (2006) (only applies to campaign literature); Cal. Elec. Code § 18351 (2006) (only applies to candidates who make false statements); S.D. Laws § 12-13-16 (2006) (only prescribes false *documents* related to a ballot initiative).  Michigan has fairly narrow laws precluding false statements during a campaign.  Mich. Comp. Laws § 168.944 (2005) (false statements concerning incumbency) and § 168.931(3) (2005) (false statements made without attribution).

must have discretion to exercise the political judgment necessary to balance competing interests."
*Miller v. Johnson*, 515 U.S. 900, 915 (1995).  Whatever decision Michigan may make, a strained
interpretation of the Act should not be used to upset the usual federal-state balance by taking the
choice from Michigan and placing it in federal courts.  *Roberts v. Wamser*, 883 F.2d 617, 622-23
(8th Cir. 1989) (candidate had no standing to pursue claim that punch card voting system
violated Section 2; "The issue of the validity or invalidity of a ballot or ballot procedures is a
question of state law . . .  Where Congress acts in a field that is within its constitutional
competence, but has not clearly spoken, a federal court should construe the congressional
enactment in a manner that recognizes and preserves a healthy balance between state and national
power.  A concern for federalism cautions against the excessive entanglement of federal courts in
state election contests.").  There is no clear indication that the Act was intended to be a national
law about campaign speech, even "racially-targeted" campaign speech, with federal judges sitting
as the arbiters over the propriety of the innumerable statements made during a campaign.

>        E.        The Complaint Does Not Allege The Elements of Fraud

Assuming *arguendo* that the Act covers claims of fraud committed by petition circulators,
the complaint would still be deficient because it does not allege the elements of fraud.
Specifically, nowhere does the complaint allege that the Citizen Defendants knew that the
statements that were allegedly made were false.  Furthermore, the assertions were not definite
representations of fact.  *E.g.*, *Ullmo ex rel. Ullmo v. Gilmour Academy*, 273 F.3d 671, 678 (6th
Cir. 2001) (statements in a school brochure about a school's "philosophy" were not fraudulent
because they were indefinite; "`As a predicate for a fraud action, a representation must be

definite; mere vague, general, or indefinite statements are insufficient").

II.     THE CITIZEN DEFENDANTS HAVE LEGISLATIVE IMMUNITY

    In passing the Act, Congress did not abrogate the common-law of legislative immunity.
*E.g.*, *Unidos v. Gov't of the U.S. Virgin Islands*, 314 F. Supp. 2d 501, 505 (D.V.I. 2004)
("Congress has shown no sign that, with the enactment of the Voting Rights Act of 1965 or the
amendments . . . , it intends to invade the parameters of legislative immunity"); *Latino Political
Action Comm. v. City of Boston*, 581 F. Supp. 478, 483-84 (D. Mass. 1984).

    Common-law legislative immunity is not limited to legislators.  It extends to all of those
who participate in the legislative process, including members of the executive branch, *Bogan v.
Scott-Harris*, 523 U.S. 44, 55 (1998) (Mayor entitled to legislative immunity for introducing
budget and signing law), and private citizens who participate in the legislative process by
proposing legislation through the initiative process.  *Brock v. Thompson*, 1997 Ok. 127, 948 P.2d
279, 290 (1997) ("Promoters of an initiative petition drive at its circulation stage clearly act as
political advocates for lawmaking through the initiative process.  Their activities *stand protected
by legislative immunity* through Oklahoma jurisprudence which teaches that (when circulating
and signing initiative or referendum petitions) the people act in their legislative capacity")
(emphasis in original).  As already noted, the Michigan Constitution reserves the right to propose
and adopt amendments to the people.  Accordingly, the Citizen Defendants were acting in a
legislative capacity reserved to private citizens by the Michigan Constitution.  *E.g.*, *Fred Meyer,
Inc.*, 781 F. Supp. at 1515 ("The defendants, in soliciting signatures in order to place an initiative

on the ballot, are participating in the process of enacting law"); *Klosterman v. Marsh*, 180 Neb. 506, 513, 143 N.W.2d 744, 749 (1966) ("The amendment under consideration reserves to the people the right to act in the capacity of legislators") (internal quotation marks omitted).

