*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| OPERATION KING'S DREAM, KWAME M. KILPATRICK, LOCALS 207 AND 312 OF THE AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES (AFSCME), SAMANTHA CANTY, BELITA H. COWAN, MARTHA CUNEO, LINDA DEE MCDONALD, MICHELLE MCFARLIN, PEARLINE MCRAE, and SARAH SMITH, <br><br> Plaintiffs. <br><br> v. <br><br> WARD CONNERLY, JENNIFER GRATZ, and the MICHIGAN CIVIL RIGHTS INITIATIVE, and TERRI LYNN LAND, in her official capacity as Secretary of State; KATHRYN DEGROW, LYNN BANKES, and DOYLE O'CONNOR, in their official capacities as members of the state Board of Canvassers; and CHRISTOPHER THOMAS, in his official capacity as State Director of Elections, <br><br> Defendants. | Case No. 06-12773 <br><br> Arthur J. Tarnow <br> District Judge |

_____

## OPINION AND ORDER

### I.  Introduction

In this voting rights case, Plaintiffs argue that Defendant Michigan Civil Rights Initiative (MCRI) used racially-targeted voter fraud to obtain signatures in support of an initiative petition to place an anti-affirmative action proposal on the November 2006 general election ballot.  The Court finds that the MCRI engaged in systematic voter fraud by telling voters that they were signing a petition supporting affirmative action.  However, the MCRI appears to have targeted

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

all Michigan voters for deception without regard to race. Because the Voting Rights Act is not a general anti-voter fraud statute, but rather prohibits practices which result in unequal access to the political process because of race, the Court must conclude that the defendants' conduct, though unprincipled, did not violate the Act.

The Court is cognizant of allegations that intervention in the political processes at issue, including a finding that the MCRI defrauded Michigan voters, would be an unwarranted exercise of "judicial activism." Such accusations are without merit.

One of the duties of a federal judge  is to serve as a "referee" as to state political processes:

> [T]he Founding Fathers recognized that voting itself posed a danger to a representative democracy. Majority factions were particularly troubling because the principle of majority rule empowered them to silence the voices of those in the minority. Consequently, the constitutional Framers installed the federal courts as "judicial referees" that would protect minorities from the tyranny of the majority. When it enacted the Voting Rights Act of 1965, Congress also envisioned that the judiciary would play an active role in protecting the right of minorities to give or withhold their consent.
>
> \*   \*   \*
>
> Judges dispassionately oversee the process of selecting the people's representatives...The extent to which judges must intervene is dictated by the play of the participants in the political process...The more participants depart from the rules of the game–concern and respect for the equal opportunity of all groups of voters to give their consent to government...the more the courts, as referees, must intervene.

James Thomas Tucker, *Tyranny of the Judiciary: Judicial Dilution of Consent Under Section 2 of the Voting Rights Act*, 7 Wm. & Mary Bill Rts. J. 443, 489-90 (1999) (citing John Hart Ely, DEMOCRACY AND DISTRUST 81, 88 (1980); *also citing League of United Latin Am. Citizens, Council No. 4434 v. Clements ("LULAC I")*, 914 F. 2d 620, 631 (5th Cir. 1990) (noting that judicial selection processes 'determine the referees in our majoritarian political game.'); *rev'd sub nom. Houston Lawyers Assn' v. Texas Attorney Gen.*, 501 U.S. 419 (1991)).

2

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

The decision to encourage an active judicial role in reviewing state electoral processes for discrimination was a policy decision made by Congress in passing the Voting Rights Act of 1965. The Court will not second-guess this decision and will not take its duty to interpret and apply the Act's provisions lightly.

All Michigan voters, whether supporters or opponents of affirmative action, should be concerned by the actions taken by MCRI in its attempt to place the proposed amendment on the November 2006 ballot. In particular, opponents of affirmative action should be concerned by what the MCRI has done while purporting to act in their name. If the proposal eventually passes, it will be stained by well-documented acts of fraud and deception that the defendants, as a matter of fact, have not credibly denied.

The People of Michigan should also be concerned by the indifference exhibited by the state agencies who could have investigated and addressed MCRI's actions but failed to do so. With the exception of the Michigan Civil Rights Commission, the record shows that the state has demonstrated an almost complete institutional indifference to the credible allegations of voter fraud raised by Plaintiffs. If the institutions established by the People of Michigan, including the Michigan Courts, Board of State Canvassers, Secretary of State, Attorney General, and Bureau of Elections, had taken the allegations of voter fraud seriously, then it is quite possible that this case would not have come to federal court. However, the Court cannot turn back the clock, and can only deal with the facts that are presented to it.

There are three motions currently pending before the Court. For the reasons that follow, Plaintiffs' motion for preliminary injunction [DE 15] is denied, the state defendants' motion to dismiss [DE 9] is granted, and the MCRI defendants' motion for judgment on the pleadings [DE 21] is granted.

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

## II.  Facts

### A.  State Proceedings

From approximately July 2004 through December 2004, the MCRI solicited signatures in support of placing its anti-affirmative action[1] initiative on the November 2006 general election ballot.  On January 6, 2005, the MCRI submitted 508,202 signatures in support of its initiative petition.  In order to qualify for the ballot, MCRI needed to submit 317,757 valid signatures, representing ten percent of the number of votes cast in the last election for governor.

The Secretary of State staff reviewed the petition, including a random sampling of 500 signatures.  This process revealed that 50 of the 500 sample signatures were invalid either because they were facially defective or the signer was not a registered voter.  Under state law, the Secretary of State was not obligated to go beyond performing these ministerial functions in approving the petition.

Operation King's Dream and the Coalition to Defend Affirmative Action & Integration and Fight for Equality by Any Means Necessary (BAMN) used the same 500 sample signatures to review the "validity" of the signatures.  They concluded that the MCRI petition circulators deceived signers by leading them to believe that the initiative was one in support of affirmative action, rather than one that would ban affirmative action.

Operation King's Dream and BAMN claimed that the petition circulators' deception was specifically directed to voters in areas with large minority populations, resulting in 125,000

---

[1]There is a disagreement among the parties as to whether or not there is a settled definition of the term "affirmative action."  The Court finds that there is a commonly understood definition of the term which is material to the purpose of the MCRI petition and proposed constitutional amendment.  In other words, in order to understand what the proposal and petition mean, voters should, at a minimum, be apprised of the fact that their purpose is to ban affirmative action.  Apparently in recognition of this fact, the Michigan Secretary of State's approved ballot language uses the term "affirmative action" in summarizing the proposal and its intended consequences. *See* Note 5, *infra*.

4

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

minority signatures being obtained under false pretenses.  As a result of their findings, they

challenged the petition based on a claim that the MCRI petition language was deceptive.

Specifically, they claimed that while the language of the proposed amendment purported to ban

"preferences," if failed to mention the term "affirmative action."[2] Plaintiffs also alleged that

MCRI obtained a significant amount of signatures by way of racially-targeted fraud.