III.   THE COMPLAINT FAILS TO ALLEGE FRAUD WITH PARTICULARITY

Rule 9(b) of the Federal Rules of Civil Procedure, which provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," is applicable to the allegations of fraud here.  *See Moss v. Bush*, 105 Ohio St. 3d 458, 459-60, 828 N.E.2d 994, 995-96 (2005) (allegations that defendants participated in a pattern of vote fraud and election fraud would have had to meet requirements of analogous Ohio Rule 9(b)); *Digenova v. Baker*, 2002 WL 32356401, *2 (E.D. Pa. April 11, 2002) (complaint dismissed where it "does not allege any facts sufficiently specific to state a claim for union election fraud").  The basic justification for this higher level of pleading is that fraud is a serious allegation, and those charged with committing it have the right to know the details concerning the circumstances.  *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir. 1988) ("[W]e note that the purpose undergirding the particularity requirement of Rule 9(b) is to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading").  *See, e.g.*, *Ross v. A.H. Robins Co., Inc.*, 607 F.2d 545, 557 (2d Cir. 1979); *In re Credit Acceptance Corp. Securities Litigation*, 50 F. Supp. 2d 662, 671 (E.D. Mich. 1999) ("The purpose of Rule 9 is three-fold: (1) it provides defendants with fair notice of the claims against them; (2) it protects defendants from harm to their reputations or goodwill caused by unfounded fraud allegations; and (3) it reduces the number of strike suits and

17

discourages fishing expeditions.").  This justification would seem particularly important where, as here, the complaint does not allege that the individual Citizen Defendants themselves made any misrepresentations.

To meet the requirements of Rule 9(b), a complaint must identify who made the allegedly fraudulent representations, and when and where they were made.  *Michaels*, 848 F.2d at 679-80 (plaintiff must identify "the parties and the participants to the alleged fraud, . . . the time, place and content of the representations"); *Vennittilli v. Primerica, Inc.*, 943 F. Supp. 793, 799 (E.D. Mich. 1996) (noting that to satisfy Rule 9(b), a plaintiff must allege "[t]he time, place and misrepresentation(s) . . . . [and] the identity of the person making the alleged misrepresentations").  Plaintiffs must also plead the circumstances of a fraudulent scheme, such as the statewide fraudulent campaign alleged here, with particularity.  *Heavrin v. Nelson*, 384 F.3d 199, 203 (6th Cir. 2004); *Michaels*, 848 F.2d at 679-80.  The complaint does not have these allegations, and, accordingly, the complaint must be dismissed for failure to plead fraud with specificity.

IV.    INTERPRETATION OF THE VOTING RIGHTS ACT TO REGULATE
       THE CITIZEN DEFENDANTS' ALLEGED CONDUCT WOULD
       RENDER IT UNCONSTITUTIONAL

Adopting plaintiffs' theory of the Act would render it unconstitutional in two ways.  First, it would extend beyond Congress's authority under Section 2 of the Fifteenth Amendment. Second, it would violate the Citizen Defendants' First Amendment rights.

A.    Congress Cannot Regulate Purely Private Conduct
      Pursuant To The Voting Rights Act

Congress passed the Act pursuant its authority under Section 2 of the Fifteenth

Amendment.  79 Stat. 437.  That authority does not permit Congress to reach purely private

conduct.  Thus, for example, in *James v. Bowman*, 190 U.S. 127 (1903), the Court rejected an

indictment, and held the law supporting it beyond Congress's authority.  The indictment alleged

that the defendant had bribed African Americans to prevent them from voting; the Court held

that "this indictment charges no wrong done by the state of Kentucky, or by anyone acting under

its authority." *Id.* at 139.  The Court noted that both the Fourteenth and Fifteenth Amendments

were limited in scope to preventing certain actions by states.  *Id.* at 138 ("The 15th Amendment

. . . has been considered by this court, and the same limitations [as the Fourteenth Amendment]

placed upon its provisions").  It held that "a statute which purports to punish purely individual

action cannot be sustained as an appropriate exercise of the power conferred by the 15th

Amendment." *Id.* at 139.

While the Court occasionally has stretched the limits of who has engaged in "state

action," it never has abandoned that requirement.  More recently, in *United States v. Morrison*,

529 U.S. 598 (2000), the Court held a law that permitted civil suits by the victims of gender-

based violence (42 U.S.C. § 13981) extended beyond Congress's authority under Section 5 of the

Fourteenth Amendment.  *Id.* at 619-27.  The Court acknowledged the legislative history

identifying "pervasive bias in various state justice systems against victims of gender-motivated

violence" (*id.* at 619), but concluded that it was insufficient to support legislation "directed not at

19

any State or state actor, but at individuals who have committed criminal acts motivated by gender bias" (*id.* at 626).  So, too, plaintiffs' theory here against the Citizen Defendants' purported acts of private fraud would render the Act unconstitutional in its application to them.