On July 19, 2005, the State Board of Canvassers held a meeting to hear challenges to the

petition and testimony regarding the claims of fraud.

In his answer to Plaintiffs' complaint in this Court, then Board of State Canvassers

member Doyle O'Connor asserted that the Board considered investigating the allegations of

fraud.  O'Connor believed that the Board's deliberations were undermined by the Office of the

_____

[2]The petition text states:

A Proposal to amend the Michigan Constitution by adding a Section 25 to Article
I that would: (1) prohibit the University of Michigan, Michigan State University,
Wayne State University, and any other public college or university, community
college, or school district from discriminating against, or granting preferential
treatment to, any individual or group on the basis of race, sex, color, ethnicity, or
national origin in the operation of public employment, public education, or public
contracting; (2) prohibit the State from discriminating against, or granting
preferential treatment to, any individual or group on the basis of race, sex, color,
ethnicity, or national origin in the operation of public employment, public
education, or public contracting; (3) define for purposes of this section "State" as
including, but not necessarily limited to, the State itself, any city, county, public
college or university, community college, school district, or other political
subdivision or governmental instrumentality of or within the State of Michigan;
(4) not apply to actions that must be taken to establish or maintain eligibility for
any federal program, if ineligibility would result in a loss of federal funds; (5) not
affect bona fide qualifications based on sex that are reasonably necessary to the
normal operation of public employment, public education, or public contracting;
(6) allow remedies as are now allowed by law; (7) be self-executing and its
provisions severable; (8) set an effective date; (9) not invalidate any court order
or consent decree that is in force as of the effective date.

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

Attorney General of Michigan, which issued a letter stating that the Board did not have the authority to investigate such claims.

State Representative Leon Drolet, who is also the Chairman of the MCRI ballot proposal committee, requested a Formal Opinion from the Attorney General.[3]  Representative Drolet's request consisted of several questions asking whether or not the Board may investigate claims of "fraudulent inducement" or "fraudulent misrepresentation" in determining the validity and sufficiency of the signatures on petitions.

The Attorney General's office did not issue a formal opinion in response to Representative Drolet's request, but instead issued an informal letter.[4]  The letter stated that the Board did not have the authority to investigate claims of fraud.  Chief Deputy Attorney General Gary P. Gordon presented the letter at the July 19, 2005 meeting of the Board.

At the evidentiary hearing held in this case, Canvasser O'Connor testified that the letter from the Attorney General's Office could not be considered a formal opinion of the Attorney General.  However, Gordon told the Board that it had to obey the decision set forth in the letter.  O'Connor tried to persuade the Board to conduct an investigation, in part because the Attorney General's letter was not binding.

At the conclusion of the hearing, one Board member moved that the Board, along with the Bureau of Elections, conduct an investigation of the fraud allegations.  The Board split on a

---

[3]According to M.C.L. 14.32, the Attorney General has the duty to "give his opinion upon all questions of law submitted to him by the legislature..."  Therefore, Representative Drolet used his legislative status to request a Formal Opinion from the Attorney General.

[4] If issued, a Formal Opinion would have the force of law and would be legally binding on the Board.  A Formal Opinion of the Attorney General must go through an internal approval process designed to protect the integrity and independence of such opinions.  The response to Representative Drolet's request was not approved for Formal Opinion status, but resulted in the non-binding letter issued by the Office of the Attorney General.

6

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

vote of two to two, and the motion to investigate did not pass. Another Board member moved to certify the petition. The vote to certify failed on a vote of one to two, with one abstention.

MCRI filed a complaint for mandamus in the Michigan Court of Appeals seeking an order requiring the Board to certify the MCRI petitions for placement on the November 2006 ballot.

On October 31, 2005, the Michigan Court of Appeals held that "the Legislature failed to provide the board with authority to investigate and determine whether fraudulent representations were made by the circulators." *Michigan Civil Rights Initiative v. Bd. of State Canvassers*, 708 N.W. 2d 139, 143; 268 Mich.App. 506 (2005). Therefore, "the board [had] no statutory authority to conduct such an investigation." *Id.*

The Court of Appeals granted MCRI's request for mandamus and remanded the case to the Board with directions to approve the petition for placement on the November 2006 ballot.

Operation King's Dream intervened and filed a motion for reconsideration of the Court of Appeals' decision. On December 7, 2005, the Court of Appeals issued an order denying reconsideration, directing the Board to immediately approve and certify the petition, and ordering the Secretary of State to take all necessary measures to place the proposal on the November 2006 general election ballot.

On December 14, 2005, the Board held a meeting but did not pass a motion certifying the petition. This meeting was disrupted by a large number of protesters opposing the petition.

MCRI filed a motion for contempt and for certification of the petition in the Michigan Court of Appeals. The Court declined to address the contempt issue and ordered the Secretary of State to take all necessary measures to place the initiative on the ballot. The Court also ordered defendant Christopher Thomas, State Director of Elections, to prepare the ballot summary of the proposal. The Board approved the summary ballot language on January 20, 2006.

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

The summary prepared by Thomas and approved by the Board clarified for the first time that the proposal would effectively ban "affirmative action" as opposed to "discrimination" or "preferential treatment," the language used in the proposal and petition.[5]

Operation King's Dream filed an application for leave to appeal in the Michigan Supreme Court. The application was denied on March 29, 2006, with Justices Kelly and Cavanagh dissenting. *Michigan Civil Rights Initiative v. Board of State Canvassers*, 711 N.W. 2d 82; 474 Mich. 1099 (2006). On April 18, 2006, the intervenors filed a motion for reconsideration, asking that the Supreme Court refrain from deciding the motion until the Michigan Civil Rights Commission had filed a report regarding its investigation of the fraud claims.

---

[5]The approved summary ballot language states:

**A PROPOSAL TO AMEND THE STATE CONSTITUTION TO BAN AFFIRMATIVE ACTION PROGRAMS THAT GIVE PREFERENTIAL TREATMENT TO GROUPS OR INDIVIDUALS BASED ON THEIR RACE, GENDER, COLOR, ETHNICITY OR NATIONAL ORIGIN FOR PUBLIC EMPLOYMENT, EDUCATION, OR CONTRACTING PURPOSES.**

The proposed constitutional amendment would:

- Ban public institutions from using affirmative action programs that give preferential treatment to groups or individuals based on their race, gender, color, ethnicity or national origin for public employment, education or contracting purposes. Public institutions affected by the proposal include state government, local governments, public colleges and universities, community colleges and school districts.

- Prohibit public institutions from discriminating against groups or individuals due to their gender, ethnicity, race, color or national origin. (A separate provision of the state constitution already prohibits discrimination on the basis of race, color or national origin.)

http://www.michigan.gov/documents/Bal_Lang_MCRI_152610_7.pdf.