B.      Application Of The Act Here Would Violate The Citizen
        Defendants' First Amendment Rights

Application of the Act to the Citizen Defendants' purported assertions that the proposed constitutional amendment "favors affirmative action" would violate the Citizen Defendants' First Amendment rights to speech and petition for two reasons.  First, the assertion is a matter of opinion, which is absolutely protected under the First Amendment.  Second, even if the assertion were a statement of fact about which a claim of falsity could properly be made, it is non-defamatory.

Opinions are protected under the First Amendment.  *Dodds v. American Broadcasting Co.*, 145 F.3d 1053, 1065 (9th Cir. 1998) (statements made during a program on "bad judges" were not factual in nature and thus could not be basis for a defamation claim).  To lose that protection, a statement must be provably false.  The statement that the proposed amendment favors affirmative action is not "provably false."

It is a truism, but one that bears repeating here, that there is no broad consensus on the meaning of the phrase "affirmative action."  *See Coalition for Econ. Equity v. Wilson*, 122 F.3d 692, 700 (9th Cir. 1997) ("the term `affirmative action' is an `amorphous, value laden term,' `rarely defined . . . so as to form a common base for intelligent discourse'") (quoting *Lungren v.*

20

*Superior Court*, 48 Cal. App. 4th 435, 442, 55 Cal. Rptr. 2d 690, 694 (Ct. App. 1996)); *Lungren*,

48 Cal. App. 4th at 442-43 (Attorney General acted properly in omitting the term "affirmative

action" from description of Proposition 209; "we cannot fault the Attorney General for refraining

from the use of such an amorphous, value-laden term in the ballot title and ballot label"); *cf.*

*Minnick v. California Dep't of Corrections*, 452 U.S. 105, 128 (1981) (Stewart, J., dissenting

from the dismissal of the writ) (under the Equal Protection Clause, "a sovereign State may never

[engage in racial discrimination], [a]nd it is wholly irrelevant whether . . . the discrimination is

called `affirmative action' or by some less euphemistic term").[5]  Indeed, on any number of

different definitions, the proposed ballot initiative *does* favor "affirmative action."

    In Executive Order No. 10925, President Kennedy required government contractors to

"take affirmative action to ensure that applicants are employed, and that employees are treated

during employment, without regard to their race, creed, color, or national origin."  Exec. Ord

10,925, § 301(1) (1961).  According to this understanding of "affirmative action," the proposed

---

[5]    *See also, e.g.*, John Valery White, *What Is Affirmative Action?*, 78 Tul. L. Rev. 2117, 2117 (2004) ("There is no rigorous definition of affirmative action"); *id.* at 2168-69 ("The academic literature offers no better understanding of what affirmative action is.  Indeed, very little effort is made to define affirmative action, and no serious conceptual definition appears in the literature in recent years"); Deborah C. Malamud, *Values, Symbols And Facts In The Affirmative Action Debate*, 95 Mich. L. Rev. 1668, 1692-94 (1997) (noting various theories in which, *inter alia*, disparate impact analysis of job requirements or the use of statistics generally to smoke out discrimination would be "affirmative action"; and others in which the conscious use of race as a hiring criteria would *not* be "affirmative action"); W. Brevard Hand, *Affirmative Action: La Mort De La Republique? A Second Cry From The Wilderness*, 48 Ala. L. Rev. 799, 800 & n.2 (1997) (senior district judge in Alabama breaks down the phrase into its component words, and concludes that "affirmative action" means "assertive behavior"; "No one can deny that some form of affirmative action, or assertive behavior, has been around since what scientists now call the Big Bang").

amendment certainly supports "affirmative action."  By precluding state employers from using

preferences on the basis of race or color, the proposed amendment will require them to take

action so as to hire and employ persons "without regard to" their race or color.

Another definition of affirmative action might be derived from Justice Douglas's opinion

in *DeFunis v. Odegaard*, 416 U.S. 312 (1972) in which he asserted that it would be entirely

appropriate to "consider[] an individual's prior achievements in light of racial discrimination that

barred his way, as a factor in attempting to assess his true potential for a successful legal career."