8

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

On June 7, 2006, the Michigan Civil Rights Commission published a report titled *Report on the Use of Fraud and Deception in the Gathering of Signatures for the Michigan Civil Rights Initiative*. The Commission's report summarized and set forth testimony from several citizens who signed the petition because circulators told them that it supported affirmative action. The report was also based on the testimony of petition circulators who stated that they had told potential signers that the petition supported affirmative action.

The Commission submitted its report to the Justices of the Michigan Supreme Court in support of the intervenors' motion for reconsideration of the order denying leave to appeal. The Commission's letter stated in part:

> Two notable and distressing truths emerge from the hundreds of pages of testimony included in the report. First, the instances of misrepresentation regarding the content of the MCRI ballot language are not isolated or random. Acts of misrepresentation occurred across the state, in multiple locations in the same communities, and over long periods of time. Second, the impact of these acts of deception is substantial. It appears that the acts documented in the report represent a highly coordinated, systematic strategy involving many circulators and most importantly, thousands of voters.

Letter from MCRC to Justices of the Michigan Supreme Court at 1-2.

On July 13, 2006, the Michigan Supreme Court denied the intervenors' motion without reviewing the findings of the Commission. *Michigan Civil Rights Initiative v. Board of State Canvassers*, 716 N.W. 2d 590 (2006). Again, Justices Kelly and Cavanagh dissented. In dissent, Justice Kelly stated that the Court should grant reconsideration, noting that the Court had the Commission's report before it for the first time. According to Justice Kelly,

> The Commission's *report* is an impressive compilation of persuasive information that this Court should not dismiss without careful consideration. We should grant reconsideration and leave to appeal. We should provide these vital issues the briefing and argument they deserve. If we fail to do so, we shirk our responsibility as the state's highest court.

*Id*. at 593 (Italics in original).

9

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

### B.  Federal Proceedings

This Court conducted an evidentiary hearing and heard oral argument on August 17 and August 18, 2006.

### 1.  Plaintiffs' Witnesses

Lawrence Fears, a sewerage plant operator from Detroit, testified that he signed the MCRI petition at a credit union in Detroit.  He read part of the petition.  However, the language was unclear to him and was obscured by padding and tape attached to the clipboard.  He asked the circulator what it was about.  She responded that it was to keep affirmative action.  When he asked her if the petition had anything to do with Ward Connerly, she told him that it did not and that she was "not trying to do that."  Fears testified that he usually reads petitions before signing them.  Because the petition language was unclear to him, he relied on the circulator's representations concerning the intent of the petition. After he found out that he had signed a petition opposing affirmative action, he signed an affidavit stating that he done so because he was deceived.

Conuetta Wright, a sewerage plant operator and college student from Detroit, testified that she and her son were approached by a petition circulator in November 2004.  The circulator told her that people were trying to abolish affirmative action and that he was petitioning to keep affirmative action on the books.  He told her that if affirmative action were abolished, then her son would not be able to attend the University of Michigan.  Wright read the language of the petition but did not understand it.  She testified that she does not consider affirmative action to be a "preference."

Heidi Osgood, an advertising sales representative for the *Michigan Citizen* newspaper in Detroit, testified that she witnessed a circulator telling a woman that the MCRI petition supported affirmative action.  She approached the signer and told her not to sign the petition

because the circulator was lying to her.  She told the circulator that she was lying, but the circulator did not respond.

Ruthie Stevenson, president of the Macomb County, Michigan NAACP, testified that she was approached by a circulator outside the Mt. Clemens post office.  When he asked the circulator what the petition was about, he told her it was to "make civil rights fairer for everybody."  The circulator then told her that Ruthie Stevenson, president of the Macomb County branch of the NAACP, supported the petition.  She told him that she was Ruthie Stevenson and that she did not support the petition.  He walked away without responding.


Sarah Smith, a community organizer from Grand Rapids, testified that she was approached by a circulator at a shopping center.  She described the circulator as "approximately five ten, five eleven, African-American, weighing about 145, 165 pounds.  Thin build with a goatee mustache and short black hair and rough complexion."  She testified that she recalled his appearance because she trains residents in her community to identify persons for public safety reasons. The circulator asked her if she supported affirmative action.  After she told him that she did, he told her that they needed her support to keep affirmative action alive by putting it on the ballot.  She signed the petition but did not read it because she trusted the circulator to be telling her the truth.  She asked the circulator if she could see the back of the petition because she believed it would present more information.  He told her that there was no back to the petition, but showed her a "script" which was taped to the back of his clipboard.  The script stated, "Do you believe in affirmative action?  If so we need to work together to save it by putting it on the ballot in November.  Please help keep affirmative action alive.  We need you to sign now."  Smith testified that she witnessed several other people sign the petition.

On cross-examination, Smith admitted that the circulator's signature at the bottom of the

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

petition was a woman's name, Dorothy Thompson. However, Smith's testimony that she trains individuals to identify persons within the community and the detail she used in identifying the circulator leads the Court to conclude that her testimony was credible on the issue of the circulator's identity. Based on Smith's testimony, the Court finds as a matter of fact that Smith testified truthfully.

Doyle O'Connor testified that on several occasions he witnessed two young African-American women circulating the petition at Eastern Market in Detroit. The circulators approached him several times and once asked him to sign a petition to help Black kids get into college. He told them that the petition opposed affirmative action and that if they were told otherwise they were lied to. Their responses alternated from telling him that the petition was not against affirmative action and that it would put affirmative action on the ballot for discussion. During their conversation with O'Connor, the circulators approached other people and told them that the petition supported affirmative action. During their first discussion, the circulators told O'Connor that they were volunteers and were circulating to help Black kids get into college. During a later discussion, they told him they were getting paid and that they did not care what the petition said, as long as they got paid. On another occasion, O'Connor saw circulators at a drug store telling signers that the petition supported affirmative action.

Canvasser O'Connor testified that in his experience with ballot proposals, there will always be certain circulators who are prone to using "puffery" and exaggeration to obtain signatures. However, after the Board of Canvassers reviewed the evidence of alleged voter fraud, O'Connor concluded that there was a pervasive pattern of deceptive conduct in support of the MCRI petition, as opposed to "isolated excesses" by individual canvassers.

Reverend Nathaniel Smith testified that he worked as a circulator and told voters that the petition supported affirmative action. According to Smith, the company that hired him to

12

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

circulate conducted an orientation and instructed circulators to tell potential signers that the petition was a pro-civil rights and pro-affirmative action petition.  The company preferred that Black circulators devote most of their attention to the inner city of Detroit.   Smith, an experienced circulator, testified that he ordinarily solicited signatures at higher volume locations outside the city of Detroit.  He estimated that he obtained approximately 500 signatures before someone approached him and said the intent of the petition was to place an anti-affirmative action proposal on the ballot.  Smith was confused by the language of the petition, in combination with the statements of the supervisors at the circulating company, who inferred that the intent of the petition was to combat discrimination.