*Id.* at 340-41 (Douglas, J., dissenting).  Some consider this definition to be "true affirmative

action," Saverio Cereste, *Minority Inclusion Without Race-Based Affirmative Action: An

Embodiment of Justice Powell's Vision*, 18 N.Y. Law School J. Hum. Rights 577, 599 (2002)

("the exact definition of a true affirmative action plan").  Those that do would be perfectly

reasonable in believing that the proposed amendment, by precluding consideration of race *qua*

race, will force state employers, institutions of higher education, and others to focus more

directly on this kind of "background" affirmative action.  *See also, e.g.*, Clint Bolick, *Civil Rights

Law Enforcement: A Time For Healing*, 24 Harv. J. Law & Publ. Pol'y 555, 563 (2001); Steven

E. Ehlmann, *Another Approach To Racial Preferences*, 54 Wash. Univ. J. Urban & Contemp.

Law 93, 96 (1998) (describing author's proposed bill, introduced in his role as state senator, to

"end[] pure racial preference while sustaining true affirmative action"); William W. Van Alstyne,

*Affirmative Action and Racial Discrimination Under Law: A Preliminary Review* in Selected

Affirmative Action Topics in Employment and Business Set Asides: A Consultation/Hearing of

the United States Commission on Civil Rights 180, 180 (1985) (describing various forms of

affirmative action that do not include preferences on the basis of race):

> The purpose of this paper is to . . . disentangle varieties of affirmative action that do not encourage or require racial discrimination from those that do . . .  The dividing line between them is that the object of appropriate affirmative action is to protect every person from racial discrimination even while expanding opportunities, whereas the object of inappropriate programs is to determine each person's civil rights, either in whole or part, by race.  To be sure, this too is sometimes also called affirmative action.  But for reasons that will become clear . . . , I do not believe the description to be warranted.

Finally, the Sixth Edition of Black's Law Dictionary defines "affirmative action

programs" as

> *Employment* programs *required by federal statutes and regulations* designed to remedy discriminatory practices in hiring minority group members; *i.e.*, designed to eliminate existing and continuing discrimination, to remedy lingering effects of past discrimination, and to create systems and procedures to prevent future discrimination; commonly based on population percentages of minority groups in a particular area.  Factors considered are race, color, sex, creed and age.

Black's Law Dictionary 59, col. 2 (6th ed. 1990) (emphasis added).[6]  It is certainly reasonable to

---

[6]     The Seventh and Eighth editions of Black's no longer define "affirmative action programs," but only "affirmative action," and do so *without* any assertion that it is "commonly based on population percentages of minority groups" or that "race, color, sex, creed, and age" are the "factors considered."  *E.g.*, Black's Law Dictionary 60, col. 1 (7th ed. 1999).  The Citizen Defendants provide the Sixth Edition definition here because it is the one that the Michigan Civil Rights Commission (MCRC) report on which plaintiffs rely so heavily apparently adopted -- presumably because plaintiffs and the MCRC prefer a definition that explicitly identifies the use of race and sex as part of "affirmative action programs."

     Even so, the MCRC report begins by asserting that the phrase affirmative action "should
(continued...)

conclude that the proposed constitutional amendment would support such "affirmative action" programs," since section 4 of the proposal specifically permits the state to take any action to maintain eligibility for any federal program that conditions funds on that eligibility, and section 9 specifically confirms that the amendment does not invalidate any court order or consent decree, including, presumably, those emanating from cases alleging violations of federal employment laws. Moreover, a proposed constitutional amendment to eliminate preferences on the basis of race or sex can certainly be said "to eliminate existing and continuing discrimination."

To be sure, there are some definitions of "affirmative action" that (as Professor Van Alstyne recognized) would include preference programs that the proposed amendment would make illegal. But that does not resolve whether "affirmative action" as a whole would be helped or harmed; the answer to that question can only come from a definition of "affirmative action" that our society currently lacks. Plaintiffs may believe that "affirmative action" necessarily involves only programs that provide a preference on the basis of race or sex, and that the proposed amendment would emaciate current "affirmative action" programs, but that is hardly a universal (or even a common) view. *Compare* Complaint ¶ 30 (purpose of initiative is to "eliminate affirmative action") and ¶ 32 ("actual aim [of initiative] is to *ban affirmative action*" (emphasis in original)) *with Lungren*, 48 Cal. App. 4th at 442 (because "affirmative action"