Donna Stern, the treasurer and administrative coordinator for Operation King's Dream, testified that she analyzed the statistically representative 500 signature sample used by the Secretary of State.  She testified that 75 of the signatures came from the city of Detroit, 25 came from Flint, 6 came from Highland Park, 4 came from Saginaw, 3 came from Southfield, 2 came from Benton Harbor, 2 came from Oak Park, 2 came from Morse Township and 1 came from Inkster.  This translated to a total of 120, or 24 percent of the total signatures from Black majority cities.  Operation King's dream utilized the sample and the partial data base of signers prepared by a company called Practical Political Consulting to contact individuals and ask whether or not they intended to sign a petition that would place an anti-affirmative action proposal on the ballot.

Allison Krantz from Bloomfield Hills testified that in 2004 she witnessed a circulator soliciting signatures at a Hispanic festival at Calder Plaza in Grand Rapids.  The solicitor approached her and asked her if she cared about civil rights and wanted to end racism.  After Krantz responded that she did, the circulator gave her the petition and told her to sign it.  Krantz asked her what the petition was about specifically and the circulator responded that it would

13

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

"end all discrimination."  Krantz read the petition and recognized it as the MCRI petition based

on news stories she had read.  When she asked the circulator if it the petition was about

affirmative action, she responded that it had nothing to do with affirmative action.  Then she

asked the circulator if the petition had any relationship to the University of Michigan affirmative

action cases.  The circulator responded that if the initiative passed, the University of Michigan

cases would not have been necessary because it would reaffirm the state's current practices.

Other people who had signed the petition and witnessed Krantz's conversation tried to get the

woman to take their names off the petition, but she ignored them and walked away.

Joseph Reed from Detroit testified that he circulated petitions through a private petition

circulating company.  He read the petition and believed that it was against affirmative action

based on what he had heard about the California anti-affirmative action proposal.  He asked the

woman who gave him the petition if she was sure that it was for affirmative action.   She told

him that it was.  He told potential signers that the petition supported affirmative action.  Many

petitioners he solicited could not read well or were in a hurry and therefore did not read the

petition.  They signed it based on his representation that it was in favor of affirmative action.

Andra Williams testified that she was approached by a circulator outside the Southfield

Public Library.  The Circulator asked her to sign a petition supporting affirmative action. She

signed the petition based on that representation.

Hannah McKinney, the mayor of Kalamazoo, testified that she signed the petition on

October 5, 2004, and that she would not have signed it had she known that it supported an anti-

affirmative action proposal.

Fred Anthony from Flint, Michigan testified that he was approached by a circulator at a

supermarket and asked to sign a petition supporting affirmative action.  The circulator asked him

if he had kids in college.  When he responded that he did, the circulator told him that the petition

14

would help kids get into college and keep affirmative action in place.  Based on those statements, Anthony signed the petition.

## 2.  State Defendants' Witnesses

Chris Thomas, Director of Elections for the Michigan Secretary of State, testified that his department's first responsibility with regard to initiative petitions is to review them as to form. This process does not require any review of the substantive language of the petition or of the accuracy of the summary but is limited to such issues as type size, warnings, and layout.

The department's next responsibility was to analyze a random sample of 500 signatures submitted in support of the petition.  On July 13, 2005, the department released its analysis of the signatures on the MCRI petition.  Thomas testified that even if all of Plaintiffs' allegations were accepted as true, there would still be a sufficient number of signatures to place the MCRI proposal on the ballot.  As to Plaintiffs' allegations of fraud, Thomas testified that the evidence submitted by Operation King's Dream in its state-level challenge of the 500 signature sample was insufficient to prohibit certification of the initiative. He also testified that there is no provision of state law addressing statements made by circulators of initiative petitioners to potential signers.

Thomas testified that other than the Michigan Civil Rights Commission, no agency of the State of Michigan has actually investigated Plaintiffs' allegations that signatures in support of the MCRI petition were obtained as a result of racially-targeted voter fraud.  Thomas testified that to his knowledge it is not a crime under Michigan law to misrepresent the purpose of an initiative petition.

## 3.  MCRI Defendants' Witnesses

William Allen, a professor of political science at Michigan State University and opponent of affirmative action, testified that he was approached by a petition circulator at the Ann Arbor

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

Art Fair.  Allen testified that the circulator presented the petition "indistinctly to be sure at the outset," which led him to interrupt the circulator, ask for a copy of the petition, and read it. Allen testified that the circulator did not misrepresent the character of the petition and that he could easily understand the petition language.  Allen did not sign the petition that day but eventually requested that a copy be mailed to him so he could sign it.

Allen also testified that a representative from BAMN came to his church and asked that people who may have signed the MCRI petition to attend a hearing in Lansing before the Michigan Civil Rights Commission and testify about their experiences in signing the petition. Allen also testified before the Commission in a manner consistent with his testimony at the evidentiary hearing in this Court.  Allen shared his opinion that the testimony before the Commission was patterned and seemed to have been prepared.

Heidi Verougstraete testified that she works for a company called National Signature Management (NSM), which was retained by the MCRI to gather petitions in support of the initiative petition.  NSM hired independent contractors to gather signatures and paid them on a per signature basis for their services.  NSM trained approximately 1000 circulators for the MCRI petition, and approximately 600 such circulators returned signed petitions to NSM. Verougstraete testified that the circulators were trained to make the language available for review by the signers, and that her company would not accept signatures if the petition form language had been altered or destroyed.

As to the substance of the MCRI petition, Verougstraete testified that NSM trainers told circulators to read the language for themselves.  She also told circulators that the purpose of the proposed amendment "was to end race and gender preferences."  She did not make any reference to affirmative action during any training session and did not witness any other trainer reference affirmative action.  She testified that several circulators came back with unsigned petitions

16

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

because they were harassed and that opposition groups would prevent people from signing the petition.

Verougstraete testified that Nathaniel Smith worked for her several times and that he had a poor validity rate and did not gather very many signatures.  Defense counsel solicited this testimony to rebut Smith's testimony that he was an excellent circulator.  However, the Court finds that the issue of Smith's effectiveness in general is irrelevant and does not affect the issue of whether or not he misled voters into signing the MCRI petition.

Verougstraete also testified that no one named Glenda, and no one who called herself Glenda, ever worked for NSM.  This testimony contradicted Joseph Reed's testimony that a woman named Glenda provided him with petitions at an office on Grand River Avenue in Detroit.

On cross-examination, Verougstraete testified that although a significant number of circulators returned to the office and asked whether or not the purpose of the petition was to end affirmative action, she never used the term "affirmative action" in explaining it to them and never corrected their misapprehension regarding the purpose of the petition.  Instead, she would direct them to read the "face of the petition," and told them that the purpose of the proposal was to end "race and gender preferences" in various institutions.

Jennifer Gratz, executive director of the MCRI initiative petition committee, testified that she hired NSM to circulate petitions and that she did not provide NSM any instructions as to how to gather petitions.  She had no personal involvement in the training of circulators.