---

[6](...continued)
be given its traditional meaning" and that "*Black's Law Dictionary* defines affirmative action programs as positive steps designed to eliminate continuing and existing discrimination . . . " Complaint Ex. 1, Report at 1 n.1 (ellipsis reflecting rest of actual definition in Black's Sixth Edition). This attributed definition, of course, ignores the significant limitations of the actual definition provided by Black's Sixth Edition, which is limited to *employment* programs *required* by federal law. Indeed, one could easily conclude that it is false and misleading for the MCRC to attribute its stated definition to Black's Law Dictionary.

encompasses programs that do not involve racial or gender preferences, "any statement to the effect that Proposition 209 repeals affirmative action programs would be overinclusive and hence `false and misleading.' (Elec. Code § 9092).").  Whether a particular definition of "affirmative action" is the "correct" one is a matter of opinion, as are assertions that the proposed amendment "supports" or "opposes" affirmative action.

Even if some revelation from above identified the true understanding of "affirmative action," and it could be said with certitude that the proposed amendment does not support it, the First Amendment would nonetheless protect the statements alleged in the complaint.  False statements of fact are left unprotected by the First Amendment only if they are defamatory statements made with actual malice.  Thus, in *State ex rel. Public Disclosure Comm'n v. 119 Vote No! Comm.*, 135 Wash. 2d 618, 957 P.2d 691 (1998), the Court concluded that a Washington statute that prohibited any political advertising containing a false statement of material fact made with actual malice, where proof of falsity and actual malice had to be shown by clear and convincing evidence, nonetheless violated the First Amendment.  The Court distinguished defamation law on the ground that the separate state interest in compensating individuals whose reputation has been injured was absent.  *Id.* at 628-29.  (Although the plurality and concurrence disagreed about whether actual defamation could be actionable when made in the course of a political campaign, both agreed that false non-defamatory statements were wholly protected, even if made with actual malice.)  Quoting Justice Jackson's opinion in *Thomas v. Collins*, 323 U.S. 516 (1945), the Court stated:

> The very purpose of the First Amendment is to foreclose public
> authority from assuming a guardianship of the public mind . . . In
> this field *every person* must be his own watchman for truth because
> the forefathers did not trust any government to separate the true
> from the false for us.

*119 Vote No! Comm.*, 957 P.2d at 695 (internal citations omitted) (emphasis in original).

Supreme Court opinions support this result.  The Court has held that First Amendment protection is at its zenith during the petitioning process, since it involves a direct effort by citizens to influence their government.  *Meyer v. Grant*, 486 U.S. 414, 425 (1988) (speech needed to obtain signatures on an initiative "is at the core of our electoral process and of the First Amendment freedoms, . . . an area of public policy where protection of robust discussion is at its zenith.") (quoting *Grant v. Meyer*, 828 F.2d 1446, 1456-57 (10th Cir. 1987)) (internal quotation marks omitted).  At the same time, the dangers from fraud or corruption are at a nadir.  *Id.* at 427 (the "risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting"); *Krislov v. Rednour*, 226 F.3d 851, 865 (7th Cir. 2000) (interest in ensuring the integrity of the election process did not support law requiring petition circulators to be residents; "Like the Supreme Court, we think that the dangers to the electoral system . . . are particularly remote when simply gathering signatures").  This is especially true here because any so-called fraud (1) easily could have been remedied by the petition signers themselves by reading the petition and assessing for themselves what the amendment would do and (2) can still be remedied by those allegedly "defrauded" by their voting against the proposition.

26

<u>Conclusion</u>

      For the foregoing reasons, the Citizen Defendants' motion for judgment on the pleadings should be granted.

<u>/s/ James K. Fett</u>
JAMES K. FETT (P39461)
FETT & FIELDS, P.C.
805 E. Main St.
Pinckney, MI 48169
Phone: (734) 954-0100

<u>/s/ Michael E. Rosman</u>
MICHAEL E. ROSMAN
CENTER FOR INDIVIDUAL RIGHTS
1233 20th St. NW Suite 300
Washington, DC 20036
Phone: (202) 833-8400

Certificate of Service

I hereby certify that on August 3, 2006, I electronically filed the foregoing motion for a

judgment on the pleadings and brief in support thereof with the Clerk of the Court using the

CM/ECF system which sent a Notice of Electronic Filing to the following persons:

George B. Washington (attorney for plaintiffs)

Patrick J. O'Brien (attorney for defendants Terry Lynn Land, *et al.*)


_____ */s/ Michael E. Rosman*_____
Michael E. Rosman

28