As to the substance of the petition, Gratz claimed to be "familiar with...affirmative action programs in the state and in the nation[.]"  However, she could not provide an answer to Plaintiffs' counsels' inquiry into whether or not the MCRI proposal would spare any program commonly known as "affirmative action" from its broad prohibition.

17

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

Gratz also testified that the purpose of using the term "preference" in the proposal was to ban "discrimination."  However, she could not explain what forms of discrimination would be banned by the proposal that are not already prohibited by state and federal anti-discrimination laws.

Gratz denied having been invited to participate in the Michigan Civil Rights Commission's investigation.  She offered no response to the Commission's conclusion that she provided an incorrect and/or intentionally misleading statement by stating that the plaintiffs' allegations had "been reviewed by the Bureau of Elections, the appropriate body to investigate election claims, and have been found to be without merit."  *Commission Report* at 5.

The Court finds that Gratz's testimony in this Court was evasive and misleading.  Her denial of an invitation to participate in the MCRC's investigation was not credible in light of the Commission's detailed and thorough report.  In fact, there is no dispute that the Commission issued an Order for MCRI to produce evidence to assist in its investigation.  At oral argument counsel for the MCRI defendants contradicted Gratz's testimony by conceding that the MCRI refused to cooperate with the Commission's investigation.

In its report, the Commission correctly noted that Gratz was either ignorant of the state's failure to investigate the plaintiff's allegations, or that she deliberately lied by stating that the Bureau of Elections had investigated those claims.  Gratz's testimony in this Court was consistent with the Commission's conclusion that her assertions have been "incorrect at best, and intentionally misleading, at worst."

 For example, as to the similarity of the MCRI proposal to California Proposition 209, Gratz testified as follows:

> Q.     Ms. Gratz, as I understand it, the language for this proposal came directly from California?
>
> A.     The language was discussed from July through September, October of

18

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

2003.

Q.      But my question is it came from California, correct?  It is exactly the
        language of proposition 209 in California?

A.      No, it's not exactly the language.

Q.      All right.  Is it 99.8 percent the language from California?

A.      It's similar to California.

Q.      What are the difference from California?

A.      We added the University of Michigan, Wayne State University.  The
        universities are spelled out because I believe that there was a status of
        timing within the Michigan Constitution.

Q.      So other than adding the University of Michigan and Wayne State it is the
        same as California correct?

A.      It is not just the University of Michigan and Wayne State.

Q.      Wayne State and a couple others?

A.      Yes.

Q.      Others than adding the names of university that aren't located in California
        it is the California language, correct?

A.      I believe so.

Evidentiary Hearing 8/17/06.

This evasive testimony illustrates that Gratz either didn't know the similarity between the

MCRI petition language and the language of California Proposition 209, or she knew the

similarity between them and intended to mislead.  In reviewing Gratz's testimony as a whole, it

is difficult to determine where the line between wilful ignorance and deliberate deception could

be drawn.

19

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

This Court was particularly struck by Gratz's refusal to clarify her intentions in supporting the MCRI proposal. It would appear that Gratz has nothing to hide concerning her intention to ban affirmative action. Unfortunately, her lack of clarity and forthrightness seems typical of the MCRI's approach, which is best characterized by the use of deception and connivance to confuse the issues in the hopes of getting the proposal on the ballot.

**4.  Findings of the Court**

The Court finds that MCRI and its circulators engaged in a pattern of voter fraud by deceiving voters into believing that the petition supported affirmative action. At the evidentiary hearing and oral argument conducted in this Court, neither the state defendants nor the MCRI defendants presented an adequate defense either to the facts set forth in the Michigan Civil Rights Commission's *Report* or to the testimony elicited during the evidentiary hearing. The evidence overwhelmingly favors a finding that the MCRI defendants engaged in voter fraud.

The Court finds that the conduct of the circulators went beyond mere "puffery" and was in fact fraudulent because it objectively misrepresented the purpose of the petition. As the Second Circuit stated in *Vulcan Metals Co. v. Simmons Mfg. Co.*, 248 F. 853 (2d Cir. 1918), the critical difference between puffing and fraud is that in the latter situation, the recipient of false information is in a position to reasonably rely on the assurances of the speaker:

> When the parties are so situated that the buyer may reasonably rely upon the expression of the seller's opinion, it is no excuse to give a false one. And so it makes much difference whether the parties stand "on an equality." For example, we should treat very differently the expressed opinion of a chemist to a layman about the properties of a composition from the same opinion between chemist and chemist, when the buyer had full opportunity to examine. The reason of the rule lies, we think, in this: There are some kinds of talk which no sensible man takes seriously, and if he does he suffers from his credulity. If we were all scrupulously honest, it would not be so; but, as it is, neither party usually believes what the seller says about his own opinions, and each knows it. Such statements, like the claims of campaign managers before election, are rather designed to allay the suspicion which would attend their absence than to be understood as having any

20

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

relation to objective truth. It is quite true that they induce a compliant temper in
the buyer, but it is by a much more subtle process than through the acceptance of
his claims for his wares.

*Id.* at 856.

In this case, some of the circulators of the MCRI petition were themselves led to believe
that they were circulating a petition supporting affirmative action. Other circulators obviously
knew that the petition opposed affirmative action and deliberately misrepresented the petition's
purpose. In either situation, the signers were in a position to reasonably rely on the circulators'
misrepresentations.

The MCRI defendants were aware of and encouraged such deception by disguising their
proposal as a ban on "preferences" and "discrimination," without ever fulfilling their
responsibility to forthrightly clarify what these terms were supposed to mean. Jennifer Gratz's
confusion at the evidentiary hearing as to the purpose of the MCRI's proposal supports the
Court's conclusion that the MCRI deliberately encouraged voter fraud and did nothing to remedy
such fraud once it occurred.

### III.  Discussion

### A.  Defendants' Motions

In deciding the state defendants' motion to dismiss and the MCRI defendants' motion for
judgment on the pleadings, the Court heard testimony and examined other extrinsic evidence.
Therefore, the motions should be reviewed under the summary judgment standard of Rule 56(c).

Summary judgment is appropriate when there is no genuine issue as to any material fact
and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P 56(c). The
moving party bears the initial responsibility of demonstrating that there is an absence of a
genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts
are determined by the substantive law in the case. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247

21

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

(1986). All inferences must be made in a light most favorable to the non-moving party, in this case, Plaintiffs. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Defendants' motions raise three key issues: (1) the applicability of Section 2 of the Voting Rights Act to the initiative petition process; (2) the issue of state action; and (3) the question of whether or not the defendants' conduct violated the act by creating unequal access to the political process.  The Court will address these issues first, and will then address additional arguments made by the MCRI defendants.[6]

### 1.  Applicability of Section 2

The state defendants argue that "the initiative petition process does not fall within the scope of the Voting Rights Act because it is too far removed from the act of voting, which is protected by the Act."  State Defendants' Motion at 2.  The MCRI defendants argue that the Act "does not cover the petitioning process at all because that process is not sufficiently tied to the *voting* process."  MCRI Defendants' Br. at 10-11 (emphasis in original).

The defendants base this argument on *Montero v. Meyer*, 861 F.2d 603 (10th Cir. 1988) and *Delgado v. Smith*, 861 F.2d 1489 (11th Cir. 1988).[7]  In *Montero* and Delgado, the Tenth and Eleventh Circuits held that § 4 of the Voting Rights Act, which required states to provide "notices, forms, instructions, assistance, or other materials or information relating to the electoral

---

[6]In addition to these arguments, the MCRI defendants argue that they are entitled to legislative immunity; that Plaintiffs failed to allege fraud with sufficient particularity under Fed. R. Civ. P. 9(b); that their conduct is entitled to absolute First Amendment protection; and that federalism concerns weigh in favor of dismissal.  These arguments are addressed, *infra*.

[7]In their reply brief, the MCRI defendants cite *Hoyle v. Priest*, 59 F. Supp. 2d 827, 834 (W.D. Ark. 1999), where the court held that "Plaintiffs' claims do not implicate the Voting Rights Act because signing an initiative petition is not tantamount to voting in an election.")  *Hoyle* cited *Montero* and *Delgado* in support of its conclusion but did not add any new analysis which would require additional discussion here.

22

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

process, including ballots" in all languages that are the primary language of five percent or more in designated jurisdictions, did not apply to the circulation of initiative petitions because the signing of an initiative petition is not "voting."

The Court finds that *Montero* and *Delgado* are unpersuasive. First, the basis for those decisions, that signing an initiative petition does not involve a choice between two alternatives, is wrong. Signing an initiative petition does involve choice–whether to sign or not to sign the petition. Therefore, the *Montero* and *Delgado* courts erred in holding that the petition process did not implicate voting on that ground. *See In re County of Monterey Initiative Matter*, 427 F. Supp. 2d 958, 963 (citing *Padilla v. Lever*, 429 F. 3d 910, 920-22 (9th Cir. 2005), *reh'g en banc granted by, vacated by* 2006 U.S. App. LEXIS 9877 (9th Cir. Apr. 20, 2006); *opinion withdrawn*, 2006 U.S. App. LEXIS 10589 (9th Cir. Apr. 18, 2006)).

Second, the plain language of § 2 provides that the Act applies to "the political processes *leading to nomination or election*[.]" 42 U.S.C. § 1973(b) (emphasis added). As the Senate Report accompanying the 1982 amendment of Section 2 stated:

> Section 2 remains the major statutory prohibition of all voting rights discrimination. It...prohibits practices which, while episodic and not involving permanent structural barriers, result in the denial of equal access to any phase of the electoral process for minority group members.

S. Rep. No. 417, 97th Cong., 2d Sess. at 207, reprinted in 1982 U.S. Code Cong. & Admin. News 177 (1981).

"The Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race." *Allen v. State Board of Education*, 393 U.S. 544, 565-66 (1969). Therefore, courts must interpret the Act in "a manner that provides the 'broadest possible scope' in combating racial discrimination.'" *Chisom v. Roemer*, 501 U.S. 391, 403 (1991) (quoting *Allen*, 393 U.S. at 567 (1969)).

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

In *Montero*, the Tenth Circuit "liken[ed] the circulation of a petition to the process of nomination" and reasoned that no "voting" under the Act occurs during the nomination process, since "a candidate who is not nominated, and an initiated measure which fails to collect sufficient support, are never voted on by the electorate." *Montero*, 861 F.2d at 607.

At oral argument, counsel for the state defendants argued that the initiative petition process is "in essence, tantamount to a nomination process." The Court agrees, and concludes that the initiative petition process is a "process leading to nomination or election" within the plain language of Section 2.[8]

The argument that Section 2 does not apply to the petition process is also at odds with the Supreme Court's decision in *Smith v. Allwright*, 321 U.S. 649 (1944). In *Smith*, the Supreme Court held that the discriminatory acts of the Texas Democratic Party in conducting is nomination primary constituted state action in violation of the Fifteenth Amendment. Since party primaries had "become a part of the machinery for choosing officials...the same tests to determine the character of discrimination or abridgement should be applied to the primary as are applied to the general election." *Id*. at 664.

In *Armstrong v. Allain*, 893 F.Supp. 1320 (S.D. Miss 1994), the Court held that § 2 applies to issue elections and not just elections for representatives:

---

[8]At oral argument, Counsel for the MCRI defendants argued that the nomination process is distinguishable because candidates who are not nominated are left behind and are not placed on the general ballot. By contrast, the MCRI proposal is the only issue subject to nomination through the petition process, and thus no voters will be denied the opportunity to vote for or against the proposal once it is placed on the ballot. The Court finds that this argument speaks to whether or not the defendants violated the Act, but has no bearing on whether or not the Act applies in the first instance. The statutory history confirms that the Act "prohibits practices which, while episodic and not involving permanent structural barriers, result in the denial of equal access to ***any phase*** of the electoral process for minority group members." S. Rep. No. 417, 97th Cong., 2d Sess. at 207, reprinted in 1982 U.S. Code Cong. & Admin. News 177 (1981) (emphasis added).

24

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

> The conclusion that § 2 coverage is not limited to elections for representatives but encompasses "issue" elections is also suggested by the Attorney General's interpretation of the "virtually companion" § 5. In regulations describing "changes affecting voting" which are subject to the preclearance requirements of § 5, the scope of a "special election" is said to include any "initiative, referendum, or recall election; or a bond issue election. . . ." 28 C.F.R. § 51.17 (1990). Moreover, these regulations interpret the terms "voting qualification, prerequisite to voting, or standard or practice, or procedure with respect to voting" to include matters which "affect[] the necessity of or methods for offering issues and propositions for approval by referendum." 28 C.F.R. § 51.13(j), as well as "the method for determining the outcome of an election (e.g., by requiring a majority vote for election or the use of a designated post or place system," 28 C.F.R. § 51.13(f).

*Armstrong*, 893 F. Supp. at 1323-24 (emphasis added).

In light of the section's broad language, the legislative history, and the broad construction required in light of the statute's remedial purposes, the Court concludes that § 2 applies to the initiative petition process at issue in this case, which is a "practice or procedure" imposed or applied by the state for the purposes of 42 U.S.C. § 1973(a).

### 2. State Action

The state defendants argue that there was "no state involvement during the signature phase, other than perhaps a sample petition form or reviewing the petition to see that it meets the technical requirements established by law." State Defendants' Br. at 4.

The MCRI defendants argue that they were not state actors for Voting Rights Act purposes because initiative petition circulators are not agents of the state. They argue that while the Supreme Court has found state action where political parties acted in accordance with state statutes, the Act does not cover the actions of private initiative petition proponents and circulators.

In *Smith v. Allwright*, *supra*, the Supreme Court held that the discriminatory acts of the Texas Democratic Party in conducting its *nomination* primary constituted state action in

25

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

violation of Section 2  despite the fact that the party itself was a private organization:

> When primaries become a part of the machinery for choosing officials, state and national, as they have here, the same tests to determine the character of discrimination or abridgement should be applied to the primary as are applied to the general election. If the State requires a certain electoral procedure, prescribes a general election ballot made up of party nominees so chosen and limits the choice of the electorate in general elections for state offices, practically speaking, to those whose names appear on such a ballot, it endorses, adopts and enforces the discrimination against Negroes, practiced by a party entrusted by Texas law with the determination of the qualifications of participants in the primary. This is state action within the meaning of the Fifteenth Amendment. *Guinn v. United States*, 238 U.S. 347, 362.

> The United States is a constitutional democracy. Its organic law grants to all citizens a right to participate in the choice of elected officials without restriction by any State because of race. This grant to the people of the opportunity for choice is not to be nullified by a State through casting its electoral process in a form which permits a private organization to practice racial discrimination in the election. Constitutional rights would be of little value if they could be thus indirectly denied.

> The privilege of membership in a party may be, as this Court said in *Grovey v. Townsend*, 295 U.S. 45, 55, no concern of a State. But when, as here, that privilege is also the essential qualification for voting in a primary to select nominees for a general election, the State makes the action of the party the action of the State.

*Smith, supra* at 665.

The state of Michigan has established a statutory system by which constitutional amendments may be proposed for placement on the ballot.  Article XII, Section 2 of the Michigan constitution grants a right for state citizens to propose amendments to the constitution by petition.[9]  This section also provides the basic requirements of each petition, including: form,

---

[9] Article XII, § 2 states:
Amendments may be proposed to this constitution by petition of the registered electors of this state.  Every petition shall include the full text of the proposed amendment, and be signed by registered electors of the state equal in number to at

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

number of signatures, and deadlines.  Michigan election law further restates this provision of the

constitution and delegates the responsibility of reviewing such petitions to the Board of

Canvassers.  MCL 168.471, MCL 168.474.

The Court finds that Plaintiffs have established state action for Section 2 purposes.

Section 2 of the Voting Rights Act imposes an obligation upon the states to ensure that their

voting practices and procedures do not result in racial discrimination.  The fact that the MCRI is

a private organization does not absolve the state defendants from their responsibilities under the

Voting Rights Act.  *See Monterey*, *supra* at 962-63.

The Court also finds that the MCRI defendants acted as part of the state's political

machinery for choosing which issues would be placed on the state's general election ballot.

Under *Smith v. Allwright*, the MCRI cannot use its status as private association to deny that it

engaged in "state action" for the purposes of the Act.  *See also Grovey v. Townsend*, 295 U.S. 45

(1935) (Fifteenth Amendment bans discrimination by a private association that had the power to

affect the choices that Black voters had on the general election ballot); *Terry v. Adams*, 345 U.S

461 (1953) (Court held that the Fifteenth Amendment banned discriminatory action by private

associations which affect the choice of candidates on the state's ballots); *Morse v. Republican

Party of Virginia*, 517 US 186 (1996) (If a private association's decisions affected the choices on

---

least 10 percent of the total vote cast for all candidates for governor at the last
preceding general election at which a governor was elected.  Such petitions shall
be filed with the person authorized by law (meaning the Board of Canvassers, as
provided by MCL 168.474) to receive the same at least 120 days before the
election at which the proposed amendment is to be voted upon.  Any such petition
shall be in the form, and shall be signed and circulated in such manner, as
prescribed by law.  The person authorized by law to receive such petition shall
upon its receipt determine as provided by law, the validity and sufficiency of the
signatures on the petition, and make an official announcement thereof at least 60
days prior to the election at which the proposed amendment is to be voted upon.
Const. 1963, art. XII, § 2.

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

the ballot, the Voting Rights Act prohibited racial discrimination in the conduct of the

association).

### 3.  Violation of Section 2

"To bring a cause of action under section 2 of the Voting Rights Act, plaintiffs must

allege that 'the challenged system or practice, in the context of all the circumstances in the

jurisdiction in question, results in minorities being denied equal access to the political process.'"

*McGee v. City of Warrensville Heights*, 16 F. Supp. 2d 837, 845 (D. Ohio 1998) (Gwyn, J.)

(*citing Nixon v. Kent County, Mich.*, 790 F. Supp. 738, 742 (W.D.Mich. 1992) (Enslen, J.)

(citations omitted).  As the Court stated in *Harris v. Siegelman*, 695 F. Supp. 517 (M.D. Ala.

1988):

> [T]o put it another way, the claim is established, if as a result of the practice,
> minority voters cannot participate in the electoral process on the same terms and
> to the same extent as non-minority voters.

*Id*. at 527.

"Congress amended the Act in 1982 in order to relieve plaintiffs of the burden of proving

discriminatory intent[.]" *Chisom*, 501 U.S. at 403.  "Thus, Congress made clear that a violation

of § 2 could be established by proof of discriminatory results alone."  *Id*. at 405.

The state defendants argue that "as long as Plaintiffs or their members are qualified and

registered electors, they will be free to enter the polls on November 7, 2006, and cast their

ballots in opposition to the MCRI petition."  Br. At 14.  The essence of their argument is that

even if the state somehow sanctioned any fraudulent acts, such acts did not abridge the right of

the Plaintiffs to vote in the election on the proposal.

Similarly, the MCRI defendants argue that "the petition signers can rectify the harm done

to them by voting against the proposition."  MCRI Defendants' Br. at 1.

Defendants cite *Welch v. McKenzie*, 765 F. 2d 1311 (5th Cir. 1985), where the plaintiffs

28

alleged that "irregularities, errors, and fraud in the distribution and counting of absentee ballots, resulting in a narrow victory for the white incumbent, either were racially motivated or had the effect of diluting the votes of Black voters..." *Id*. at 1312.  The Court found numerous violations of Mississippi election law by campaign workers for the plaintiff candidate's opponent, but affirmed the district court's finding that "no evidence that racially discriminatory intent underlay those infractions, or that blacks, as opposed to [the plaintiff candidate's] supporters, suffered dilution of their votes." *Id*.

Defendants are mistaken to the extent that they cite *Welch* in support of an intent requirement under Section 2.  As the *Welch* court recognized,

> Congress, in amending Section 2 in 1982, made it clear that the statute covers episodic practices, as well as structural barriers, that result in discrimination in voting. The relevant inquiry is whether, in the particular situation, the [episodic] practice operated to deny the minority plaintiff an equal opportunity to participate and to elect candidates of their [sic] choice.

*Welch*, 765 F.2d at 1315 (citation omitted).

However, under the Section 2 results test, the *Welch* court found no Voting Rights Act violation because the conduct alleged by the plaintiffs "resulted in the counting of [improper] ballots cast by both black and white voters." *Id*. at 1316.

Plaintiffs argue that the evidence of *racially targeted* fraud set forth in the Civil Right Commission's report distinguishes this case from *Welch*.  Plaintiffs "do not claim that the Voting Rights Act bans every 'dirty trick'–but they do claim that it bans fraud targeted at Black voters for the purpose of securing a place on a state-sponsored ballot."

The Court finds that in this case, as in *Welch*, Plaintiffs have established voter fraud but have not established the inequality of access necessary to establish a violation of the Voting

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

Rights Act.   Three findings of fact support the Court's conclusion that Plaintiff's evidence is insufficient to establish a Section 2 violation.

First, State Director of Elections Thomas testified that even if all of the disputed Black votes were stricken from the petition, there would still be an adequate number of votes to require certification of the petition under state law.

Second, there is no evidence in the record to support Plaintiffs' theory that but for the support of minority voters, a large number of white voters would not have signed the petition.

Third, and most importantly, the evidence in the record, including the Commission's report and the testimony elicited at the evidentiary hearing, showed that the MCRI sought to deceive and in fact deceived both minority and non-minority voters in order to obtain their signatures.  The evidence also showed that several minority and non-minority voters did not fall for MCRI's deception.

The Court will not assume that all minority voters oppose the MCRI's petition.  For example, Professor Allen, who is Black, testified that he supports the MCRI's proposal to prohibit affirmative action and that he signed the petition.

The Court finds it distressing that its finding of a lack of discrimination is based on the fact that minority and non-minority voters had equal access to a deceptive political process. However, the Voting Rights Act is not a general anti-fraud statute.  The Act requires a finding of unequal *access*, which in this case required Plaintiffs to show that minority voters could not participate in the electoral process on the same terms and to the same extent as non-minority voters.  The evidence in this case shows that minority and non-minority voters participated in the initiative petition process on the same terms.  The fact that the terms were fraudulent does not establish a Section 2 violation.

**4.  Legislative Immunity**

30

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

The MCRI defendants argue that they are entitled to absolute legislative immunity. The Court finds that this argument is frivolous because if Plaintiffs could establish a violation of the Voting Rights Act, they would be entitled to prospective injunctive relief as a remedy, regardless of the role played by the MCRI defendants in placing the proposal on the ballot.

### 5. Failure to Plead Fraud With Particularity

The MCRI defendants argue that Plaintiffs' complaint does not allege fraud with sufficient particularity under Fed. R. Civ. P. 9(b). This argument is without merit.

Fraud claims are subject to the pleading requirements of Rule 9(b). In *Bender v. Southland Corp.*, 749 F. 2d 1205, 1216 (6th Cir. 1984), the court described the rule as follows:

> FRCP 9(b) requires that fraud be pleaded with particularity. To satisfy FRCP 9(b), a plaintiff must at a minimum allege the time, place and contents of the misrepresentation(s) upon which he relied.

*Bender*, 749 F. 2d at 1216 (citations omitted).

However, the Sixth Circuit has also held that Rule 9(b) must be balanced with the more liberal policy in favor notice pleading, which is set forth in Rule 8. In *Michaels Bldg. Co. v. Ameritrust Co.*, 848 F. 2d 674 (6th Cir. 1988), the court held that Rule 9(b)

> requires only that the 'circumstances' of the fraud be pled with particularity, not the evidence of the case. While 'circumstances may consist of evidence, the rule does not mandate the presentation of facts and evidence in a complaint.

*Michaels,* 848 F. 2d at 680 n. 9.

The Court finds that Plaintiffs' complaint along with the exhibits submitted in support of their motion for preliminary injunction satisfy the requirements of Rule 9(b).

### 6. First Amendment Concerns

The MCRI defendants argue that Plaintiffs' interpretation of the Voting Rights Act would infringe the defendants' free speech rights under the First Amendment. Conversations between circulators and potential signers are at the "core of our electoral process and of the First

31

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

Amendment Freedoms–an area of public policy where protection of robust discussion is at its zenith." *Meyer v. Grant*, 486 U.S. 414, 425 (1988) (quoting *Grant v. Meyer*, *supra* at 1456-57 (internal citations omitted).

The Court finds that the First Amendment rights of the MCRI and its circulators are entitled to some weight in the preliminary injunction analysis. However, "the First Amendment does not shield fraud." *Illinois ex rel. Madigan v. Telemarketing Associates*, 538 U.S. 600, 612 (2003). Therefore, the Court rejects the MCRI defendants' contention that they are entitled to absolute First Amendment protection and that the complaint should be dismissed on that basis.

### 7.  Federalism Concerns

The MCRI defendants argue that federalism concerns weigh in favor of dismissal. Although states are free to regulate their own internal elections as they see fit, federal law places legitimate constraints on state election regulation. As the Supreme Court noted in *Smith v. Allwright*:

> Texas is free to conduct her elections and limit her electorate as she may deem wise, save only as her action may be affected by the prohibitions of the United States Constitution or in conflict with powers delegated to and exercised by the National Government.

*Smith, supra* at 657.

The Court is reluctant to intervene in the administration of state electoral practices. It is likely that it would not be in a position to intervene had the state of Michigan addressed Plaintiffs' credible allegations of fraud in some meaningful fashion.

Precisely because of the state's indifference to valid allegations of voter fraud, this case has fallen through the cracks and reached federal court. Under the circumstances, federalism concerns do not preclude application of the Voting Rights Act to ensure that Michigan's political processes are administered in compliance with federal law. However, since Plaintiffs' claims

32

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

fail to establish a Voting Rights Act violation, the Court need not further address this argument.

### B.  Plaintiffs' Motion for Preliminary Injunction

"In the exercise of its discretion with respect to a motion for preliminary injunction, a district court must give consideration to four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *ACLU of Kentucky v. McCreary County*, 354 F. 3d 438, 445 (6th Cir. 2003) (citations and quotation omitted).  Fed. R. Civ. P. 52(c) "requires a district court to make specific findings concerning each of these four factors, unless fewer are dispositive of the issue."  *Id*. (citation omitted).

For the reasons set forth above, the Court finds that Plaintiffs do not have a strong likelihood of success on the merits of their Voting Rights Act claim.  Although Plaintiffs have proven that the MCRI committed voter fraud in obtaining signatures in support of the petition, they have not established that such fraud deprived minorities of equal access to the political process.

In addition, the Court notes that voters who were induced by fraud into signing the petition still have an opportunity to participate in the political process by voting against the proposal in the general election.

### IV.  Conclusion

For the foregoing reasons,

IT IS HEREBY ORDERED that Plaintiffs' motion for preliminary injunction is DENIED.

33

*Operation King's Dream, et al. v. Connerly, et al.*
Case No. 06-12773

IT IS FURTHER ORDERED that the state defendants' motion to dismiss is GRANTED.

IT IS FURTHER ORDERED that the MCRI defendants' motion to dismiss is

GRANTED.

SO ORDERED.


s/Arthur J. Tarnow
Arthur J. Tarnow
United States District Judge

Dated:  August 29, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on
August 29, 2006, by electronic and/or ordinary mail.

s/Theresa E. Taylor
Case Manager